NO. 13-212

FILED IN
4th COURT OF APPEALS
SAN ANTONIO, TEXAS
09/11/15 11:24:40 AM
KEITH E. HOTTLE
Clerk

ROBERTSON ELECTRIC, INC.      )      IN THE DISTRICT COURT
                              )
                              )
VS.                           )      216TH JUDICIAL DISTRICT
                              )
                              )
SELECT BUILDING SYSTEMS,      )
INC., TRI-BAR RANCH, LTD.     )
AND G&R LAND COMPANY, INC.    )      KENDALL COUNTY, TEXAS

------------------------------------------------------------

REPORTER'S RECORD
VOLUME 4 OF 5

------------------------------------------------------------

On the 18th day of March 2015, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Bill Palmer, Judge presiding, held in Boerne, Kendall County, Texas.

Proceedings reported by machine stenographic method.

A P P E A R A N C E S:


MR. JIMMIE L.J. BROWN, JR.
Attorney at Law
3102 Cherry Creek Drive
Missouri City, Texas   77459
Phone: (713) 419-1021
ATTORNEY FOR ROBERTSON ELECTRIC


        - AND -


MR. TOM C. CLARK
DEALEY, ZIMMERMANN, CLARK, MALOUF & BLEND
Attorneys at Law
3131 Turtle Creek Blvd., Suite 1201
Dallas, Texas   75219
Phone: (214) 559-4400
ATTORNEY FOR SELECT BUILDING SYSTEMS


        - AND -


MR. JOHN W. SLATES
MS. COLBIE BRAZELL
SLATES HARWELL
Attorneys at Law
1700 Pacific, Suite 3800
Dallas, Texas   75201
Phone: (469) 317-1000
ATTORNEYS FOR THE TRI-BAR RANCH COMPANY


        - AND -


MR. FRED R. JONES
GOODE, CASSEB, JONES, RIKLIN, CHOATE & WATSON
Attorneys at Law
2122 N. Main Avenue
San Antonio, Texas   78212
Phone:  (210) 733-6030
ATTORNEY FOR TRI-BAR RANCH COMPANY

INDEX

VOLUME 3 OF 3
(MARCH 18, 2015)

PAGE

WITNESSES:

DAVE MORGAN
Direct Examination by Mr. Clark ...        6
Cross-Examination by Mr. Brown ....       42
Cross-Examination by Mr. Slates ...       46
Redirect Examination by Mr. Clark .       92

STEVE SCHIFFMAN
Direct Examination by Mr. Cluck ...       96
Cross-Examination by Mr. Slates ...      149
Redirect Examination by Mr. Cluck .      165
Recross-Examination by Mr. Slates .      171

VICTOR de ANDA
Direct Examination by Ms. Brazell .      172
Cross-Examination by Mr. Clark ....      186
Redirect Examination by Mr. Brown .      188

JENNIFER SWISHER
Direct Examination by Mr. Slates ..      190
Cross-Examination by Mr. Brown ....      194
Cross-Examination by Mr. Cluck ....      195

DANIEL BODDIE
Direct Examination by Mr. Slates ..      197
Cross-Examination by Mr. Brown ....      272
Cross-Examination by Mr. Clark ....      296
Redirect Examination by Mr. Slates.      306

STEVEN MOWRER
Direct Examination by Mr. Jones ...      311
Cross-Examination by Mr. Cluck ....      325
Cross-Examination by Mr. Brown ....      334
Redirect Examination by Mr. Jones .      335

CLOSING ARGUMENTS:
MR. BROWN ........................      337
MR. CLARK ........................      355
MR. SLATES .......................      371
MR. BROWN ........................      386

COURT REPORTER'S CERTIFICATE ..............      390

P R O C E E D I N G S

THE COURT:  Y'all have a seat, please. Mr. Cluck, are you ready to go?

MR. CLUCK:  Yes, Your Honor.  Subject to calling Mr. Schiffman as a rebuttal witness and supplying our attorney's fees, we rest.

THE COURT:  You're a Defendant; right?

MR. CLUCK:  Yes, sir.

THE COURT:  Think about the rebuttal part.  Okay.

MR. CLUCK:  Well, okay.  I mean, we're going to call Mr. Schiffman as a -- as a rebuttal witness.

THE COURT:  Think about what you just said.  Okay.

MR. CLUCK:  Okay.

THE COURT:  Because you're a Defendant. Defendant doesn't have a right to rebuttal.  Do you want to think about this?

MR. CLUCK:  Your Honor, I mean, we're going to call him in response to the testimony from Mr. Boddie.

THE COURT:  Okay.  We'll see what they do.  Who's next?

MR. SLATES: Is Mr. Schiffman here?

MR. CLUCK: No.

MR. SLATES: Okay. At this time, Your Honor, we will call Jennifer Swisher.

THE COURT: Okay.

MR. CLARK: Your Honor, before we have this witness, can we get a clarification just before the witness comes up? Because we were talking about what we thought we heard the other day and --

THE COURT: Well, when I first talked about it, I thought you were part of the Plaintiffs when we were talking about that. Remember when I made the mistake about letting you do redirect?

MR. CLARK: Yes, Your Honor.

THE COURT: You're a Defendant. The Plaintiff comes back -- has the right to rebut what the Defendants put on; you and them.

MR. CLARK: Well, our Plaintiff is against Tri-Bar. We have a claim against Tri-Bar.

THE COURT: Okay. I hear what you're saying, but let's see what they do.

MR. CLARK: Okay.

THE COURT: I think you might have a problem. Up here, ma'am.

MR. CLARK: Your Honor, in that case, we

would -- if we may, we'd rather -- we misunderstood that, then we do have a witness to call.

THE COURT: Okay. You've got to go outside again. At least you know your way now. Call your witness before you rest.

MR. CLARK: It's going to be Dave Morgan. He'll be on his way up.

(Discussion off the record.)

THE COURT: Up here, Mr. Morgan. Around there, sir, please. Raise your right hand.

(At this time the

witness was sworn in.)

THE COURT: Have a seat, sir. Go ahead, Mr. Clark.

*DAVE MORGAN,*

having been first duly sworn, testified as follows:

*DIRECT EXAMINATION*

*BY MR. CLARK:*

Q. Mr. Morgan, where are you from?

A. Where am I from? Born in New Orleans, Louisiana.

Q. And what's your background?

A. I went to college at Louisiana State University in New Orleans; graduated from there.

Q. In what year?

A.   1974.

Q.   And how were you employed between '74 and '94, the first 20 years?

A.   I was with Arthur Young & Company, which I think is now Ernst & Young, one of the CPA firms for about seven years or so.  I was with Newpark Resources, which was a publicly held oil and gas company that was in New Orleans at that time.  Then I was at an advertising agency in New Orleans until I moved to San Antonio.

Q.   And what year did you move to San Antonio?

A.   In '94.

Q.   And what did -- type of job did you get? What did you do when you came to San Antonio?

A.   I originally was working for a company called Morgan Construction with my now business partner, Steve Schiffman.

Q.   And in July of 1995, what did you and Mr. Schiffman do?

A.   We formed Select Building Systems, Inc., or SBS as we refer to it as.

Q.   And who are the two owners of SBS?

A.   Myself and Mr. Schiffman.

Q.   Is that the way it's always been since 1995?

A.   Yes.  We do have -- I think we have two or

three minority owners; a couple percentage points, but he and I own primarily the entire company.

Q. And so, what does Select Building Systems do?

A. We're a general contractor. We do design build work, development work. And all of our work is commercial. We don't do any residential work.

Q. Okay. And what is your title at Select Building Systems?

A. I'm executive vice president.

Q. So, what is Mr. Schiffman's title?

A. He's president.

Q. So, tell me who runs what.

A. Mr. Schiffman's background is in construction. He's been -- he started as a carpenter and kind of worked his way up. And he's been in both residential and commercial since he was about 18 or 19 years old. So, he's primarily responsible for the field operations; the construction aspects of the business. He also works with -- in our client development area. And then I basically run the business side of the business.

Q. Okay. Business side, what are you talking about?

A. I am the, you know, kind of human resources,

finances, banking, contracting, and things of that nature.

Q. So, John Maywald, who testified the other day, works for you?

A. John Maywald works for me.

Q. Okay. Let's talk about SBS for a minute. Does SBS -- you said it does commercial construction. Does it have any niche or specialty?

A. We have been for about 15 years now involved in the self-storage industry. It's a -- a lot of people are familiar with the multistory climate controlled storage facilities. That is one of our main areas of operations, although we do other things within commercial construction.

Q. And are the -- the public storage buildings you're talking about, what kind of construction are those?

A. The primary component of most of those are metal buildings.

Q. And how many metal buildings has SBS built quantity, volume-wise, however you can distinguish it, over the last 20 years -- or 15 years?

A. I think through now, about 120 plus thereabouts.

Q. Buildings?

A.   Yes.  Buildings, probably 12 million square feet.

Q.   Of metal buildings?

A.   Yeah.

Q.   Are you familiar -- were you involved in the hangar project at all?

A.   I was primarily involved in the original negotiations of the contract, working with -- I think it was Neena Singh, who was one of the in-house attorneys for Lewis Energy.

Q.   Okay.  And then, did you actually go out and do any of the construction?

A.   No.

Q.   Did you have oversight over the invoices and bills and stuff that was being paid as part of the project?

A.   My accounting department, under Mr. Maywald's guidance, would -- that's their responsibility.  I would review the monthly applications for payment and then I would be the one who would normally sign them.

Q.   Okay.  If you would, let's look at Exhibit Number 7.  I believe it's in the books right in front of you.  It's SBS Number 7.

THE COURT:  Mr. Clark, before we get started, I think that divorce just came in.  Let me do

that quick.

MR. CLARK:  Oh, yes, sir.

(Discussion off the record.)

THE COURT:  Okay, Mr. Clark.  Sorry.

Q.  *(BY MR. CLARK)*  All right, Mr. Morgan.  What is Defendant's Exhibit Number 7?

A.  It appears to be a recap of the monthly draws that were submitted on this project.

Q.  And is that one of the SBS accounting documents?

A.  Yes.

Q.  Let's look at how we -- can you tell us -- go through -- let's just start with the very first entry on there, the Ace Concrete, and tell us, in looking at those columns, what the first column means that's highlighted at the top.

A.  Well, it appears that one of the -- across the top it's the monthly draws, the dates for July, August, September through the last one; draw number 1 through draw number 9.

Q.  Okay.  And if you go straight down the column, what are the boxes down at the very bottom?

A.  The box at the bottom is the payments that were received, the dates that they were received, and the check number that was on each check that came from

this particular owner.

Q. Okay. So, if we look at -- on Exhibit Number 7, if we look at Ace Concrete, look in that very first column, the vertical column, the first draw was what date?

A. It was on the July draw.

Q. July 31st?

A. July 31st.

Q. And when was that draw paid?

A. September the 6th.

Q. Okay. And so, that would have -- that draw would have included all the entries that are in that first column; right?

A. Yes.

Q. Okay. And then on draw number 2, there's another entry for Ace Concrete that's $99,000.00. And when was that draw request?

A. The draw request is the end of the month, August 31st, and it was paid on October 22nd.

Q. Okay. And how late was that payment, assuming 30 days?

A. It would have been due at the end of September, so 22 days.

Q. And then draw number 3 is dated what date?

A. September 30th.

Q.   And it includes how much for concrete?

A.   16,000.

Q.   And when was it paid?

A.   January 17th.

Q.   Were you made aware at any point between September 30th and January 17th that there was a problem getting that invoice paid for Ace Concrete?

A.   No.  We had not gotten paid.

Q.   Right.  And therefore, you hadn't paid Ace Concrete; right?

A.   No, we had not.

Q.   If you would, turn back to Exhibit Number 1. What is that document?

A.   That is a standard AIA change order form.

Q.   And is that your signature on Exhibit Number 1?

A.   Yes, it is.

Q.   And this was submitted July 10th of 2012; right?

A.   Yes, sir.

Q.   Were you promised that it would be signed?

A.   It was my understanding that it would be signed and returned to us.  Yes.

Q.   Was it ever signed?

A.   No.

Q. Okay. And we were sitting in court the other day -- yesterday and the question came out, is Tri-Bar seeking to avoid the change order because it wasn't signed; and the answer was no. Was that the first time you'd ever heard that?

A. Yes, sir.

Q. Was it your understanding up until yesterday that Tri-Bar was saying that the change order was unsigned and we're not paying for it?

A. I had never received a return executed change order by Tri-Bar.

Q. Okay. And if you would, look at -- and did that raise a concern for you?

A. Of course.

Q. Why?

A. You would expect that if you submitted a change order for work that had been discussed, the architect signed it, that the owner would be signing it as well and returning it.

Q. What would be a reason that the owner wouldn't sign it?

A. We were told that there was no problem with it and it would be signed. And at times I was told that it had been signed, and had never been given a reason why it was not signed.

Q. And so, what did you do to try to get it?

A. We -- we would take various steps. I mean, normally, you have a project manager, so he would be inquiring with his contact. And I would be getting feedback from those conversations.

Q. And so, for example, a standard practice might be, with respect to those weekly or daily job logs on issues -- you saw those when we were talking on Monday. The issues noted on there, change order number 1, change order number 2 not signed.

A. It would be reflected on a daily report or if there were meetings between SBS and representatives with the owner or architects, engineers, whoever; it may be reflected in notes of that nature. Maybe e-mails that would go back and forth when people were trying to update information.

Q. And did you -- did you request any -- what did you do when -- how long did it take you before you decided that the little subtle hints weren't -- weren't working?

A. It would be hard to say an exact date. I mean, what I would normally do is, we have a relationship with a new client here. So, you're trying to get a feel for everyone -- different procedures. Every client we work with is a little bit

different.  We have clients that pay in five and ten days, and we have clients that pay in 30 and 35 days.  It kind of depends on their internal procedure.  So, we would normally work through what I would call just polite channels of having various people talk to our contacts.  And then eventually, if it works up the line and it gets to my desk, then I will get in contact with the people that I knew worked with our respective clients.

Q.   Okay.  Let me help you out with the timeline then.  Look at Exhibit Number 4.  And this is an e-mail from John Maywald to Tom Pittman, but it copies you, Steve Schiffman, and Jack Green.  And John Maywald works directly for you; right?

A.   Yes, sir.

Q.   And was this Exhibit Number 4 sent at your direction?

A.   Yes.

Q.   Why did you have John Maywald send this?

A.    I mean, at first, it would be kind of a normal course where we have the accounting people call.  And since he's our leader of our accounting group, say, hey, can you help me out here and can you give me some updated information; following up on outstanding draws, change orders, or any other

accounting or business related documents that we needed.

Q. And change orders still didn't come in and the payments still weren't made; right?

A. No, sir. The change orders did not come in executed.

Q. Okay. Look at Exhibit Number 5.

A. (Witness complying.)

Q. And I'll get you to look at the e-mail that starts at the bottom of the page and goes to page number 2. This is an e-mail directly from you; right?

A. Yes.

Q. Okay. And it begins with, "Appreciate the opportunity to meet on Monday." I'm just trying to give you a context of time. Was there a meeting that you had with Mr. Pittman?

A. Yes.

Q. Can you describe how that meeting came about or why the meeting came about and how?

A. I had been having conversations with Mr. Pittman, if I refer to him as Tom, along the way just normal course of business following up on things.

Q. Is this on the phone?

A. Yes.

Q. Okay.

A. Phone conversations. We decided after a period of time that it was best to get together on a -- try to get together on a regular basis. So, we had started having some meetings over at Glacier Cap's office with representatives of SBS, Mr. Pittman, there was normally a representative from Mr. Grable's office, either John Grable or Matt Martinez, who would be present.

Q. And if you would, look at the second page where it says, "Thanks for your efforts." See that part at the top of the page? "Thanks for your efforts to get the checks and change orders in time for the meeting." But he didn't have the checks by January 9th, did he?

A. No. He said he was going to have them.

Q. Okay. And then you asked a question, "Would it be beneficial for me to contact anyone in your organization to see what is holding up payment and processing of the documents?" Why were you putting that in an e-mail?

A. Because I was trying to bring a higher level of concern to the situation. And our relationship with many of our clients oftentimes the -- what I would refer to as the construction guys; the owner's construction manager, our project manager -- at a

point in time like the -- if they can't resolve business matters, just get them out from the middle. I'll get in it from SBS's side and try to find out who my counterpart is in the other organization and we can work together to try to resolve the issues. So, I was trying to go, in essence, above Mr. Pittman and find out who else I could work with and get him out of the middle.

Q. Did you succeed in that?

A. No.

Q. Let's go back to Exhibit Number 7. Do you recognize the amount in the bottom right-hand corner as the same amount that's on your mechanics lien; right?

A. 426,560.88. Yeah.

Q. Okay. The payments that are -- the numbers that are referenced on Exhibit Number 7, what are those?

A. What are these numbers?

Q. Yeah. What are they? Are those numbers that you just -- are those payments that you made for invoices or for work that was performed?

A. Exhibit Number 7 is a recap?

Q. Yes.

A. Of these payments?

Q.   Yes.

A.   This is really more of a receivable -- accounts receivable recap.

Q.   You're right.  I'm sorry.  This is work that's been performed for which you're owed money?

A.   Correct.

Q.   Okay.  So, what are each of those numbers and what do they represent?

A.   Well, if we go through the -- there's two main categories; subcontractor/supplier.  SBS subcontractor/supplier would be amounts that we have that would be distributed to the various parties that were providing services or materials.  And then the bottom part of it are items that would have gone through the general contractor that we would have paid for for items that were part of our overall contract on the project.

Q.   All right.  So, this shows the total amount that's been billed and the total amount that's been paid and what's left outstanding; right?

A.   Correct.

Q.   And this is a cost plus contract?

A.   Yes.

Q.   So, what's on Exhibit Number 7 are the costs of SBS; right?

A.   Only costs.

Q.   Okay.  Well, with the payment records at the bottom; right?

A.   Yes.  But I mean, what makes -- what generates the accounting is the cost.  That's what goes into the billing.

Q.   Okay.  Shortly after -- I guess less than a month after you had that meeting with Mr. Pittman, you know that SBS was terminated; right?

A.   Yes.

Q.   Had you received any type of notification or warning from the ops department that that might be happening?

A.   No.

Q.   Had you received any inkling from your meeting with Mr. Pittman that that might be happening?

A.   No.

Q.   In the meeting that you had with Mr. Pittman in January, was there any mention of any failure to properly man the project or any complaint about time or delays or any complaint -- any complaint at all that would lead you to believe that you were headed down the road towards termination?

A.   The meetings that I was personally involved in, which I think was two of them, it was all the

parties getting together and discussing the job and just what I would refer to as construction related matters that -- we'd work back and forth and come up with suggestions to go back to work the next day.

Q. Okay. And that -- so, how many meetings -- were both of those meetings in January?

A. I do not recall, but I remember going to two of those meetings.

Q. Okay. And you know that -- and you were not at the meeting where SBS was terminated, were you?

A. No, I was not.

Q. Who was at that meeting; do you remember?

A. From SBS; that was Steve Schiffman, Jack Green, and Kyle Kieke, I think, were there representing us that week.

Q. Okay. If you would, look at -- and you were informed right after the meeting that the termination had occurred; right?

A. Mr. Schiffman called me once the meeting was over.

Q. Okay. If you would, turn to Exhibit Number 11.

A. (Witness complying.)

Q. Okay. What is Exhibit Number 11?

A. It was an e-mail transmitting a letter from

23

me to Tom Pittman.

Q. And let's start with the e-mail. "Tom, please note the attached letter." And then it's from you directly to Tom Pittman and it says what?

A. "Tom, please note the attached letter. Please let me know if there's anything we can do during this transition. Thanks for your assistance. Dave."

Q. At any point in time, did Mr. Pittman call you or e-mail you or write a letter to you between February 5th and now?

A. Not that I recall.

Q. Let's look at the letter. If you would, let's read the first part of it. It says, "Steve and Jack informed me of the decision that was made."

A. "Steve and Jack informed me last evening that the decision made by you and your representatives at Tri-Bar Ranch Company, Limited to complete the remaining scope of work at the Uvalde hangar site utilizing internal management personnel. We are in the process of notifying each of the vendors, suppliers, and subcontractors of your decision. We will issue each of them a notice to cease all work effective today, February 6th, 2013."

Q. Okay. And I notice you didn't use the word

fired or terminated or anything like that.

A.   No, sir.

Q.   Was it your understanding that they were simply electing to finish it in-house?

A.   What I was told by Mr. Schiffman is that they decided to make a change.  And we were asked to cooperate as much as we could, and we said we would cooperate.

Q.   Okay.  So, what did you request each of the subcontractors to do?  Read the next paragraph.

A.   The next paragraph; you want me to read that, sir?

Q.   Yes.

A.   "We will request each of them to submit a status report to Jack at the close of business today.  And that they will coordinate transfer of any materials to you through an on-site verification process with Kyle.  We will also request that a final accounting of all costs incurred to date for each vendor, supplier, and subcontractor be submitted to our office as of the close of business this Friday."

Q.   Hold on.  Let me stop you there.  Did you get it done by Friday?

A.   I don't think we heard back from all of the subs.  It was a very short time frame to ask them -- I

don't remember what day of the week February 6th was, but I think it was a Tuesday or Wednesday. And we were originally asked to get everything done by Friday. So, by the time we notified all the various subcontractors, some of them immediately got us information and some of them, I think, took until the next week.

Q. Okay. And then you agreed -- just to short circuit things, you agreed to prepare the final invoices and submit the list of vendors, suppliers, and subcontractors; correct?

A. We agreed to do everything we were asked to do that was relayed to me from that meeting.

Q. And did you -- you got the list of subcontractors with names, addresses, and phone numbers, and contact information in a packet?

A. Yes.

Q. Was there originally some confusion about who the packet was sent to?

A. My understanding is that we gave -- I think John Maywald, after it was completed, gave the package to Jack Green, who said that he would deliver it over to Grable's office. And I think he gave it to Matt Martinez. And I think there's subsequently some confusion that it was -- it was at Mr. Grable's

office, but maybe he had not personally seen it as of a certain time.

Q. And let me ask you then. If you would, look at Exhibit Number 12.

A. (Witness complying.)

Q. And this is a transmittal on February 15th. Was this something that was -- although it's got Mr. Schiffman's signature on it, is this something that you helped prepare?

A. Mr. Schiffman and I, at this point, were -- we were business partners of a company. So, we were working together on trying to wrap up this project.

Q. And some of the documents that are attached are documents from you and your department; right?

A. Excuse me?

Q. Some of the documents that are attached are from you and your department; right?

A. Let me look at them. Yes, sir.

Q. Okay. So, looking at the third page -- the second page behind the letter. Isn't that the list of contractors with all of their -- subcontractors with all of their contact information?

A. The third page. Yes, sir.

Q. Okay. With the phone numbers and who to contact at the company and the whole works; right?

A. Yes.

Q. Okay. At this point in time -- and attached to that are the two draw requests that Mr. Cluck went over with Mr. Maywald; right?

A. Yes.

Q. One is for the remainder of work that had been executed to date, and the other is for a retainage; right?

A. Correct.

Q. Okay. As of the 15th, had you provided all the information that you thought you were supposed to provide as had been requested?

A. To my knowledge, yes.

Q. Okay. After February 15th, did you make any phone calls to Mr. Pittman to find out about -- well, what was your understanding about why you were getting all these payment invoices over there to them?

A. It was my understanding that Mr. Pittman had represented in that particular meeting that if we all cooperated in this matter, we could close this up as quickly and amicably as possible. So, my objective at this time is to get payments for our subcontractors.

Q. Okay. And so, did you call Mr. Pittman to see why it was now two weeks, three weeks after and you hadn't heard anything?

A.   I made a couple of phone calls to Mr. Pittman.  Yes.

Q.   Did he ever answer any of your phone calls?

A.   No, sir.

Q.   Did he ever return any of your phone calls?

A.   No, sir.

Q.   All right.  If you would, look at Exhibit Number 14.

A.   (Witness complying.)

Q.   And do you recall receiving this letter from Mr. Grable?

A.   I recall getting a copy of it.  I didn't -- I don't think I personally received it from Mr. Grable.

Q.   Okay.  And you see the very first paragraph has to do with some administrative stuff; right?

A.   Yes.

Q.   Stuff that Mr. Grable thought he hadn't received?

A.   I have to read it real quick.

Q.   Particularly the last sentence.

A.   "We did receive your final draw application number 7 on February 6th, 2013.  And I assumed that the critical project contacts and suppliers list would be forthcoming the following week, but to date, we have not received this list that all parties agreed

to."

Q. And that's the list that we just looked at that was provided two weeks before that; right?

A. I'd have to look at the date, but I know it was provided before this letter was issued by Mr. Grable.

Q. Okay. Another miscommunication; right?

A. Yeah.

Q. Okay. If you would, skip the second paragraph and just go down to where it says, "Jack, you may not be aware, but we have discovered several defects in work delivered by SBS. Glacier Cap has hired an independent consultant to test and review all as-built conditions. This effort continues and is still underway to complete a detailed list that outlines these defects and how they will be resolved." Did you ever see a list of defects?

A. Nothing was ever delivered to me.

Q. Did SBS ever receive one?

A. Not to my knowledge.

Q. "Today it was determined that the building is a minimum of 2 inches out of plumb towards the west and that a number of the double-lock seam roof panels are not contiguous as specified." Have you ever seen any measurements of the building provided by Mr.

Grable that would show any -- anything that shows that the building is somehow out of plumb?

A. Nothing to me.

Q. Any -- any photograph of a laser shot -- how easy is it to -- to document that a building is out of plumb?

A. I'm not a construction person, but I've been out to our project sites and the guys that work in the erection of metal buildings usually all have 4 and 6 foot long levels that are used throughout the process, for beams and columns and things of that nature to check that they're level as they progress along. So, it's not -- not that hard from what I would know.

Q. And it would be fairly easy to document, wouldn't it?

A. Yes, it would.

Q. And have you ever seen any documentation that shows that the building is out of plumb?

A. I have not.

Q. Okay. Do you know if -- has any been provided to SBS?

A. Not that I'm aware of.

Q. Okay. And the rest of that stuff has to do with construction stuff, and you're not a construction guy; right?

A.  No, I'm not.

Q.  All right.  In Exhibit Number 14, does Mr. Grable complain about any issues that have been found at this point with any of the electrical components?

A.  Can I read the letter real quickly?

Q.  Sure.

A.  (Witness complying.)  I don't see anything referencing electrical work in this letter.

Q.  Mr. Robertson had been terminated from the project a month before this, January 23rd; right?

A.  Yes.

Q.  And he was terminated at the express request of Tri-Bar; right?

A.  Yes.

Q.  And you know, that issue was discussed at the office, wasn't it?

A.  Yes.  As soon as Mr. Schiffman received the phone call from Mr. Pittman -- well, I don't remember if it was Jack may have received the first indication and it was discussed with Mr. Schiffman.  And then Steve and I discussed the matter once he received word of it.

Q.  Okay.  You knew that it was going -- that you had a contract with Mr. Robertson; right -- SBS did?

A.  Yes.

Q. And you knew that you were going to be breaking that contract; right?

A. We had been told to break that contract.

Q. Right. And why didn't you just stand up for Mr. Robertson at that point and say, no, we won't do it? What would have happened to SBS?

A. It was -- it was a very awkward moment, to say the least, when you have a client call and tell you to terminate a sub. It's not something that we had encountered. We discussed it internally. And I think the approach that -- that Steve took with Mr. Schiffman was to call Jerrod and to discuss with him what was going on and to hopefully try to come up with an amicable solution to a difficult situation.

Q. Okay. Did you have other suppliers and vendors that needed to be paid as well?

A. Oh, yes.

Q. And you knew that Mr. Robertson needed to be paid 50-something thousand dollars; right?

A. Of course.

Q. If you had said, no, we're not going to do it and SBS had been terminated from the project at that point, would anybody have gotten paid?

A. No. I think at that moment, after the termination, you're kind of in a situation where

you're business owners, and someone owes you a substantial amount of money and you either decide that you're going to draw a line in the sand or get into a fight or are you going to try to work through it. Our objective was to work through it to get money to make sure all subs were paid.

Q. And at that point had you had any indication that Mr. Robertson was being terminated by Tri-Bar for quality reasons or anything to do with their work?

A. I did not.

Q. Okay. So, did you have any reason to believe that you were not going to receive the $54,000.00 for Mr. Robertson?

A. I did not.

Q. So, in other words, by staying on the job, you felt like maybe you could get the $54,000.00 from Tri-Bar the next draw, pay Mr. Robertson, and at least you've --

A. Better for the whole to work through a situation than to try to -- to take a stand on one issue.

Q. Okay. And you're familiar with your contract with Mr. Robertson, aren't you?

A. Yes.

Q. It's got the pay when paid clause?

A.   Yes.

Q.   So, you know that you pay Robertson when you get paid by the -- by the owner?

A.   Yes, sir.

Q.   If you would, we're going to look briefly at Exhibit 16.  This was going to be the next communication that anybody at SBS received from Tri-Bar; is that right?

A.   I think so.

Q.   And this is a letter that talks about the --

A.   May I correct something?

Q.   Yes.

A.   I don't think we received communication from Tri-Bar.  I think we were getting letters from Mr. Grable.

Q.   You're right.  You got nothing from Tri-Bar; right?  I got it.  And this complaint -- it doesn't answer any of -- it doesn't answer any of your inquiries, does it?

A.   No, sir.

Q.   This letter simply just brings up one other issue; right?

A.   The first paragraph seems to address what appears to be another concern that's being placed on the table.

Q.   Okay.  If you would, look briefly at Exhibit 17.

A.   (Witness complying.)

Q.   This is a letter from Mr. Schiffman.  Did Mr. Schiffman write this e-mail by himself?

A.   He and I worked on it together, along with Mr. Green, as I recall.

Q.   Okay.  So, this is a collaborative effort of everybody?

A.   Yes.

Q.   But as far as the construction issues that are in there, those are the issues that probably Mr. Schiffman should address?

A.   Yes, sir.

Q.   Okay.  Then if you would, turn to Exhibit 19.

A.   (Witness complying.)

Q.   And did you receive a copy of this e-mail eventually?

A.   Mr. Schiffman reviewed this with me right after he had received it from Mr. Pittman.

Q.   And what it says is, "Don't call us; call our attorney"?

A.   That's correct.

Q.   And I'm paraphrasing because we're trying to move along.  And so, who got assigned to call the

attorney?

A. Me.

Q. And so, you were able to locate Mr. Trevino's number?

A. Yes.

Q. And tell us about the -- tell us about how the sequence of conversations went with Mr. Trevino.

A. I think I called him; left a message. I called him a second time; left a message. I think he called me back. We had a brief conversation. Basically --

Q. Tell us about the conversation.

A. Basically, from my perspective, you know --

Q. I tell you what. Look at Exhibit 21, and I'll ask you if that references your conversation.

A. Okay.

Q. You can read it.

A. "Just received a call back from Tony Trevino, in-house counsel of Lewis Energy Group. He was returning my calls from last week and this morning. He was pleasant and nice. Said that he had not yet had an opportunity to thoroughly review the matter and to meet with Tom. Said that he would focus on this matter and committed to call me back on Wednesday. I will follow up if I don't hear from him."

Q.   Did you hear from Mr. Trevino on Wednesday?

A.   No, I did not.

Q.   Did you follow up with him?

A.   Yes, I did.

Q.   Did he ever call you back?

A.   He called me back and left a message -- voice message.  And then I called him back several times after that and I did not have any more correspondence or communication with him.

Q.   The voicemail that he left you, was it substantive or was it just --

A.   No.  It was just, sorry I haven't gotten all the information I need yet, or something to thereabouts.  I'll be getting back with you.

Q.   Okay.

A.   I took it as a don't call me; I'll call you.

Q.   So, another two weeks pass.  It's coming up on April 15th.  And so, did you -- were you forced to get me involved in the situation somewhere in this time period?

A.   Yes.

Q.   And if you look at Exhibit Number 22, did you retain me to go ahead and file an Affidavit Claiming Statutory and Constitutional Mechanic's and Material Man's Lien?

A.   Yes.

Q.   And is Exhibit Number 22 that mechanic's and material man's lien?

A.   Affidavit Claiming Statutory and Constitutional Mechanic's and Material Man's Lien.

Q.   And the amount that's claimed in there, the $426,560.88; that's the same amount that we saw in Exhibit Number 7; correct?

A.   Yes, sir.

Q.   Okay.  And what was the -- when you -- you helped me review the documents that we received in discovery; correct --

A.   Yes.

Q.   -- as they came in over the summer after the lawsuit was filed.  What was the one thing that you kept asking me; where are these documents?  What was it?

A.   Where were the documents?

Q.   What document were you looking -- documents were you looking for specifically?

A.   I was looking -- well, exactly what you're referring to.  But I was looking for documents on purported payments that were made to subcontractors, for other liens that may have been filed.  There was a variety of information that I was looking at from a

business perspective.

Q. But on the -- you were still working with people in the industry; correct, like Schulte and whatnot?

A. Oh, yes.

Q. And you knew that several liens had either been filed or threatened to be filed; right?

A. Our relationship with some of our recurring vendors and suppliers -- they had informed me that they were filing liens.

Q. And did you try to find out from them if Tri-Bar was going behind you and paying off those liens?

A. I think I received the first phone call from one of our regular suppliers who told me that he had been paid. We knew nothing about that. And as a result of that, I think I inquired with some other of our regular subcontractors to see what was going on. Some of them said either we got paid or we're working on it. Some of them said, I'm sorry; I've got some kind of a confidentiality agreement, I can't discuss anything with you. I did not see any of those agreements. I don't know what existed. That's what I was told.

Q. Okay. And if you'd been -- I mean, how long

did it take before you finally saw all of the -- the checks or the payments?

A. All of them?

Q. Yeah, all of them. About two months ago?

A. I was about to say, in the last couple of months before all the documents came through. We had been given various indications that different people had been paid, but never got lists, never got final amounts. I mean, to this day, we have the information provided through discovery.

Q. And that was provided just recently?

A. Yes.

Q. Even though it was the first thing we asked for?

A. I think that's why the -- 426 was always the number we were working with because it wasn't until later on that we started finding out that there was some payments made that we could actually verify.

Q. Yeah. Confirming that payments had been made. We suspected it, but couldn't confirm it.

A. Yeah.

Q. Okay. So, the implication that was made to John Maywald the other day that SBS hasn't gone back and amended this lien affidavit.

A. We didn't have that information until the

last couple of months.

Q. Right. And nobody has asked you to amend that lien amount to do something, have they?

A. No. No one has asked me.

Q. Okay. Knowing that some of the subcontractors have now been paid, if somebody did ask you to reduce the lien amount, you wouldn't have any problem signing a lien affidavit, would you?

A. I'd have no problem. I'd call my attorney.

Q. In general, what was SBS's experience in working with Mr. Pittman and Mr. Grable?

A. My personal experience in working with them?

Q. Yes.

A. I admit I had meetings with Tom on a few occasions. We had phone calls on a couple of occasions. I guess I can only look back and say, he always seemed to say, we're going to do this. We'll help you with that. We'll get this done. And then for various reasons that I don't know, the things that he and I were working on did not seem to ever get accomplished; whether it was checks, change orders, things of that nature. I didn't have as much contact with Mr. Grable other than being in meetings that he was present at.

Q. Okay.

A. And in those meetings, he was more the -- you know, the architect who was focusing on designs and things of that nature and aesthetics than anything else.

Q. Okay. But suffice it to say that this was an odd working relationship; right?

A. Oh, very -- very different from our typical client relationships. I mean, I'm involved in just the business relationship with our clients and -- you know. There appeared on this one, from my perspective looking into the operation side, more issues with communication, more issues with changes, more issues with redesigns, things of that nature than I had encountered on other projects.

Q. In 20 years of working with SBS, has SBS ever been sued or had to go to arbitration or even mediation regarding a claim like this?

A. No.

MR. CLARK: Thank you. No further questions.

THE COURT: Mr. Brown?

MR. BROWN: Thank you.

*CROSS-EXAMINATION*

*BY MR. BROWN:*

Q. Good morning.

A. Good morning.

Q. Mr. Morgan, yesterday when my client was testifying about the plan that he had, was it uncommon for Tri-Bar to just change plans with regard to this matter?

A. I -- I would not be involved in the technical drawings, plans, specifications, so I would not know if he would or wouldn't. That could be kind of outside of my whole area.

Q. Okay. But when my client -- you received information from Mr. Green that they wanted to terminate the Plaintiff, Robertson Electric?

A. How did I get that information?

Q. Yes.

A. I was first informed, as I recall, from Mr. Schiffman.

Q. And was that by phone or by e-mail or --

A. No. We were in the office together that day, as I recall.

Q. And that was the same day as the e-mail or --

A. I think it was. As soon as -- as soon as that was shifted to -- to Steve's desk, he immediately contacted me and we started conversing what we thought we should do.

Q. Did he give you a reason?

A.  The only reason I ever got in that -- as I recall in that moment was just, Mr. Pittman had made a phone call and/or contacted Jack or Kyle in some way and said that they wanted to make a change with the electrician.  I was not given any other reason.

Q.  And you're not aware of any deficiencies or problems with Robertson Electric?

A.  Not that I'm aware of.

Q.  Now, with regard to paying -- that is for some work on this project -- I believe page 10, paragraph 8.07 of the contract -- and let me get that for you.

A.  Okay.

Q.  At 8.07 there's a section that says, "Please take note."

A.  Yes, sir.

Q.  Would you read that, please?

A.  "Please take note, it does not matter how many witnesses hear the contractor make an alleged verbal agreement to pay for a change.  If there is no written change order in compliance with this section, subcontractor should not be entitled to any compensation for the change, addition, or revision."

Q.  So, you heard Robertson's -- Jerrod Robertson's testimony regarding the revised plans that

he had?

A. Yes, sir.

Q. And with regard to that work, had you ever received any change order?

A. From Mr. Robertson?

Q. From --

A. Tri-Bar?

Q. -- Tri-Bar.

A. No.

Q. So --

A. No executed change order returned from Tri-Bar.

Q. So, it would appear that they wanted him to work with a real possibility of not paying him; would that be correct?

A. If he was asked to do something that was different from the plans without a change order, then there would be a risk to the subcontractor of not getting paid.

Q. Now -- we're now two days into this trial. And it appears to me, after I've listened to some of the testimony, there were many things that you guys attempted to do to accommodate Tri-Bar without the change order. Correct?

A. Correct.

Q. And you're here suing to get paid; right?

A. That's true.

Q. And here we are attempting to comply with the requirement that they do, and we're suing to get paid; right?

A. That's why we're all here.

Q. So, it appears to me a catch-22; you're damned if you do and you're damned if you don't; right?

A. I understand.

MR. BROWN: Pass the witness.

THE COURT: Mr. Slates?

MR. SLATES: Thank you, Your Honor.

### CROSS-EXAMINATION

**BY MR. SLATES:**

Q. Mr. Morgan, on the point about Mr. Robertson, he was never asked to perform work that was subject of a change order, was he?

A. I would not know. That would be the people directly working in the field.

Q. In fact, after his change order came in at $60,000.00 and Mr. Pittman got a bid from C&S for 21,000, that's when Mr. Pittman asked you to make a change; not to ask him to perform the work?

A. I did not see that flow of information. That

would not come through me.

Q. Now, you said that you didn't know that the subs had been paid until the last couple of months. Are you sure that's accurate?

A. All the information -- well, like I said earlier to my -- as I recall, we had some subs that called us and told us they had been paid. We had some that had indicated that they were working on it. I do not know exactly when every document came. But contemporaneous with the events chronologically, we were not given copies of checks as Tri-Bar issued them. We got them through the discovery process.

Q. Isn't it true that you got copies of the lien releases in December of 2013? And we can look at the documentation if you'd like.

A. There may have been some changes and lien releases.

Q. You don't dispute that, do you?

A. I'm just saying that there may be. That's not an accounting document within our accounting system. So, if someone files a -- if a subcontractor files a lien as a subcontractor, that doesn't change our accounting records. If a subcontractor goes in and unfiles a lien, that doesn't change our accounting records.

Q. Mr. Morgan, do you get lien releases in your business?

A. We do.

Q. You've seen lien release forms before?

A. Yes.

Q. And you know they typically say, in exchange for payment of "X" number of dollars, I release my lien?

A. I think there is a -- yes. It's in that form.

Q. So, when you got those lien releases in December of 2013, you were seeing representations on sworn lien releases from your subcontractors saying they had received payment of "X" number of dollars; right?

A. Yes.

Q. All right. So, the suggestion to this Court that you didn't know they had been paid until the last couple of months is really not true, is it?

A. I don't know when each of those lien releases came in. But if they're dated, and I don't know when we received them afterwards.

Q. Well, you certainly knew -- without going into any of the substance of discussions at our mediation, but just using it as -- we mediated this

case in May of 2014. You certainly knew at that point that the subs had been paid, didn't you?

MR. BROWN: I would object to any conversations that --

THE COURT: I don't think he's asking for the conversations at mediation; just as to any knowledge --

A. You're asking me, do I recall when mediation was? No, I do not recall.

Q. (BY MR. SLATES) I'll represent to you that mediation was in May of 2014. If in fact, that's when it was, you knew at that time the subs had been paid, didn't you?

A. I do not recall, sir.

Q. All right. You mentioned that you've never been involved in a lawsuit. You had the opportunity yesterday when Mr. Lewis was here to talk to him some; is that right?

A. Did I say I was never involved in a lawsuit?

Q. I may be -- that may be overstating it.

A. Yeah.

Q. Mr. Clark asked you about whether or not you'd ever ended up in a lawsuit, and I don't remember the exact way the question --

A. As I understood the question, was SBS ever

involved in a lawsuit in this type of situation.

Q. Okay.

A. An election of a receivable, is what I would characterize that.

Q. All right. So, you've been in lawsuits; just not one like this?

A. Yes.

Q. My question is actually a little different. You had some conversations with Mr. Lewis yesterday; right -- Rod Lewis?

A. Mr. Lewis and I had what was purported between Mr. Lewis and I to be a private conversation. Yes.

Q. That's fine. My question to you is, did he tell you that he's never been involved in a lawsuit with anyone that's ever built a project for him?

MR. BROWN: Objection, hearsay.

A. I do not recall --

THE COURT: It's a party admission.

A. -- every word that we spoke between each other as businessmen.

Q. *(BY MR. SLATES)* Do you know how many projects he's built?

A. Mr. Lewis?

Q. Yeah.

A.  I have no idea.

Q.  Do you know if it's millions and millions of dollars?

A.  All I know is that he's a very successful businessman in the community who has a very large business.  And I would think that he has many more zeros behind his numbers than most of us.

Q.  Now, there's been questions asked about when -- well, if you ever received a list of the defects and the costs that were being sought to be charged back.  You did get letters, or at least people at your company got letters where -- in fact, very early on. I believe the first one we saw was February 15th.  I think it's SBS Exhibit Number 14.  We don't need to pull it back up.  But in that letter, Mr. Grable says, hey, we're discovering defects and we're going to be offsetting whatever the cost of those defects are against your contract balance; right?

A.  That's what I recall the letter says.

Q.  And in fact, this lawsuit got filed -- I don't remember the exact date, but sometime in the -- in the early summer of 2013; correct?

A.  Whenever the date of it is.

Q.  May of 2013; correct?

A.  Whatever the date of it is.

Q. And at that time, do you know if the project was finished?

A. I have no knowledge of what went on in the project side after we left.

Q. In fact, if the project wasn't finished in the -- it's difficult to know exactly what it's going to cost to complete the work on the project until you finish, isn't it? Isn't that just an obvious statement?

A. I think that's for many reasons.

Q. But my point is, Mr. Morgan, that Tri-Bar wasn't in a position to tell you exactly how much they believed they were entitled to offset against your contract balance until after they finished the project and calculated the total amount. And chronologically, that date fell after the lawsuit was filed; right?

A. I don't know when the project was finished.

Q. And isn't it true that you have received information in this lawsuit about what the defects are that are being claimed and the amounts that are being claimed?

A. Sure. I think that's why we have a difference of opinion as to why we're here.

Q. So, to suggest that there was never -- that information was never provided to you, it was never

provided to you before the lawsuit was filed, and the lawsuit was filed before the project was finished; right?

A. The letters were also after the termination meeting as well and not before.

Q. I assume you're familiar with the AIA contract?

A. That's one of the documents that we use.

Q. You use them on a number of projects. This isn't the first time you've used them, is it?

A. Not the first, but it's not our first go-to document.

Q. Okay. Are you familiar enough with them to -- I believe you signed the contract; right?

A. Yes.

Q. And I've looked on the certificate of authenticity on the -- because the AIA software requires someone to sign a certificate of authenticity and you signed that, too? It's okay. You are familiar --

A. I think the -- I think in this case the owner prepared the contract, so I think in addition to the deletions page, that would be -- I'm not sure. I'd have to look at it. If you've got the contract. I signed -- I executed the contract that we had with

SBS.

Q. Let's look at Robertson 16.

A. Which one of these books is Robertson?

Q. Oh, sorry. It's --

A. Plaintiff's Exhibits?

Q. Yes, that's it.

A. 16?

Q. The last page of that exhibit. Here you go, Mr. Morgan. This may be a little faster.

A. Okay. I signed this one, then I'll stand corrected.

Q. That means that you generated this document on your AIA software?

A. If we -- probably came out of our office, then I knew we were working back and forth with Neena Singh at that time. Mr. Clark was assisting and trying to go through the changes that were being proposed.

Q. My question, though, is given that the document's certificate of authenticity is signed by you, that must mean that the document was generated out of your office.

A. It came out of our office because it had our red herrings on it.

Q. Okay. And if we go to Robertson 17, there's

been talk in this case about the period of time where payments were being withheld.  And you're familiar with that testimony; right?

A.  Yes.

Q.  We'll go back into that in detail.  But you had a remedy that you could exercise if you believed that that was having a detrimental impact to the project, didn't you?

A.  Yes.

Q.  And that remedy is in 9.7 of the A201?

A.  Okay.

Q.  Are you familiar with that provision?

A.  Not off the top of my head.

Q.  Okay.  This is it right here.  It's failure of payment.  Are you familiar with that provision?

A.   I am not going to represent that I'm familiar with every provision within the AIA documents.

Q.  Okay.  Take your time to read it.  I'm going to paraphrase it.  But basically what it says, if we don't pay you, you can stop work; right?

A.  Uh-huh.

Q.  You never did that, did you?

A.  No.

Q.  Let's look at paragraph 5.3 of the A201.

A.  5.3?

Q. Yes, sir. And again, we've got it up on the screen. This is the provision we've looked at before in the trial that says -- I'm going to paraphrase it again -- that you have an obligation to enter into a subcontract to incorporate the terms of the general conditions. Is that a fair paraphrase of that paragraph, in your opinion?

A. What it says.

Q. And did you attempt to do that in your contract with SBS?

A. Did we attempt to do that? Oh, between SBS and Tri-Bar?

Q. I'm sorry. Yeah. That was a bad question.

A. Yeah.

Q. Did you --

A. It's all aright. It's been long for all of us.

Q. Did you attempt to incorporate in your subcontract with Robertson a provision that would meet your obligation to Tri-Bar under section 5.3?

A. I'd have to go look at our exact subcontract agreement. I'm sure that's something that you will be doing.

Q. Right where I'm headed. We're going to go to Robertson Exhibit 1, section 3.04.

A.   Robertson 1.

Q.   Are you familiar with the term flow-down clause?

A.   Honestly, I am not.

Q.   Okay.

A.   I'll be honest.

Q.   I won't ask --

A.   Legal term; not one that I --

Q.   I won't ask it in those terms then.  You see the language here?

A.   3.04?

Q.   Yes, sir.

A.   Okay.

Q.   Contract documents include the A201 general conditions; correct?  We saw that yesterday with Mr. Robertson.  We can go back to it if you want to.

A.   No.  Which paragraph are you looking at?

Q.   That's previously in the agreement.  Let me find the reference for you.  Here we go.  3.02.  "The contract documents also include the bidding requirements and general conditions."

A.   Okay.

Q.   Okay.  So, back at 3.04, you've got to comply with the contract documents.  "That contract documents include the general conditions.  And subcontractors

shall be bound to contractor by all the terms and conditions of the contract documents, and assumes towards the contractor" -- that's you -- "all obligations and responsibilities which contractor, under the contract documents, assumes towards the owner with respect to subcontractor's work."  Right?

A.   What it says.

Q.   That was what you were binding Robertson to do?  You were binding Robertson to you just as you, SBS, were bound to Tri-Bar?

A.   That's a legal representation.

Q.   Do you have any reason to disagree with it based on your understanding of the agreement?

A.   No.

Q.   And if you, in your relationship with Tri-Bar -- Tri-Bar had the right to terminate you for convenience -- would you agree that, by incorporation, you had the right to terminate Robertson for convenience?

A.   I wouldn't, but I'm not a lawyer.

Q.   Did you believe that you were breaching your contract with Robertson when you advised them that the owner wanted to make a change?

MR. CLARK:  Your Honor, I object.  That calls for a legal conclusion.

THE COURT:  Overruled.  Your interpretation of the contract, please.  Your interpretation.

A.   When Mr. Schiffman and I met after he was informed of the desire to -- or the demand from Mr. Pittman to terminate Robertson, we discussed contractual matters.  We made a business decision based upon the environment to contact Mr. Robertson and try to work out a business solution to a problem based upon representations that we were going to be paid --

Q.   *(BY MR. SLATES)*  But my question --

A.   -- to be paid.

Q.   Sorry.  My question still remains, did you believe that you were breaching your contract with Robertson by telling him that the owner wanted to make a change?

A.   I didn't even think of it at the moment, as I recall.

Q.   If you believed it would have been a breach, would you have hesitated?

A.   I didn't think of that at that moment.  Made a business decision.

Q.   When you and Mr. Schiffman talked about it, did you discuss, are we going to be in breach of our

subcontract agreement?

A. Didn't pull the contract out. Didn't read it at that moment in time.

Q. And certainly, you heard Mr. Pittman's testimony; you're not here to controvert that and say that either of you or anyone else at SBS went to Mr. Pittman said, whoa, we can't do this; that's going to be a breach of our subcontract? That didn't happen, did it?

A. I was not involved. Mr. Schiffman had a phone conversation with Mr. Pittman. I was not party to that conversation. I don't know what they discussed.

Q. Let's look at Robertson 17, section 5.4.1.

A. (Witness complying.)

Q. There's been some testimony, frankly, that I didn't understand about this section is somehow relating to Robertson. I want to make sure we get a clear understanding of what this section addresses.

A. I can only give you my understanding, and it may not be clear.

Q. That's fair. This talks about the right of the owner to take an assignment of the contractor's subcontracts in the event of a termination for cause; right? Is that right?

A.   What you're representing -- I mean --

Q.   Well, let's just read it.  "Each subcontract agreement for a portion of the work is assigned by the contractor to the owner provided that, one, assignment is effective only after termination of the contract by the owner for cause pursuant to section 14.2, and only for those subcontract agreements that the owner accepts by notifying the subcontractor and contractor in writing."  Did I read that correctly?

A.   What it says.

Q.   Is there any document that you're aware of where the owner or anyone else acting on behalf of the owner indicated that they intended to take an assignment of the Robertson subcontract?

A.   I did not use the word assignment in any conversation that I was involved in.

Q.   And certainly --

A.   And I did not see a document that said we were an assignment.

Q.   What -- what Mr. Pittman said is, I don't want to have anything to do with Robertson anymore.  I want a new subcontractor.  And I don't want to take over their subcontract.  Right?

A.   I was not involved in the conversation with Mr. Pittman, so I don't know what he said.

Q. Have you heard any testimony during this case to the contrary? You've been here the whole time; right?

A. Mostly.

Q. Have you heard any testimony to --

A. Not that I recall.

Q. I want to make sure I understand how much SBS is claiming in this case. I want to look at SBS 7.

A. Okay. Am I in a different book now?

Q. Yeah, I'm sorry. I think it's still the black.

A. Yeah, I got it. SBS 7?

Q. Yes. And it's up on the screen. Oh, I'm sorry. You know what? I'm directing you to the wrong exhibit. Let's look at 23. Do you know when this document was created?

A. Do I know when it was created?

Q. Yes, sir.

A. No. Date-wise? No.

Q. Certainly whenever that was, you knew that payments had been made to the subcontractors; right, getting back to one of our earlier topics?

A. Uh-huh.

Q. Okay. So, the total due but unpaid is 304,926.88; is that right?

A.   On that one.  But I think there's one that says 305 something.  There's a couple hundred dollars difference.

Q.   Okay.

A.   Which I discovered along the way.

Q.   Well, how much are you asking the Court to award you today in balance on the contract?

A.   Oh, you're asking my opinion?

Q.   I'm asking what your claim is in this lawsuit.  What are you suing my client for?

A.   I -- I would have to look at a variety of documents here.  There's 305 and -- which is the 304, and then I think there's information relative to amounts related to work that wasn't performed and loss of profit, which I think are the two numbers at the bottom of this recap here.

Q.   I'm going to get into that later.  Right now I'm just trying to figure out what SBS contends the contract balance is after the subs having been paid. Is that this number?

A.   I think there was a number that says 305, and there's a difference of a couple hundred dollars between the two numbers.

Q.   Okay.  I'm going to put 305.  It's somewhere in that neighborhood; right?

A. 304,926 and I think the other one is 305 something, but --

Q. All right. So, your contract balance claim is about 305?

A. May I ask a question?

Q. Yes, sir.

THE WITNESS: Mr. Clark, what is the exhibit that has -- that we were looking at earlier that had the recap?

MR. CLARK: 7. That's not the one you're looking for, though. He's looking at the one that you're thinking of.

THE WITNESS: 7 is the one with the recap? Am I looking in the wrong book here? If somebody could help me just a second.

MR. CLARK: 7 is the one that gets you to the 426.

THE WITNESS: Yeah. I'm trying to --

MR. CLARK: That's number 7 in the same book you were just in.

THE WITNESS: In a white binder?

MR. CLARK: No. It's in the black binder.

THE WITNESS: If you don't mind, I'd like to have something to --

Q. (BY MR. SLATES) I want you to take all the time you need.

A. Because I'm trying to remember numbers in my head. Okay.

Q. All right.

A. I'm looking -- I'm looking at the document we were referring to earlier, Exhibit Number 7 in whatever book this is.

Q. That's SBS 7; right?

A. That has -- I think starting at 426 and the 426 is the amount of the lien. But there's also a document that then comes in and offsets the amounts that we've been told have been paid.

Q. Yeah. And that's this one; right?

A. So, it's a different recap that I'm looking for that has that one.

Q. All right. Well, I don't want to bog us down in this. I didn't think it would be this complicated. I'm sure Mr. Clark will correct us if we're confused. But it's my understanding the contract balance claim is about $305,000.00.

A. It was 426, and then I think there was a hundred some-odd thousand of the amounts that were paid, and whatever that number nets to.

Q. About $120,000.00. And I'll represent to you

that Tri-Bar has an offset claim of about $318,000.00. A little less; 317,900 something. And if that's the case, and if the Court agrees with that offset, then you would actually owe Tri-Bar money, wouldn't you?

A. I have -- that's your representation.

Q. And the 305, that number includes the amount that you owe -- you put air quotes around owe -- to Superior Metal Services; right?

A. Yes.

Q. And that amount for Superior Metal Services is $102,070.00; is that right?

A. Yes.

Q. You don't owe that money to some third party, do you?

A. We already paid it.

Q. Well, you own SMS, don't you?

A. This is cash. Cash we paid the bills for the erector. We paid the bills out of our own cash flow for the installers. We paid the materials for Schulte other than a small amount of money. Intercompany-wise Superior is out that cash. They have a receivable from SBS in that amount of money.

Q. But that's not what I asked you. I asked you if you own SMS, and the answer to that is --

A. We own SMS, yes. But I don't think that's

what you asked; if we owned it.

Q. I said, do you own SMS?

A. I thought you said, do you owe SMS.

Q. I'm sorry. I wasn't --

A. That's what I understood. Excuse me.

Q. The -- the statement was made yesterday by Maywald that you don't charge a profit on SMS. Can you explain to me? I didn't really understand that.

A. We work in an area where metal buildings are a large part of the projects that we do. Are you familiar with how metal buildings and erections and things of that nature are done?

Q. I am generally, but I don't know if the Court is; so if you want to explain that, go ahead.

A. Here is how we do it. It may be different how you would do it. There are metal building companies in the marketplace that package deals together in varying ways. They -- you pay them a price, they have -- they get the materials, they might do some engineering, they do the installation, they package together, they have a company, they have an operation, they mark it up, they charge people. Since it's a component of our work, we set up our own operation wherein we buy the materials, we arrange for the erector, we package that together at a cheaper

price than a third party, who would do the exact same work. And then we manage that in-house.

Q. Okay. But the statement was made yesterday, I think, that you don't charge a profit on SMS. That's not true, is it?

A. It varies from job to job.

Q. Well --

A. In this job we did not charge any profit because we used it as a manner to control costs. The alternative is to go to a third party who charges more.

Q. The 8 percent fee that you charged on this project included the cost of SMS, didn't it?

A. The subcontractor -- it's a subcontractor -- like the 8 percent fee on HVAC and the 8 percent fee on anybody else.

Q. But to the extent the Court was left with the perception that you didn't charge profit on SMS, that's not accurate relative to the amounts that you charged to Tri-Bar, is it? You charged 8 percent on SMS's costs --

A. 8 percent of all the costs. That's a different question than does Superior Metal mark up its own amount and then it's marked up by the general contractor. That's not what happened.

Q.   And are you familiar with the related party transactions provision in the AIA documents?

A.   Uh-huh.

Q.   Let's look at Robertson 15, section 7.8.

A.   Which one?

Q.   It's 7.8, related party transactions.  7.8.1 defines a related party.  Certainly SMS and SBS are related parties under that definition; would you agree?

A.   Yes.

Q.   And 7.8.2 says if you're going to do business with a related party, you need to let the owner know and get their approval; right?

A.   Yes.

Q.   And yesterday, I believe Mr. Green said that he told Mr. Grable that SMS and SBS were related.  But can you point to any communication or any documentation where that was communicated to the owner?

A.   I can only give you my understanding of the chain of events that happened.

Q.   And if I represent to you that the owner didn't know that you were affiliated until the mediation of this case, would that come as any surprise to you?

A. I think we learned that day and it was a surprise. But it was my understanding that it had been discussed with Mr. Grable, Mr. Pittman, I cannot say that it was discussed with Mr. Lewis.

Q. All right. In any event, if Mr. Grable is the only one that was advised of this, you did meet your obligation to give notice to the owner that you were doing business with a related party, did you?

A. There was no specific written notice given.

Q. And no verbal notice that you're aware of, other than Mr. Green's testimony yesterday about what he told --

A. It was my understanding that Mr. Pittman knew.

Q. Based on what?

A. Based on conversations that we had internally with Mr. Green, Mr. Schiffman, myself, and I met Matt Martinez. And I think Mr. Grable said yesterday, and I did not hear anything, that one of the reasons they got us together was our metal building experience.

Q. Again --

A. That's how I recall.

Q. I'm sorry. I didn't mean to interrupt you. 7.8.1 and 7.8.2 don't talk about notice to the architect, do they? They talk about notice to the

owner; right?

A. If the owner is Mr. Lewis, I would not be aware if he did or did not know.

Q. All right. Let's look at the termination for cause section of this agreement, section 14.2. Oh, one more. Before we -- before we go on to that, if we could pull up Tri-Bar 14. And this document, I don't believe, has been admitted yet. But can you take a look at it?

A. Is that in this white book?

Q. It appears on the screen.

A. It's sometimes easier for me to --

Q. Okay. It appears in the subcontract agreement between Select Building Systems, SBS, and SMS. Is that, in fact, what it is?

A. Yes.

Q. It lists a P.O. box for Select Management Systems. Is that right?

A. Yes.

Q. Isn't it true that Select Management Systems' office is the exact same address as Select Building Systems?

A. Both SBS and SMS office out of our office in Boerne. Both SBS and SMS have P.O. boxes.

Q. How come you don't list the same address on

the subcontract?

A.    It's been like that for years.  Both of those P.O. boxes are by our old office we used to have in San Antonio.  Probably never changed.

Q.    Is that Lance Wright?

A.    Lori Wright.

Q.    I'm sorry.  Who is Lori Wright?

A.    Lori Wright is the controller and accountant for Select Management Systems.

Q.    Isn't it true that you personally are the director and secretary for Select Management Systems?

A.    Both companies.

Q.    But you could have signed both lines, couldn't you?

A.    I could.  I don't.

Q.    Okay.  Let's go to Robertson 17, section 14.2.

A.    Robertson 17.  Okay.

Q.    Now, Mr. Morgan, there's been a lot of talk in this case about the failure to provide notice prior to termination.  Do you recall that testimony?

A.    Yes.

Q.    Can you show me in this provision where it says that you have the right to cure a default after receiving that notice or do anything to avoid

termination after receiving that notice?

A.   I'd have to review the entire document and find something, so I don't know.

Q.   Well, I'm asking you with respect to 14.2, that's right in front of you, if you can point me to anything that says you have the right to cure after receiving the notice or the right to do anything to avoid the termination after having received that notice.  I want you to tell me what it is.

A.   As I recall, the notification provisions are required before you get to this point.  I'm not sure that --

Q.   After giving the contractor a contractor surety, if any, seven days written notice.

A.   Can you repeat the question again?

Q.   Yeah.  I'm looking for the language that says you have a right to cure or have the right to do anything to avoid being terminated once you've received this notice.

A.   Maybe requires notice.  What would the notice say?

Q.   We're going to terminate you in seven days because you haven't complied with the contract.  Once you received that notice, there's nothing you can do to avoid it, is there, Mr. Morgan?

A.   I would not know that.

Q.   All right.  You -- you do understand the way that payment works in termination for cause?

A.   Never experienced it before.

Q.   All right.  Let's look at the language.  14.2.3 says, "When the owner terminates for cause, the contractor shall not be entitled to receive further payment until the work is finished."  Do you see that?

A.   Which one?

Q.   14.2.3.

A.   Okay.

Q.   And 14.2.4 then says, "If the unpaid balance of the contract sum exceeds costs of finishing the work, including compensation for the architect's services and expenses made necessary thereby, and other damages incurred by the owner and not expressly waived, such excess shall be paid to the contractor."

A.   That's what it reads.

Q.   "If the costs exceed the unpaid balance, contractor shall pay the difference to the owner."  Right?

A.   That's what it reads.

Q.   So, when you terminate for cause, you don't get paid until the project is finished; right?

A.   That's what it says.

Q.   And then only if there's excess balance?

A.   That's what it says.

Q.   And with a termination for convenience, if we can go to that section -- well, first of all, a termination for convenience can be for any reason; right?

A.   I'm sure the document has specific reasons.

Q.   All right.  Well, let's just focus on what happens in a termination for convenience.  14.4.3. "In case of such termination for the owner's convenience, the contractor shall be entitled to receive payment for work executed and costs incurred by reason of such termination, along with reasonable overhead and profit on the work not executed."  Right? Is that correct?  Did I read it correctly?

A.   Uh-huh.

Q.   Is that a yes?

A.   (Witness nodding head up and down.)

Q.   Did SBS treat this termination as one for cause or convenience?

A.   Convenience.

Q.   Did you conduct yourself consistently with that testimony?

A.   You're going to draw legal conclusions.

Q.   Well, let's look at what you did.  Tri-Bar

Exhibit Number 8.

MR. CLARK: Your Honor, if I may, this is not -- there's no defense of waiver or estoppel or anything like that to Mr. Slates' rates, so this is irrelevant.

THE COURT: Okay. Overruled. You can find it, sir, if you can. Remember what he's asking for you to look at?

THE WITNESS: No. Which one?

THE COURT: Tell him again.

Q. (BY MR. SLATES) Tri-Bar Exhibit Number 8. You know what, let's start -- I think you looked at this with Mr. Clark. Let me give you some context. Let's look at SBS Exhibit Number 12. Do you remember this one? It was the submittal closeout documentation.

A. Okay. The letter to Mr. Pittman?

Q. Okay. We looked at it earlier this morning. You were submitting -- or Mr. Schiffman -- I don't remember who it was from, but I think you were copied -- were submitting closeout documentation. Correct?

A. Yes.

Q. And there's two pay apps that are submitted there. And we're going to look at those now. And now let's go to Tri-Bar Exhibit Number 8. We go down and

look at the schedule of values.  You're submitting for work in place as of date of termination; is that right?

A.  I'm trying to get to the right book.

Q.  Yeah.  Sorry.  I'm trying to move us along. I apologize if I'm rushing you.

A.  No.  Okay.

Q.  Are you ready?

A.  Yeah.

Q.  Schedule of values.  If you look at what's being billed for this period, I take it to mean that that's the value that SBS contends is the work in place or the cost of the work in place; is that right?

A.  Work completed to this period?

Q.  Yes, sir.

A.  Okay.

Q.  That's -- so, in other words, pay app number 8 is your last bill on the project to close out the project.  That's what was said in the letter; right -- or what you said in the letter?

A.  Yes.  And I think there's a separate retention clause.

Q.  Right.  I was just trying to draw the distinction between the value of work completed and retainage.  And we're going to go to the retainage

bill next.  This is the value for work in place bill; right?

A.  The total amounts.  Yes.

Q.  Okay.  And if we look at Tri-Bar 9.

A.  I'm sorry.  Same book?

Q.  Yeah.  Just the next page.

A.  Sorry.

Q.  The next tab, rather.  This is the retainage. And we can see that, if we scroll down to the last -- your billing for -- well, let me look at the schedule. Am I correct, without having to get stuck in the details, that this was a bill for retainage on the project?

A.  Yes.

Q.  Okay.  Let's look at whether or not you billed for the remaining profit on the job.  If we look at line item number 44 on that pay application. Do you see this line item here, contractor's fee?

A.  Uh-huh.

Q.  Yes?

A.  Yes.

Q.  Your total fee on the job is 90,820.

A.  Yes.

Q.  Total completed to date is 63,000; the balance to finish is 27,000; right?

A. Yes.

Q. So, you did not bill for your profit on your remaining work, did you?

A. We billed as to the cost to the date of termination.

Q. Yes. But do you recall just a minute ago we looked at the termination for convenience provision. Now let's look at it again, 14.4. And just to be -- before we go back there, am I a hundred percent correct in saying you did not bill for profit on the remaining work?

A. No. We just billed for the cost incurred to that date.

Q. All right. Back to Robertson 17, section 14.

A. That's -- that's my understanding from looking at this here.

Q. "In the case of termination for convenience, payment for the work executed" -- that was 8 -- "any costs incurred by reason of termination along with reasonable overhead and profit on the work not executed." So, if you were going under this provision, you should have billed for the profit under remaining work; right, Mr. Morgan? You weren't treating it as a convenience, were you? You were treating it as a termination for cause.

A.   No.  I think our accounting department was following a cost-plus approach to accounting.

Q.   Well, Mr. Morgan, if you were following the contract and getting paid what the contract said you could be paid in a termination for convenience, you would have billed for your profit under remaining work, wouldn't you?

A.   I can tell you that I didn't even refer to that.  We did our accounting the way we always would, and that's all I can say.

Q.   In fact, you knew it was a termination for cause.  You knew there had been problems on the project.  You knew that schedule had been a continuous issue.  And you knew that Mr. Pittman was trying to be a stand-up guy and get you paid, even though he was terminating you for cause, didn't you?

A.   I did not know those things.

Q.   Let's look back at the meeting minutes.

MR. SLATES:  Oh, I don't believe Exhibit Number 14 has been admitted yet.  We would move to admit that at this time.

THE COURT:  Any objections to 14?

MR. CLARK:  No objection, Your Honor.

THE COURT:  Mr. Brown?

MR. BROWN:  I do have an objection.  And

my objection basically to it was that it includes a non-party. I'm not certain that they're making a claim. And so, that's my objection to it and was my objection then and it still is now. It's a non-party. I'm not certain that there's a claim being made for it or collection for it. And so, to that extent -- if it's just a document and there's no claim being made, then that's fine. Other than that, I'm not clear of its relevance to this lawsuit.

THE COURT: Okay. Objection is overruled. 14 is admitted.

Q. (BY MR. SLATES) All right. I know you weren't at the meeting where the termination occurred. But if we can look at Exhibit Number 48 for just a minute. You said --

A. Am I in the same book here?

Q. Tri-Bar 48. Yes, sir. You said that you just heard yesterday that Tri-Bar was going to pay the change orders. Is that your testimony?

A. I think Mr. Jones -- I think he said that yesterday.

Q. Didn't Mr. Pittman say it at the meeting? Mr. Pittman said that you've got -- we know you've got the change orders out there; we're going to get them paid. Right?

A.   I'm trying to find it, unless you can direct me.

Q.   I'll try.  I'm sorry.  We've all seen this before.  I was just trying to move us along.

A.   I don't remember -- memorize these things.

Q.   Okay.  Down at the bottom, it says, "Two outstanding draws and change orders not processed. Will get processed and paid."  Do you see that?

A.   Okay.  It says that.  Yes.

Q.   And then after the fact, Mr. Pittman discovers defects and sends you a letter and says, we're going to offset against the balance owed. Right?

A.   I don't think Mr. Pittman sent any letters.

Q.   You're correct.  Mr. Grable sent the letter. My apologies.  That happened, though; right?

A.   Mr. Grable sent the letters subsequent to the termination meeting.  Yes.

Q.   That number -- your 305 -- includes the change orders, doesn't it?

A.   It includes the work that was accomplished; not the change orders because it's a cost-plus contract.

Q.   Okay.  That's a fair clarification.  In other words, it doesn't include the total value of the

change orders.  It includes the value of the work that was performed pursuant to the change orders?

A.  Yes.

Q.  So, in other words, that includes the amount that you're claiming on change orders?

A.  For the work performed.  Yes.

Q.  And if -- if Tri-Bar's offset claim is 318 and they're only asking for $13,000.00 from you in this case, then they are acknowledging the change order to be valid, aren't they?

A.  I don't know what your offset is or anything of that nature, so I can't make that leap.

Q.  I want to look very briefly at the change orders.  SBS Exhibit Number 1.

A.  I have that.

Q.  Okay.  A change order can have a time component and a cost component to it; right?

A.  Yes.

Q.  And there's a space on the AIA form for both; right?

A.  Yes.

Q.  You filled out the change order, I take it?

A.  No.

Q.  Someone at your company did?

A.  Yes.

Q. And there is an amount associated with the change; it's 44,600. Correct?

A. Yes.

Q. What did you all put in in terms of the time impact of the change?

A. Nothing was put in at that time.

Q. Zero; correct? And it says, the date of substantial completion as of the date of this change order is, therefore, at 12/7/2012.

A. As of the date of that change order. Yes.

Q. No impact to the schedule; correct? That's the original date for completion, isn't it?

A. I think that's what it is in the contract.

Q. Let's look at Exhibit 2 SBS. Again, a cost change of 27,000, but no time change; right?

A. None listed.

Q. Zero. And the same substantial completion -- or final completion date, rather?

A. That's what's listed.

Q. Change order number 3. This is actually the day after you're terminated, isn't it?

A. February 6th. I think that was the wrap-up -- the accounting change order.

Q. Right. We're going to capture everything that hadn't been captured yet. $19,000.00?

A. That's what it says.

Q. So, those first two change orders -- one of them was for 44,000, I believe, in July. One of them was for -- 44,600 was the first one. 27,544 was the second one. And 19,786 is this one. Correct? Total change orders of about $90,000.00?

A. If that's the way they add up.

Q. So, for all of this talk about the constant changes on this job, in fact, that you couldn't come or go from all the misinformation and information that you were getting about what you should build and what you shouldn't build and how many changes you were making -- at the end of the day when you were terminated, what you asked for was a total of $90,000.00 in changes on a $1.2 million job?

A. If that's what it adds up to. You're saying the three change orders add up to 90,000?

Q. That's a round number.

A. Okay.

Q. You didn't ask for any time extensions on this change either, did you?

A. No. Is there a section in this contract that has liquidated damages for delays?

Q. I'm sure if Mr. Clark thinks that's important, he'll ask you about it.

A.   Oh.

Q.   Mr. Morgan, in your experience in the industry, do you understand there to be a difference between claims for breach of warranty and a claim for breach of contract.

A.   I've never encountered this.  I wouldn't say that I'm aware of it.

Q.   Are you aware of any legal obligation to provide notice and opportunity for a cure before you make a claim against a contractor for breach of contract?

A.   Am I aware of what, sir?

Q.   Any legal obligation to provide notice to a contractor before you make a claim for them -- against them for breach of contract?

A.   I'm only aware of what's in these documents.

Q.   Let's assume that the Court doesn't agree with the offset claim and only agrees to a part of the offset claim, and that when you do the math, money is owed to you.  I want to look at the interest provision in your contract.  Let's look at Robertson Exhibit 15, section 15.2.

A.   Robertson which one?

Q.   Exhibit 15, section 15.2.

A.   (Witness complying.)  Okay.

Q. The interest rate that you contractually agreed to is 1 percent per annum; am I correct?

A. If that's what the contract says.

Q. And you signed the contract?

A. Yes, I did.

Q. Let's look at SBS 55. And first, let's establish that Mr. Morgan received a copy of this. I believe he did. That's your e-mail address, isn't it, Mr. Morgan?

A. Yes.

Q. And I want you to take your time to read this letter, though you've seen it before. It's a letter where Mr. Schiffman is addressing the concerns that have been raised by Mr. Grable about the fact that there's been some field modifications to the wind bents on the project. Do you recall that?

A. I'm aware of the issue, but I have no idea where the wind bents are.

Q. Okay. What Mr. Schiffman says is, "The two field modifications that have been reflected upon with a misalignment of bolt holes marrying the wind bents to the taped column and the flange on the wind bent being modified to fit inside the taped column flange where they marry." Do you see that?

A. Yes.

Q. Do you see anywhere in that letter where it refers to a discussion of field modification of the building itself so that it would fit the hangar doors?

A. I'd have to read the whole letter.

Q. I'll represent to you that there's none in there. If you find one, let me know.

A. Okay.

Q. If we go down a little further, what commitment is Mr. Schiffman making to the owner in conjunction with field modifications? He says, "The SBS team will wait for Schulte's field assessment and consult with the owner's representatives in regards to any corrective action process recommended by the structural engineer and proceed from that point." And here is the important part. "SBS will continue the erection process, but will not proceed with any future erection discrepancy without giving the owner representative notice to assess and respond with direction." Do you see that?

A. Yes, sir.

Q. That was a personal commitment from Mr. Schiffman and SBS not to do any further field modifications without notifying the owner and getting approval, wasn't it?

A. That's an e-mail from Mr. Schiffman to the

parties. Yes.

Q. And that's what he said; right?

A. What he said.

Q. And we heard Mr. Green yesterday say that he wasn't aware of any notice that went to the owner. Are you aware of any notice that went to the owner before those -- that building was field modified to make it fit on the foundation?

A. I am not aware.

Q. We went over this with Mr. Green yesterday, so I'm not going to belabor the point. But you saw in the contract where it's the contractor's responsibility to review the shop drawings for any inconsistencies; right?

A. That's what it said.

Q. And what it says is, if you find an inconsistency, you're suppose to report it to the owner. Do you remember that?

A. I remember that being discussed.

Q. Have you seen anything that indicates that that inconsistency in the size of the building to the size of the foundation was reported to the owner?

A. I wouldn't see every correspondence involving the field operation, but I did not see it.

Q. All right. We know Mr. Green said that he

had a meeting with Mr. Grable where they called Mr. de Anda and they talked about the extension of the brick lug. We heard Mr. Grable deny that that conversation ever existed. And I think we're going to hear from Mr. Victor de Anda later today and we'll see what he says. But if, in fact, both Mr. Grable and Mr. de Anda say that never happened, are you aware of any other facts that would suggest that SBS brought the inconsistency in the brick lug and the structural drawings to the owner's attention?

A. I would not have been involved in any of those discussions.

Q. Let's go to Tri-Bar 48, second page.

A. Give me a second, sir.

Q. I'm sorry.

A. This process is cumbersome, at best.

Q. This is the meeting minutes from the termination February 5th; correct?

A. Yes.

Q. And this is Mr. Schiffman talking. He says, "We are upfront forthright people." He's referring to SBS; right?

A. I would assume that.

Q. Is it a true statement? Is SBS upfront forthright people?

A. Yes.

Q. Can you see where the owner wouldn't believe that you were upfront and forthright when you failed to disclose the fact that you were field modifying the building to fit the foundation?

A. I can't comment as to what the owner may or may not feel.

Q. Can you see where the owner might feel that you weren't upfront and forthright when you modified the brick lug in the field without telling them?

A. I don't know what the owner felt.

Q. Can you see where the owner might feel that you weren't upfront and forthright when you didn't tell them that you owned SMS, the building erector?

A. I don't know what the owner felt. I -- as we discussed earlier, to my knowledge, that was discussed and everyone knew that. To my knowledge.

Q. Can you see where the owner might feel that you weren't upfront and forthright in the communications that were made about when the building would be delivered relative to what Schulte was telling you?

A. I don't know what the owner would feel.

Q. And given their experience with just how honest and forthright SBS was, can you see why they

would have no desire to have you back out there to fix the problems with the project?

A.  I don't know how the owner would feel.

MR. SLATES:  No further questions.

THE COURT:  Let's take our morning break, 15 minutes.  You can step down, Mr. Morgan.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  Yes, sir.  15 minutes.

(Recess taken.)

THE COURT:  Mr. Morgan, come on back up, sir.  Mr. Clark, you may proceed, sir.

### REDIRECT EXAMINATION

**BY MR. CLARK:**

Q.  Mr. Morgan, right there in front of you is the Tri-Bar contract with Select Building Systems.

A.  Okay.

Q.  If you would, look at paragraph 7.1 and 7.2, where it talks about costs to be reimbursed.  Do you see that?

A.  Yes, sir.

Q.  The costs that SMS charged, is that a cost that was run through the same accounting department as SBS?

A.  Yes.

Q.  Is that a cost that whether it's incurred --

if it was incurred -- as incurred by the contractor is the wages or salaries or materials or something purchased that's going to be charged through no matter what?

A.   Yes.

Q.   Okay.  And there's no profit on it; it's booked through at cost; correct?

A.   Correct.

Q.   In other words, SBS didn't charge a profit like a third party company would; right?

A.   SMS.

Q.   SMS did not charge a profit like a third party company would?

A.   Correct.

Q.   There's only one profit that's billed and the profit that is paid by SBS is the same no matter what; right?

A.   Correct.

Q.   Okay.  And just so we're clear, SBS and SMS, it's one accounting department; right?

A.   One accounting department.

Q.   All right.  If you would, turn back to -- turn back, I guess, two pages in that contract.

A.   Okay.

Q.   Just above where it says, article 5, contract

sum, do you see where it talks about the contract time?

A.   Yes.

Q.   And there's a little thing that says, "Certain provisions for liquidated damages relating to failure to achieve substantial completion on time." Did I read that part?

A.   Correct.

Q.   And what did you guys agree to?

A.   None.

Q.   And why is that significant to you?

A.   If you have a contract that has liquidated damages from a contracting administration standpoint, you're obviously sensitive about days; so, therefore, you count days and reasons for delays along the way. If you are not sensitive to that, then we typically do not account for that within our change orders and things of that nature.  Because we're not -- we're not counting days.  We're not asking for it.  It's not a factor in processing the accounting documents.

Q.   Okay.  So, that would not -- and the accounting documents that you were talking about earlier when Mr. Slates was talking about days and whatnot and changing the contract time, you from an accounting perspective were not worried about that?

A.   No.

Q.   Now, on the project side, you're certainly trying to keep to a schedule; right?

A.   Yes.

Q.   But that's somebody else's department?

A.   That's outside what we do from the accounting side.

Q.   Different set of documents.  Okay.  Mr. Slates had you go through and try to read and get your understanding about the AIA contracts and general conditions.  Is that something that you do as -- is that something that you do when you have a question about what those documents mean?

A.   As a businessman, I have a working knowledge.  If I have a detailed question, I would call my attorney.

Q.   And who do you call?

A.   Mr. Tom Clark.

Q.   Okay.  So, you don't answer -- you don't even try to figure out questions like what Mr. Slates was asking you, do you?

MR. SLATES:  Objection, leading.

THE COURT:  Sustained.

Q.   (BY MR. CLARK)  Would you ever try to figure out on your own, without consultation with an

attorney, the answers to those kinds of questions?

A. No.

MR. CLARK: No further questions, Your Honor.

THE COURT: You can step down, Mr. Morgan.

THE WITNESS: Thank you.

THE COURT: Yes, sir. Mr. Clark, your next witness? Mr. Cluck?

MR. CLUCK: Mr. Schiffman. I'm going to get him.

THE COURT: Around here, Mr. Schiffman. All the way around here, sir, please. Raise your right hand.

(At this time the witness was sworn in.)

THE COURT: Have a seat, sir.

THE WITNESS: Thank you.

THE COURT: Go ahead, Mr. Cluck.

*STEVE SCHIFFMAN,*

having been first duly sworn, testified as follows:

*DIRECT EXAMINATION*

*BY MR. CLUCK:*

Q. Mr. Schiffman, who do you work for?

A. I work for SBS Construction.

Q.   Now, a little while earlier Dave Morgan spoke.  He's your business partner; right?

A.   Yes, sir.

Q.   Okay.  How long have y'all been in business together?

A.   Since 1994.

Q.   Okay.  What -- what aspect -- or what are Dave's responsibilities and what are your responsibilities, as far as SBS is concerned?

A.   I'm responsible for the overall development and management of the company, and Dave is responsible for all the daily operations.

Q.   Okay.  Would it be more fair -- or would it be fair to say that you're responsible for the project operations, and Dave is responsible for the accounting and business operations?

A.   Correct.

Q.   Okay.  Now, did you ever have an opportunity to -- I want you to focus on this project for a second.  You know, we're talking about the project with Tri-Bar out at Uvalde; right?

A.   Yes, sir.

Q.   Okay.  Now, when you first got involved in this, were you involved in negotiations of the contract?

A.   No, sir.

Q.   Okay.  Is that something Dave handled?

A.   Yes, sir.

Q.   Okay.  And asking questions about the contract; is that something that you have significant familiarity, or is that something that you'd have to either ask your attorney or Dave would handle?

A.   Correct.  I'd have to refer to Dave, who would probably refer to an attorney if he needed to consult.

Q.   Okay.  Now, there's been some talk in the past about a mockup.  Do you know what a mockup is?

A.   Yes, I do.

Q.   Okay.  Do you remember being asked to prepare a mockup?

A.   Not prior to contract.

Q.   I'm sorry?

A.   Not prior to contract.

Q.   Right.  It's not in the contract; right?

A.   No, sir.

Q.   Okay.  Did somebody ever ask you to prepare a mockup?

A.   Yes.

Q.   And did you prepare a mockup?

A.   Yes.

Q.   Was that something that you did in order to try to help Mr. Grable?

A.   Correct.

Q.   And was that part of a meeting between Mr. Grable and Mr. Lewis in order to see how certain finishes, et cetera, were on the project?

A.   Yes.  It was -- was to accommodate Mr. Lewis.

Q.   How much time were you given to do this mockup?

A.   I don't know.  I think it was -- there were two mockups.  One of them wasn't to Mr. Grable's satisfaction, so we developed another mockup the day before -- night before.

Q.   And then you developed it where; here in Boerne?

A.   Actually, on one of our job sites in San Antonio.

Q.   And then where did you transport it out to?

A.   We transferred it out to their offices, off of -- by the airport.

Q.   Okay.  And what time was that supposed to be there?

A.   It was supposed to be ready at 7:00 o'clock in the morning.

Q.   Okay.  And did you have it ready?

A.   Yes, sir.

Q.   And what time did Mr. Lewis come see it?

A.   I don't know if Mr. Lewis ever saw it.

Q.   Okay.  But the talking about a mockup, that's something that you did to try to accommodate Mr. Grable and his -- and your relationship with Mr. Lewis?

A.   Yes.

Q.   Okay.  Now, there's been some discussion about a termination meeting.  If I say a termination meeting, do you know what I'm talking about?

A.   The meeting where there was a change.

Q.   Okay.  Well, I'm going to talk to you about a meeting that occurred on February the 5th, 2013.

A.   Yes, sir.

Q.   Does that refresh your recollection?

A.   Yes.

Q.   If you'll look in the Tri-Bar exhibit book -- and I'll try to figure out which exhibit book this is.  And you attended that meeting; correct?

A.   Yes, sir.

Q.   Okay.  Tom Pittman was there, Jack, Kyle, John Grable were there?

A.   Correct.

Q.   Okay.  Now, have you ever seen this Exhibit

48 before today?

A. Yes.

Q. Okay. This is just a -- sort of a memo transcription; this isn't the whole thing, is it?

A. It's not word for word factual. No.

Q. Okay. Now, before this meeting on February 5th, what were your expectations when you went to this meeting?

A. It was a construction meeting. A weekly meeting or monthly meeting on work in progress.

Q. Okay. And is that a series of meetings that were set up between SBS, the architect, and -- and the owner?

A. Yes.

Q. And what was the purpose of those meetings?

A. Typically, to discuss job progress and -- and anything else affiliated with the job.

Q. Move the job forward?

A. Yes.

Q. Okay. And now, before February the 5th, had you been repeatedly told by Mr. Pittman or Mr. Grable that you were in breach or in violation of the terms of the contract with Mr. Lewis?

A. No, sir.

Q. Now, there had been some problems on the

project; correct?

A.   Yes, sir.

Q.   Been some delays?

A.   Yes, sir.

Q.   And did -- was that a secret to anybody?

A.   No, sir.

Q.   Mr. Pittman; did he know?

A.   Oh, absolutely.

Q.   Mr. Grable; did he know?

A.   Yes.

Q.   Okay.  Now, you've been in the pre-engineered metal building business for a while; is that correct?

A.   Right.

Q.   About how many years?

A.   Oh, you're testing my memory.  A long time.

Q.   Okay.

A.   More than 15 years, 20 years.

Q.   Okay.  Now, are you -- do you understand -- or can you tell us; are you familiar with sort of classification of complexity of structures?

A.   Yes, sir.

Q.   If this is a type 1 building or a type 10 building, what does that mean?

A.   Well, they classify rigid frame metal buildings as far as the degree of difficulty by

number, using a scale of 1 to 10.

Q. Okay. Was this a type 1 building?

A. No, sir.

Q. What kind of building was this, as far as you're concerned?

A. The building was rated, because of its height and its complexity in regards to the copula and the doors, as a type 8 or 9.

Q. Okay. So, this was a complex building?

A. It's not an ordinary building.

Q. A lot of moving parts?

A. Yes, sir.

Q. Now, in your career constructing buildings, especially metal buildings, have you ever been on a job where there was absolutely everything perfectly delivered to the job site?

A. No.

Q. Okay. Even on a fairly simple building, have you ever had a situation where everything perfectly fit when it was delivered to the job site?

A. Not necessarily, no.

Q. Did you have a situation on this job where some things were delivered that were not absolutely perfect?

A. Correct.

Q. Okay. And what -- what does an experienced contractor do when that happens?

A. Well, you know, you identify the situation and you -- and you address it.

Q. Okay. Does that make it a used building?

A. No.

Q. That's a new building; right?

A. Yes.

Q. Okay. And sometimes it would be a matter of moving a -- making a bolt hole, moving it over; is that correct?

A. That's correct.

Q. Okay. Did you ever encounter that in this job, to your knowledge?

A. Yes.

Q. Now, you went out to the job site; right?

A. Correct.

Q. Okay. And so, you had a chance to inspect it from time -- not to inspect it, but to visit from time to time?

A. Yes.

Q. You also met with Mr. Grable?

A. Yes.

Q. You met with Mr. Pittman?

A. Yes, sir.

Q. Okay. Before February the 5th, had Mr. Pittman ever said anything to you that indicated that the owner was so upset with you that SBS should expect to be terminated, at any time?

A. Not -- not at all. No.

Q. Okay. Had Mr. Grable ever told you or made any comment to you that it led you to believe that SBS was going to be terminated on the job site?

A. No mention of termination was ever discussed.

Q. Now, when you -- you had -- you had had a chance to discuss these issues regarding the delay of the Schulte and other -- other project delays with Mr. Grable or Mr. Pittman?

A. Yes.

Q. And did they ever tell you that if this continues, SBS is going to be terminated?

A. No, sir.

Q. Okay. Now, originally this contract called for the project to take 173 days.

A. That is correct.

Q. Okay. At the time you drew up the contract, did you think that this job could be done in 173 days?

A. At the time the contract was drawn -- I didn't draw the contract -- that's the number of days that we thought we could complete the set of plans

that we were originally given.

Q.   Okay.  And then, did the owner ever make any changes?

A.   Oh, yes.

Q.   Okay.  Did you ever -- to your knowledge, did SBS or Schulte or any supplier have to wait on decisions to be made from the architect, Mr. Grable, or the structural engineer, or Mr. Pittman?

A.   The changes that were made were -- were sent directly to Schulte, and then there was times when they needed to be addressed.

Q.   Okay.  Are we talking about on the building dimensions?

A.   No.

Q.   Okay.  Was there ever a time -- well, let's talk about the building for just a second.

A.   Yes, sir.

Q.   Was there ever a time that the foundation was -- was -- well, let me ask you; how was the foundation poured?  Was it poured according to the structural plans or the building plans?

A.   The foundation was poured prior to the building plans -- the actual shop drawings being complete.  And it was poured according to the architectural plans.

Q. And is it your understanding that Schulte Building Systems, Mr. Key, contacted Mr. Grable and told him that there was a discrepancy in the building drawings?

MR. SLATES: Objection, calls for hearsay.

THE COURT: Sustained.

**BY MR. CLUCK:**

Q. Have you ever been told -- or is it your understanding that that happened?

MR. SLATES: Same objection as to "has been told."

THE COURT: Rephrase it one more time.

MR. CLUCK: Okay.

**BY MR. CLUCK:**

Q. In this case there has been some testimony that Mr. Key told -- or sent a set of shop drawings to Mr. Grable disclosing the discrepancy between the foundation and the shop drawings. Are you aware of that?

MR. SLATES: Objection, that mischaracterizes the record.

THE COURT: Overruled.

MR. CLUCK: I'm sorry?

THE COURT: Overruled.

MR. CLUCK: You can answer the question.

A. I'm aware that the shop drawings were sent from Schulte Building Systems to, I think, the architect's office with denotations and questions about dimensions.

**BY MR. CLUCK:**

Q. Okay. Did those plans ever -- were they ever sent directly to SBS for SBS to take a look at, as far as you know?

A. SBS got them after the fact from Schulte.

Q. Okay. But that was after -- or was that after John Grable had already signed off on them and sent them back to Schulte?

A. John Grable and the structural engineer both signed off on them.

Q. Okay. So, was it your understanding that the owner was already aware of the discrepancy, as far as your understanding?

MR. SLATES: Objection, calls for speculation.

THE COURT: Overruled.

MR. CLUCK: Go ahead and answer the question.

A. I'm not sure I know how to answer that question, because the -- we didn't have the plans to

make that -- at the time we didn't have the plans to know that there was a discrepancy.

BY MR. CLUCK:

Q. SBS was cut out of that part of the information loop, as far as you --

A. Yeah.

Q. Okay. Now, in the meeting -- I want you to go back to the meeting minutes on Exhibit 40-A. Let me ask you, when you walked into this meeting -- I think you testified a minute ago you had no idea that you were about ready to get fired; is that right?

A. Right.

Q. Tell us how that meeting went, from your perspective.

A. Well, we all sat down in the room and they sent a person in to -- with a laptop computer to do something. I didn't know what they were going to do at the time, but it was rather unusual. And then Tom Pittman was not there. He came in last -- well, he came in last and then a gentleman named Tony -- I don't remember his last name -- came in in the middle of the meeting later. So, Tom was not actually last. But Tom came in, sat down, and basically said right off the bat, "Rod wants to make a change."

Q. Okay. Did you take that as -- I mean, let me

ask you. When Mr. Pittman made that statement, did he say, you know, we've repeated problems on here; you've refused to do things, you've never done this; you've never done that; you repeatedly do this or don't do that? Did he ever say those kind of things to you?

A. No, sir.

Q. He said that Rod wants to make a change?

A. Yes.

Q. Sounds like -- would that be something like termination for convenience?

A. Yes, sir.

Q. Okay. And how did that strike you?

A. Well, you know, you walk into a meeting like that and you're not expecting something and you've never really been in that situation before. And the number of years I've been in construction, it kind of set me back and -- and basically -- I guess we stated some cordialities after that and we exchanged -- just kind of looking for words.

Q. Now, did Mr. Pittman tell you, look, Rod wants to make this break as amicable as possible?

A. Yes. And I took him as being sincere.

Q. Okay. And then -- now, the minutes say that you said, "We're disappointed. We understand part of it." What did you mean?

A. Well, I don't think that -- that -- the job itself wasn't a job where you're given a set of plans and you just went out and built a project from a set of plans. It was constantly being redesigned. And -- which always causes some difficulties.

Q. And you say you understood part of it. What is it that you meant when you say you understood part -- if you said that?

A. Well, because the job was constantly under redesign and there were always things that needed to be addressed, it wasn't really cohesive. So, I guess I -- that's what I meant.

Q. There wasn't a constant flow?

A. Right.

Q. Project flow?

A. Right.

Q. Okay. So, the project was a stop, start, stop, start type project?

A. Well, it was a surprise every day.

Q. Now, once you were told that you'd been terminated because Rod wanted to make a change for his convenience, did you ask what can we do to get back -- you know, get back on the job?

A. Yeah. I asked if there was some type of -- I forgot the word I used, but it's in here somewhere. I

asked him if we could appeal.

Q. And what were you told?

A. If there was an appeal process.

Q. I'm sorry. What were you told?

A. No. Rod has made the decision.

Q. So, by the time this -- this meeting occurred, Rod had already made a decision to terminate you guys, even though you'd never been told of any, quote, repeated refusals to do the work?

A. If they told us anything, we would do it.

Q. And you were told that this was a done deal and there was no appeal; correct?

A. Yes, sir.

Q. Okay. No one you could talk to?

A. No, sir.

Q. Okay. But they wanted to make it as applicable as possible; right?

A. Yes. They made it sound like, you know, we were going to work together to work this out. And there wouldn't be any -- what I drew from it is there wouldn't be any problems getting paid.

Q. Okay. Now, there's a comment here that says -- says that -- from Mr. Pittman, "We're terminating and that we're going to be fair. Two outstanding draws and change orders not processed. Will get

processed and paid." Is that what your understanding was?

A. Yes.

Q. Did that ever occur?

A. No.

Q. Okay. And then let me see if I've got this right. Says, "Tom says to continue with the meeting is moot."

A. Correct.

Q. Do you remember that?

A. (Witness nodding head up and down.)

Q. So, it was like, you're done, you're over, we'll see about getting you paid, we'll get you paid. But to continue any further is -- that's off. Was that your understanding?

A. Yes, sir.

Q. Okay. And then -- now, you made a comment that you said that you felt that you were upfront forthright people. And you know that there were some problems and you're sorry about it. Can you explain to the Court what you meant, if that's what you said? It's on page 2 of Exhibit 48.

A. Yes. I'm reading it. Well, we were sorry about the situation. We certainly didn't want to be fired. And we really would have rather have had a --

had been able to talk to Rod to see if we could fix whatever he perceived to be the problem.

Q. So -- and then again, Tom tells you, "Rod wants to make a change, and so we're going to make a change." Is that what he says in there, right below there? Is that the way you remember it?

A. Yes.

Q. Okay.

A. That's correct.

Q. Now, then Tom makes some comment about, "Well, contractually we don't have to pay until the project is finished and we're not going to do that." Is that what he said?

A. Correct.

Q. Okay. So, he represented, we're going to terminate you. It's a done deal. We're going to get you paid. We could take a position, but we're not going to take a position. Okay. Did he ever say that, hey, we're not -- we don't have to pay you because we're terminating you for cause? He never said that, did he?

A. No, sir.

Q. Okay. He said, Rod wants to make a change?

A. Yes, sir.

Q. Okay. Didn't say anything that led you to

believe anything otherwise; right?

A. Really quite the contrary. He said he was going to pay us our fee.

Q. Okay.

A. That's what kind of gave me the confidence that this deal was going to work out.

Q. Okay. Now, I want to sort of take you back a little bit. There were a couple of draw requests where SBS didn't get paid timely. Do you remember those?

A. Yes. I remember.

Q. And that would be draw number 6 and -- and 7; is that correct?

A. I don't know.

Q. Okay.

A. I don't know them by number.

Q. Okay. And -- well, let me ask you, during the course of this project, there were times when SBS had not been paid timely; correct?

A. Yes.

Q. Okay. But even though you weren't paid timely and you were -- and somebody from SBS was asking about it, was SBS led to believe, hey, Tri-Bar is going to take care of it and get the thing taken care of?

A.   Yes.

Q.   Okay.  Did you ever have those conversations with anyone?

A.   Yes.

Q.   And who did you have those conversations with?

A.   Tom.

Q.   Tom Pittman?

A.   Uh-huh.

Q.   The owner's representative?

A.   Yes, sir.

Q.   Now, the contract says that if you're not paid, what could happen?

A.   I don't know what the contract says.

Q.   Well, if the contract said that if you weren't paid, you could cease work, would that be an option that you would have?

A.   Yes.

Q.   Okay.  But you didn't cease work when you didn't get paid, did you?

A.   No.  We didn't cease work when we didn't get paid and we didn't cease work when the change orders were never signed.

Q.   Right.  If the contract -- if the AIA contract says you don't have to do any more work until

the change order is signed, you'd have that right?

A. Yes, sir.

Q. Generally?

A. Well, we wouldn't proceed with the change orders. But in order to do anything, we had to.

Q. Right.

A. We couldn't even order the metal building without -- with a change order.

Q. Now, let me ask you -- so, SBS relied on what the owner's representative, Mr. Pittman, promised in terms of payment; correct?

A. Yes, sir.

Q. And that had been an ongoing course of dealing; correct?

A. Correct.

Q. As a matter of fact, you had come to continue to do work based upon Mr. Pittman's representations?

A. Yes.

Q. As the owner's representative?

A. Yes.

Q. Okay. Now, have you ever become aware that in this case Mr. Lewis issued a no-pay edict way back in October?

A. I know today, but I did not know then.

Q. Right. So, after that no-pay edict came down

from Mr. Lewis, did Mr. Pittman say, hey, Mr. Lewis isn't going to pay you anymore?

A. No.

Q. He never revealed that little secret to you?

A. No, sir.

Q. Okay. And as a matter of fact, he didn't pay -- you can look up here at this list, just like the Court can, and see and how many times the payments were late or not made at all; correct?

A. Uh-huh.

Q. But despite these representations and -- or based upon the representations and the promises that they were going to happen, SBS continued?

A. Yes.

Q. And you relied on them -- SBS relied on them?

A. Yes, sir.

Q. Okay. And now SBS hadn't gotten paid, according to the promises?

A. Correct.

Q. Right? Now, Mr. Pittman knew that he had gotten a no-pay edict from Mr. Lewis back in October; right? I mean, assume with me the testimony is that Mr. Lewis gave a no-pay edict to Mr. Pittman back in October.

A. I know that now. Yes.

Q.   Okay.  Did Mr. Pittman personally -- tell you personally that he was going to make sure you got paid and the change orders were going to be signed after that statement was made in October?

A.   Yes.

Q.   Okay.  And so, you would continue to rely on statements or representations that Mr. Pittman made on behalf of the owner, even though Mr. Pittman knew that that was absolutely false?

A.   I know that now.

Q.   And if you had known that Mr. Lewis wasn't going to pay you, would that have impacted whether or not SBS would have continued to do the work and supply labor and materials and continue on the job site?

A.   Yes, sir.

Q.   Might have stopped it right there; right?

A.   Yes, sir.

Q.   Until you got it worked out?

A.   Yes, sir.

Q.   Now, let me ask you, are you now aware that the building's roof had to be removed?

A.   Yes.  I've been told that.

Q.   Okay.  And let me back up.  You visited the job site, didn't you?

A.   Yes, sir.

Q. Okay. And are you aware of any reason why the roof -- the entire roof of this structure would have to be removed?

A. I don't know why they removed the roof. No.

Q. Even if you had to maybe move a column a small amount to re-plumb it, would that require the entire roof to be removed?

A. No, sir. I think that they had to pair two panels on the roof to make it match them. So, that's why they removed the roof, is my opinion.

Q. Now, if you were going to -- let's assume that there were two panels on the end of the building toward the river of where this project is located. Okay. And if -- and if that column had to be -- was out of plumb, how would you, based on your experience, fix it?

A. If the column was out of plumb, we would loosen the adhesion of the base and we would slide the column over and then reweld it or bolt it or adhere it in some method approved by the structural engineer.

Q. Okay. Well, number one, did anybody ever tell you that the building that was constructed was out of plumb?

A. No, sir.

Q. Okay. Has anybody to this date, other than

what's come out in this case, told you that the building was out of plumb?

A. No.

Q. Okay. So, would you have had to remove the roof just to move that -- the base of those columns over like you were just talking about?

A. No, sir.

Q. Okay. Would you think that changing that roof would -- or removing the roof would be an unreasonable expense?

A. I'm sorry. I didn't hear you.

Q. Do you think that removing the roof to plumb two columns would be an unreasonable expense?

A. In my opinion, yes.

Q. Yeah. In your opinion. Based on at least 15 years in the pre-engineered metal building business?

A. Yes.

Q. And I mean, could you give the Court an idea of how many pre-engineered metal buildings you have built in the last 15 years?

A. I know of -- I know of 110 of them.

Q. Okay. Now, when the building was -- let me ask you, this February 5th meeting, were you at the end of the project?

A.   No, sir.   We were in the middle of the project.

Q.   So, they stopped SBS smack dab in the middle of an unfinished project?

A.   Yes, sir.

Q.   Okay.   So, if somebody went out there on February 5th and went -- and let's say that they went out there on March the 1st and started taking pictures of an unfinished project, what would those pictures show?

A.   They would show an unfinished project.

Q.   Okay.

A.   I mean, it would show multiple things that weren't finished.

Q.   Now, let me -- let me ask you; do you know what a wind bent is?

A.   Yes, sir.

Q.   Am I using the right word?

A.   Yes, sir.

Q.   Okay.   Was there ever a question about a wind bent?

A.   There was not a question about a wind bent. There was a question about the hole that the wind bent was installed in.

Q.   Okay.   Tell us about that.   Is that a problem

that came with a piece of material supplied from Schulte to the job site?

A.   Yeah.  I mean, typically, the wind bent is placed in the field.  Every different building manufacturer has different specifications on how the wind bents are assembled.  And Schulte specified for the wind bents to be placed in the field.  And so, therefore, when the wind bents were installed, the slots that they fit in were cut there.

Q.   Would you consider that to be a modification?

A.   No, sir.

Q.   Okay.  And if you made the hole in the field, would that make the building a used building?

A.   Absolutely not.

Q.   So, if somebody was wanting a new building, would you have -- would that be a new building if you had that hole in there that's been punched in the field?

A.   Yes.  It's still a new building.

Q.   Now, let me ask you, there's been some discussion today and/or yesterday and I think maybe Monday about a dip in the roof.  Have you ever heard that phrase, a dip in the roof?

A.   There's no dips in the roof.

Q.   Okay.  If somebody was to say there was a dip

in the roof after looking at this project that was partially completed, would they be mischaracterizing the way you build your roofs?

A. Yes, sir.

Q. Okay. Tell us how SBS built the roof on the Tri-Bar project.

A. I guess generically, in the construction industry, a dip in the roof would be a hollow spot somewhere on the roof. But they -- what they're referring to is a sloped area at the end of the roof.

Q. Okay. Now, yesterday Mr. Key talked about how -- the way that SBS builds roofs that -- on a project like this, that you go up 5 feet to the first purlin and insert a raised clip?

A. Yes, sir.

Q. Is that the way you do it?

A. Yes, sir.

Q. And so, the roof sort of makes a slight upward dip?

A. Correct.

Q. And then drops off; is that correct?

A. Yes, sir.

Q. Why would you ever do that?

A. Well, you have to have some space between the roof and the purlins to install the insulation. So,

the clip that is in the inner field of the roof is usually higher than the clip that is on the edge of the roof. The clip on the edge of the roof ties the roof down to the last member that's there, so wind does not get underneath it and try and lift it up. And the second thing is so water drips off the roof and doesn't try to clog on the underside of the roof back into the building.

Q. Okay. Now, I will assert to you that there have been a number of pictures that have been provided by Tri-Bar's counsel of the project. And I can go through each one of them with you, but -- and they show things that need to be done; maybe a bad cut, maybe insulation, you know, various things. Okay. In the middle of a project, would that be unusual to find things like that?

A. No, sir. They're items that we would go through and punch --

Q. Okay.

A. -- and have repaired or have finished.

Q. So, if someone was to sit here and go through picture after picture after picture after picture showing, quote, defects on the property, that would be just things that would be remedied at the conclusion of the project; correct?

MR. SLATES:  Objection, calls for speculation.

THE COURT:  Overruled.

MR. CLUCK:  You can answer the question.

A.  Yes.

**BY MR. CLUCK:**

Q.  Okay.  I mean, that's the way SBS's project -- or path of work is done; right?

A.  Yes.

Q.  Okay.  Now, have you ever been provided -- or have you ever seen a specific list of any and all defects of -- with this property before Mr. Robertson filed a lawsuit?

A.  No, sir.

Q.  Can you remember having seen one at any other time, other than through the discovery process in this case?

A.  No.

Q.  Now, you were told at some point -- or let me ask you.  You tried to come out -- back out -- or you wanted to come back out to fix the problems; correct?

A.  Yes.

Q.  And you were told that wasn't going to happen?

A.  Right.

Q.   Okay.  Now, to your knowledge, did -- were there ever attempts to get paid?

A.   Yes.  Numerous attempts.

Q.   And what happened with those attempts to get paid?

A.   Nothing.  We didn't even receive a return phone call.

Q.   And at some point, did someone tell you -- or did Mr. Pittman tell SBS, from now on, you need to talk to our lawyer, Tony Trevino?

A.   We got an e-mail that said that.

Q.   Right.  And there was an attempt to talk to Mr. Trevino?

A.   I turned that over to Dave Morgan.

Q.   Okay.  I'm going to show you what is SBS Exhibit 12.  Do you see Exhibit 12?

A.   Yes, sir.

Q.   This is a letter that you wrote to Tom Pittman; is that correct?

A.   Yes, sir.

Q.   Tell us what caused this letter and what was the purpose of this letter.

A.   Basically, a letter giving him all the final invoices and trying to close out the project as he instructed us to do in the meeting on February 5th.

Q. Now, attached to this is a -- a breakdown of draws through draw 8; correct, and a list of the subcontractors?

A. That's what it says.

Q. Am I reviewing this correctly?

A. Yes.

Q. And then on the third paragraph of your February 15th letter, it says -- it indicates that you're trying to cooperate and turn this project over to whoever the new contractor is.

A. Yes, sir.

Q. Okay. And it says -- let's see if I've got this right. It says, "Based upon your representation with me that everyone would be fairly compensated in a timely manner."

A. Yes, sir.

Q. Is that what it says?

A. Correct.

Q. And then I'm going to direct you to Exhibit 13. It's just right next to this. This seems to be an e-mail from you to Mr. Pittman saying that, you know, Tom had made representation about getting a closeout check and, you know, now we're three weeks down the road and you still hadn't gotten a closeout check?

A.   No, sir.

Q.   Okay.   And how long had SBS been off the site at this point?

A.   Since February 5th; three weeks.

Q.   Okay.   Now, was there another entity coming in that Jack cooperated with in terms of taking over the job?

A.   Yes.   There was another contractor.

Q.   Okay.   At this time in February -- at the end of February, had anyone told you about defects or problems related to the property?

A.   I don't remember exactly when the letter came in regards to the defects.

Q.   Okay.   I want you to look at Exhibit 15, please.

A.   (Witness complying.)

Q.   Exhibit 15, is that an e-mail from Mr. Robertson to you telling you that, we're going to file a lien -- we're going to lien this property?   Is that what it says at the bottom of the e-mail?

A.   Yes, sir.

Q.   Okay.   It says, "We'll be filing a lien on the property on Friday, February 15"?

A.   That's correct.

Q.   "We'd like to resolve it, if possible, to

minimize any further cost and claims."

A. Yes, sir.

Q. That's what it says. Okay. And then you wrote back to Jerrod Robertson. It says that you've placed a number of calls to Pittman, but have not gotten a return call.

A. That's correct.

Q. Is that starting to be the wall of silence that you're encountering when dealing on this project?

A. Yes.

Q. Okay. Both in terms of getting paid or being told about problems or reasons why -- or problems with the job or reasons why you're not getting paid; is that right?

A. Right.

Q. Okay. Now, I want you to take a look at Exhibit 17, correspondence to Mr. Pittman dated March 19th. Can you tell us about this letter?

A. Basically, it's just telling Mr. Pittman that we'd like to get paid again, and that he made some representations in the February 15th meeting -- and I'm not reading it word for word, but we'd like him to live up to those representations.

Q. Okay. And if you'll look at -- it says on February 28th, and we're going to talk about that

February 28th letter from John Grable in a minute. You were responding to those issues; is that correct?

A. Yes, sir.

Q. Okay. And then, I want you to get down to the fourth paragraph -- or third paragraph. And it says, "We've submitted e-mails, numerous calls seeking the opportunity to meet, discuss steps requiring to complete the closeout process."

A. Where are you at? I'm lost.

Q. Do you see where it says that?

A. No.

Q. Yes?

A. No. Where are we?

Q. It's on page SBS-2008 of that exhibit.

A. Okay.

Q. In that third paragraph. Do you see that?

A. Yes.

Q. Is that a -- I mean, that's what was happening is that, at least as far as March the 19th, as far as Mr. Pittman was concerned, the wall of silence was continuing?

A. Correct.

Q. Okay. And it says no calls have been returned, no exchange of information?

A. Correct.

Q.   Okay.  And then apparently, there's another paragraph right after that.

A.   Uh-huh.

Q.   Take a minute and read that for a second.

A.   (Witness complying.)

Q.   What is that paragraph about?

A.   Well, it's referencing a letter that was issued by John Grable, basically saying that we have a real problem with the -- or they had a real problem with some things they were seeing on the job and that we should be calling our insurance company.

Q.   And you dispute that, don't you?

A.   Yes, sir.

Q.   Okay.  Then you go on to say, "The dimensions of the foundation were extended from the original design specs as a result of meetings and discussions with Grable.  The foundation was reformed and inspected prior to pouring."  Okay.  And then it says, "By several e-mails among and between SBS, Grable, and Victor de Anda on August 18th, 2012, supported by the field observation report, both de Anda and Grable approved and poured the foundation that's currently in place."  Is that your understanding?

A.   Yes, sir.

Q.   Okay.  Now, to your -- in your experience --

let's go back to that pour for just a second. In your experience, is it typical for a structural engineer to go out and inspect and verify the area for a concrete pour?

A. Yes, definitely.

Q. Do you have any reason to believe that Mr. de Anda did not do that in this case?

A. No. I have no reason to believe he did not do it.

Q. Have you seen -- have you seen any document that says that he didn't go out there and take a look at the -- at the foundation pour site?

A. No, sir.

Q. Okay. So, there's been some testimony about a building lug. Have you heard about that?

A. Yes.

Q. If there was a problem with the building lug, that would have been available to be seen. That wasn't covered up, was it?

A. It would be very obvious. It would be on the edge of the foundation forms.

Q. And if the -- and if the structural engineer who -- let me back up. Whose job is it to check the -- or whose job is it to check the structural engineering compliance with the structural engineered

plan prior to the pour?

A. The structural engineer.

Q. Okay. And let me ask you, you were out there the day when they had the pour; right?

A. Yes.

Q. Okay. The pour site was open for anybody to take a look at?

A. Correct.

Q. Okay. Do you know whether or not Mr. de Anda approved the pour?

A. I did not see him on the site.

Q. Okay. Have you seen anything where he did not approve the pour?

A. No, sir. But Mr. Pittman was there and John Grable. And I'm sure if he hadn't approved the pour, they wouldn't have poured. They would have stopped.

Q. Now, to your knowledge, was any other concrete poured on that project other than on the two pour dates?

A. No, sir.

Q. And they were two consecutive pour dates; right?

A. Yes. They were -- the foundation was poured two days in a row.

Q. Now, those pour dates come back to the draw

number 3; is that correct? That was back in -- that would have been billed in September. Does that sound right to you?

A. The foundation was poured in August, so it would be billed in September.

Q. Okay.

A. That sounds right.

Q. Now, are you aware that draw number 3 wasn't paid for quite some time? As a matter of fact, it was billed in September and it wasn't paid until January the 17th.

A. I don't know the exact dates, but --

Q. Assume with me that's --

A. I believe -- yes.

Q. Let me ask you, in your experience in the business, what happens when a small tradesman or a concrete supplier like, you know, we've got in this case doesn't get paid?

A. It's very disillusioning. They do not want to come out and work.

Q. Exactly. And what impact does that have on any trade if they don't get paid, coming back out to the job site?

A. It has a serious impact on it.

Q. Now, was there ever a time when SBS offered

to pay out of its own pocket the tradesmen?

A. I don't remember. We offered to pay for some materials.

Q. Now, let me ask you, did you offer -- did SBS offer to pay these tradesmen out of its own pocket if Pittman would guarantee that y'all would get paid back?

A. No, sir. What we offered was to pay for concrete in advance because the nonpayment from Lewis to the concrete contractor -- to the concrete supplier would not allow us -- he would not allow us to buy any concrete on any type of credit. We would have to pay in advance. And yes, I offered Mr. Pittman, if he would assure me that I could -- I would be reimbursed for the moneys that we would put out of SBS, that we would pay for future concrete in order to get the job -- to continue the job.

Q. And did Mr. Pittman give you that assurance of payment?

A. No, sir.

Q. Okay.

A. We didn't do it.

Q. Let me ask you, at the bottom of page 2008 -- that's going to be Exhibit 17 -- you make this statement. "The relationship among all the parties

has been hampered since inception by lack of substantive communication and teamwork. It's effectively difficult to manage a construction project when the payment process is not reasonable and when authorized change orders are not approved and executed in time." Okay. The project plans and specifications are continually being adjusted. Could you tell me what you meant when you put that in that letter?

A. Yes. When you have consistent changes and you add on top of it the fact that you're not being -- being consistently paid and you have the additional burden of change orders that aren't approved. So, therefore, you're truly liable for that amount of money without any authorization, which really compounds the amount of risk that you have in regards to receivables.

Q. Now, are you aware that there have been a number of e-mails from Mr. Grable where he accepts responsibility for communication problems; that he's -- where he admits that he's had communication problems, that it was his fault? Are you aware of those e-mails?

A. I don't know.

MR. SLATES: Objection, mischaracterizes the record.

THE COURT: Overruled.

Q. (BY MR. CLUCK) But if there are e-mails to that effect, you just don't know about them?

A. Correct.

Q. Okay. But would that seem to complement what you're talking about in your letter?

A. Yeah. There was not a lot of cohesiveness between the architect, Mr. Pittman, and SBS communication-wise.

Q. Now, you -- this isn't your first project with Mr. Grable, is it?

A. Yes, it is.

Q. Did you ever do another project for Mr. Hixon?

A. Yes. We do all of Hixon's.

Q. Is Mr. Grable an architect for Mr. Hixon?

A. I don't know that.

Q. Okay. Did you ever build a metal building for Mr. Hixon?

A. I've built quite a number of them.

Q. Okay. Did you ever have this kind of problem with Mr. Hixon?

A. It's Hixon Properties, and no, I did not.

Q. Okay. Now, let me ask you -- turn to Exhibit Number 14, sir, in that book. We talked about a

letter from Mr. Grable, February the 28th. Okay. This is after the termination. Okay?

A. Uh-huh.

Q. And then it says -- now, in February in the letter from Mr. Grable to Jack Green, it says, "You may not be aware, but we have discovered several defects in the work delivered by SBS." Okay?

A. Uh-huh. Yes.

Q. And now, you hadn't seen -- you hadn't been informed of any defects that -- you hadn't -- this is new to you?

A. Right. There was no prior inspections.

Q. It says, "Efforts are underway to complete a detailed list outlining these defects and how they would be resolved. Okay. To your knowledge, have you ever seen such a list that tells you -- outlines each defect and how it will be resolved?

A. No, sir.

Q. Okay. Now, you may have gotten a list of purported defects, or maybe through the discovery process you may have seen a list of purported defects and how they were resolved. Did you receive that list? And you may not have.

A. No, sir.

Q. Okay. And it said now -- and it talks about

2 inches out of plumb towards the west or river end and a number of double lock seam panels not contiguous as specified. It talks about diaphragm function of the roof. And then practice of installing a roof before a building is squared and plumb violates industry standards. How -- you've been building these things for 15 years.

A. Yes, sir.

Q. Was the building, as far as you know, out of plumb?

A. To our standards, it was perfectly plumb.

Q. Okay. They say it was 2 inches out of plumb. Have you ever seen any document that actually shows how it was determined to be out of plumb?

A. No, sir.

Q. And if someone was to say that it was 2 inches out of plumb, were you ever given -- was SBS ever given a chance -- at least in February of 2013, was SBS ever given a chance to go out there and verify it?

A. No, sir.

Q. As a matter of fact, you were told you weren't allowed back on the job?

A. That's correct.

Q. Okay. And so, if this plumb issue -- you

know, that being the straight up and down of the building -- if it was a problem, if it existed, there's no way to verify that?

A.   No, sir.

Q.   I mean, there's no more way of verifying that than you or Mr. Key or anybody else saying, as far as you're concerned, it was -- it was plumb?

A.   Correct.

Q.   Okay.  As a matter of fact, someone may have looked at the CMU or the brick work and the CMU or brick work may have been out of plumb.

A.   I don't think it was, but --

Q.   I mean, who knows?

A.   But it could be.  It could be a number of things.

Q.   Now, there's a discussion about roof panels in this letter.

A.   Yes, sir.

Q.   Can you tell us what was going on with the roof?

A.   I -- what I know about the roof is -- the first fact is that it's not a -- it's not a diaphragm, as stated in the letter.  It specifically is engineered not to use the roof as a diaphragm.  The second thing is, we were short two panels, so our

installer installed two panels that were -- that were lapped over each other with the intentions of coming back and re-rolling and reinstalling two full -- full panels.

Q. And if this had been a complete -- you know, if you'd been able to finish this project, would those roof panels have been correctly installed?

A. Oh, yeah. Sure.

Q. Okay. And you provided a list of the subcontractor contracts, supplier contracts -- I mean, you supplied a list of all those people?

A. Yes.

Q. Okay. And to your knowledge, the people that Tri-Bar wanted to retain, they paid and kept on the job; and people they didn't want to retain, they haven't paid?

A. To my knowledge, yes.

Q. Okay. One of the people they haven't paid is San Antonio Septic. Have you ever heard anything that's a problem with San Antonio Septic?

A. There was no reason why they should not pay San Antonio Septic.

Q. But I mean, have you ever heard any defect or complaint or anything about San Antonio Septic?

A. No, sir.

Q. They didn't pay them. Okay. Now, at some point you received instructions to terminate Robertson Electric?

A. Yes, sir.

Q. Okay. Did that conversation come to you?

A. Yes, sir.

Q. And who made that conversation -- who told you that?

A. Tom Pittman.

Q. Was that a personal visit?

A. A phone call.

Q. And how did that phone call go?

A. He basically just told me that -- that they did not like the fact that Robertson was going to file a lien. And they did not like the pricing they got on the change order from Robertson. And that we should -- that they had already secured another electrician to come on the job. And that we should replace Robertson immediately; and if we didn't, more than likely, we could be next.

Q. Okay. You basically took it as, either you do what we say or we're going to fire you, too?

A. It was a directive.

Q. Okay. And so, did you make contact with Mr. Robertson?

A.  Yes, I did.

Q.  And did you tell him what had gone on?

A.  Yes, I did.

Q.  Okay.  How did he take that news?

A.  As you would expect.  Not very well.

Q.  To your knowledge, what if any complaints did you receive or become aware of dealing with Robertson Electric Company?

A.  I received none.

Q.  Okay.  Now, tell me, on this change order; Robertson gave you change order or gave you a pricing on a change order?

A.  Yes, sir.

Q.  You submitted it to the owner; correct?

A.  Jack Green did.

Q.  Okay.  And then apparently, there was some modification; correct?

A.  Yes.

Q.  The price went down -- I think there has been some testimony that the price -- that Robertson cut his price in half or something like that.

A.  I do not know that for a fact.

Q.  Okay.  But I'll assert to you there's been some testimony about that.  So, let me ask you; is it unusual in your experience to have an owner reject a

supplier's bid and want it to be re-bid by that supplier?

A. We've done that before. Yes.

Q. Okay. And how -- how typical is it on the job that you've seen for the owner to have already established a relationship with an outside vendor and come in and said, oh, we've already decided to hire somebody else and fire this person, so we want to use our guy?

A. I've not had that happen before.

Q. That would be very unusual?

A. Yes, sir.

Q. Okay. Now, when you made the -- you talked to Dave Morgan about making that decision; right, regarding Robertson?

A. I don't remember.

Q. May have?

A. I'm sure I would have. Yes.

Q. Would that have just been a business decision between --

A. Yes.

Q. -- you guys?

A. Yes. Would be a business decision on SBS.

Q. I mean, regardless of what the contract said, you understood it was either fire Robertson or get

fired right away?

A.   We understood if we didn't fire Robertson --

Q.   How much money was owed to you back in --

MR. SLATES:  Wait.  I'd like to hear that answer.

MR. CLUCK:  Oh, I'm sorry.  Go ahead.

THE COURT:  Repeat the answer, Mr. Schiffman.

WITNESS:  Yes.

A.   I understood that we should fire Robertson or there would be a problem.

*BY MR. CLUCK:*

Q.   That's the way you understood that threat?

A.   Yes.

Q.   Okay.  At that time, how much money was owed?

A.   I don't know the numbers in the billing schedules.

Q.   But at least you know that you were owed money?

A.   Oh, yes.

Q.   Okay.

A.   And Robertson was owed money.

Q.   Robertson was owed money.  Okay.

A.   Correct.

Q.   And you still had a project that you were

trying to -- to continue to stay on?

A.   Correct.

Q.   Okay.  As a matter of fact, your entire -- throughout the entire job, there's evidence that SBS tried to do whatever it could to make the owner's rep happy?

A.   Yes, sir.

Q.   And stay on the job, no matter how difficult?

A.   That's correct.

Q.   No matter the demands?

A.   That was our job.

Q.   I want you to look at Exhibit 55.  Do you recognize this e-mail that came from you, sir?

A.   I'm refreshing myself.

Q.   Sure.  Take a minute and read it.

A.   (Witness complying.)  Yes, sir.

Q.   Okay.  Now, what caused this e-mail?

A.   I think Tom Pittman called me and told me he wanted -- he had some problems with the wind bents and -- on the job, if I remember right.

Q.   Okay.  Now, there's some discussion of field modifications.  Okay?

A.   Yes.

Q.   Now, at the bottom it says that you will not proceed with any future erection discrepancies without

giving the owner representative notice to assess and respond with direction. That was as of November the 14th.

A. Correct. In regards to the building, yes.

Q. In regard to the building. Is it your understanding that SBS did not proceed with any future erection discrepancies without giving the owner representative notice to assess and respond?

A. Not to my knowledge.

Q. Now, in this case you have seen through the discovery process a large number of photographs -- I mentioned it briefly -- regarding the unfinished -- or the way the project appeared in this unfinished state.

A. Yes.

Q. Okay. Have you had a chance to look at -- have you seen those pictures, by any chance?

A. Yes.

Q. Okay. Were any of those pictures -- or did any of those pictures present to you any actual defect that would not be cured during the completion process on the project?

A. A lot of pictures weren't defects. They were just work in progress that hadn't been completed. Some of the pictures that were called defects were easily repaired, if they were found out to be so, or

they weren't defects.

MR. CLUCK:  I'll pass the witness.

THE COURT:  Mr. Brown?

MR. BROWN:  I have no questions.

MR. SLATES:  One moment, Your Honor.  I think I can go relative quickly with this witness.  It's obviously your call, but I want to try to push through this and then let him go before lunch.

THE COURT:  Okay.

MR. SLATES:  Just one second.

MR. CLUCK:  Let me just ask one question before I pass the witness, if Mr. Slates doesn't mind.

THE COURT:  Do you mind, Mr. Slates?

MR. SLATES:  I'm okay with it.

Q.   *(BY MR. CLUCK)*  Was the work that you saw -- would it be completed in a manner that, upon completion of the project, would pass inspection and meet with industry standards without objection?

A.  Yes, sir.

MR. CLUCK:  Thank you very much.  Thank you, Mr. Slates.  I appreciate it.

MR. SLATES:  Certainly.

### CROSS-EXAMINATION

**BY MR. SLATES:**

Q.  Mr. Schiffman, at one point in the day I

didn't think you were going to testify, and so a lot of the questions I was going to ask you I asked Mr. Morgan, so I think I can move pretty quickly. But I do want to talk to you about a few things. There was reference to changes on this project. If you can look at SBS 12. That's the letter that you wrote on February 15th to Mr. Pittman after the termination. And in the second paragraph of that letter you say, "While we accepted the challenge to deal with the various parties involved and to manage the ongoing design changes." Do you see that? Do you see what I just read?

A. (Witness nodding head up and down.)

Q. I see you're nodding your head. But for the court reporter's benefit, is that a yes?

A. Yes.

Q. Mr. Pittman and the other people -- Mr. Grable; they told SBS on the front end that they needed to expect there was going to be some changes on this project, didn't they?

A. Yes.

Q. You knew going into this project that there were going to be changes?

A. I knew that there were going to be some changes. Yes.

Q.   The monthly meetings that you referenced, when did those begin?

A.   I do not know.

Q.   Okay.  Isn't it true that those monthly meetings were established because the owner wasn't happy with how the project was going in terms of meeting the schedule?

A.   I can't state that.

Q.   Isn't it true -- weren't you at the meetings?

A.   Not all of them.

Q.   Okay.  The primary focus of the meetings was, are we on schedule, where are we, what's going to get done this month, how are you guys going to recover the schedule; isn't that true?

A.   That's every monthly construction meeting that we have with every client.

Q.   Well, you had problems with this client with the schedule; right?  You were behind?

A.   Yes.  Correct.

Q.   The building wasn't delivered when you promised it the first time.  It wasn't delivered when you promised it the second time.  It wasn't delivered when you promised it the third time.  Right?

A.   Correct.

Q.   They were expressing concerns not just about

the building delivery, but about your staffing; not having enough people out there.  They expressed those concerns, didn't they?

A.  I do not know.

Q.  Mr. Schiffman, did you have conversations with Mr. Pittman where he told you you needed to get more people out there?

A.  I think he had that conversation with Jack Green.

Q.  All right.  So, certainly, you're not denying those conversations were -- occurred and that SBS was aware that the owner wasn't happy with staffing.  You knew that; right?

A.  I didn't know at what time period during the job he was referring to or you're referring to.

Q.  Okay.  Mr. Cluck asked you some questions about field modifications and he talked about moving a bolt hole over.  Do you recall that question?

A.  Yes.

Q.  There's a big difference, isn't there, between moving a bolt hole over and field modifying a building so that it will fit on a foundation that it's too big for?

A.  I don't know how to answer the fact if the building was too big for the foundation.  I don't

think that's true.

Q.   Were you aware that the building was field modified to fit a foundation that it was too big for?

A.   I'm aware that there were dimension problems. Yes.

Q.   Were you aware that the building was field modified to address the fact that the foundation was too small for the building?

A.   Yes.

Q.   Did you advise the owner of that?

A.   Yes.

Q.   When?

A.   Pardon?

Q.   When?

A.   I happened to be in the field that day when -- when we discussed it.  And Tom Pittman came to the job and we walked over to the back of his -- a pickup truck; I can't say it was his pickup truck.  And he was sitting there and we talked to him about it.  He also had another gentleman with him while he was there.

Q.   Was that Bob Cardin?

A.   I don't know his name.

Q.   Was that the day you measured the door opening?

A.    Yes.

Q.    That was after the field modification had already occurred, wasn't it?

A.    The field modification had occurred prior to us -- prior to the first meeting.

Q.    My question to you, Mr. Schiffman, is, can you point me to any evidence that would suggest that the owner was provided notice that you were going to field modify that building to make it fit the foundation before you did it?

A.    The field modification you're referring to was there the day Tom Pittman and the engineers and everybody else came out and inspected the job.

Q.    My point, Mr. Schiffman, is at that point you've got a building that's erected, you've got hangar doors that are installed, and you've got wing walls that aren't big enough to accommodate the door opening so it doesn't open to 80 feet.  I'm talking about before they built those walls, they had to cut those metal members somehow or modify them in some way to make them fit on that foundation.  And I want to know what evidence you can point me to to say the owner was put on notice of that before it was done and given an opportunity to approve it.  It doesn't exist, does it?

A.   I can't tell you that it does or it does not.

Q.   I want to hand you what's been marked as Exhibit Number 120 -- SBS 120.  There was a statement made that Mr. Grable was made aware of the discrepancy between the size of the foundation and the fact that the building that was being fabricated was going to be too big for that foundation.  And reference was made to Mr. Grable approving the shop drawings.  Do you see his signature on the last page of that?

A.   Yes, sir.

Q.   Can you show me in the shop drawings where it points out the conflict?

A.   It's on page -- I can't read all this.  It's too small.

Q.   I can't read it either.  What I'm trying to get at is, there may be -- if you look at one page and look at another page -- an inconsistency.  But nobody called that to his attention, did they?

A.   It came back as a denotation on the shop drawings that were shipped to the architect.

MR. SLATES:  I don't have an extra copy of this.  I'm sorry.  So, let me look at it for a second.

MR. CLUCK:  Mr. Slates, that might be Exhibit 119 that you're looking for.

MR. CLARK:  Are you looking for the e-mail from Matt Martinez to us with the stamp on it?

MR. SLATES:  I'm looking for whatever y'all contend was bringing the discrepancy to Grable's attention.

MR. CLARK:  Grable brought it to our attention.  It's 119.

MR. SLATES:  119 is the e-mail where it says verify field dimensions?

MR. CLARK:  And it notes the discrepancy.

MR. SLATES:  This is what you're talking about?

MR. CLARK:  That's the e-mail.

Q.   (BY MR. SLATES)  Can you show me in Exhibit Number 119 where someone calls to the architect's attention the discrepancy between the foundation size and the metal building size?

A.   Am I supposed to go through all these plans or what?

Q.   You know what?  In the interest of time, let's move along.  With respect to the payment, there was -- the building was supposed to be delivered back in August, and then it was September, and then it was in October.  So, when this pay application is pending, the building is late, isn't it?

A. Yes, sir.

Q. And the building is delivered in November and the erection begins. So, you get paid after the building gets delivered and you get progress on getting the building erected. That's what happened, isn't it?

A. I thought the building was delivered in October, the way I remember it.

Q. The record in this case shows the building was delivered November 7th, I'll represent to you.

A. Okay.

Q. And that erection began soon thereafter.

A. Yes.

Q. Continued into December and January. And so, late building, no building, and then once the building gets there and progress gets made, you get paid; right?

A. That's what it shows. Yes.

Q. Okay. You testified -- first of all -- I take that back. Let's move along. You testified, based on some photographs that weren't shown to you that you think that -- or at least not presented to you in court today -- that you think that the work that was done was cost to complete basically; is that right?

A.   I don't know what you're saying.

Q.   In other words, it wasn't defective work; it was work that just needed to be done to complete the work in place.

A.   Quite a bit of it.  Yes.

Q.   Is that what your testimony is?

A.   Yes.

Q.   Okay.  Let's assume that's true.  The $317,000.00 cost to complete as reflected in the defect plan.  And then you guys weren't done with the project when you got terminated, were you?

A.   No, sir.

Q.   There was other work that needed to be done in addition to the work to fix the metal building -- or to use your words, to complete the metal building; correct?

A.   Yes, sir.

Q.   If we go to Tri-Bar Number 9, I want to focus on the schedule of values.  First of all, that's the last pay app -- I'll represent to you, the testimony has been this was for the retainage.  And if we look on that first page, do you see the -- the balance to finish shows to be $400,051.24?

A.   Yes.

Q.   All right.  Now, if we go to the schedule of

values, item number 18, concrete -- or excuse me -- 17, concrete staining was 18,000; right? I'll represent to you that I don't think we're arguing about concrete staining here. At line item 22, cabinets and millwork, 14,150. Do you see that?

A. Yes.

Q. And I'm sorry. I'm looking in the Balance to Finish column. I'm trying to move fast here. I apologize if I'm not being clear. The balance to finish, that's work that's not yet done; correct?

A. Yes.

Q. Work that needs to be done to finish the project?

A. Yes.

Q. And again, cabinets and millwork; I don't think we're arguing about that. Cedar plank cladding, 20,529.82. Do you see that one at line item 24?

A. Yes.

Q. Paint, 17,500. See that one, line item number 32?

A. Yes.

Q. Okay. And plumbing shows 33,300. But we do have a claim for $14,000.00 in defective work on plumbing. So, I'm going to back that one down to 19,000; okay. 33 minus the 14, leaving a balance of

19.  Okay?

A.  Okay.

Q.  Does that make sense to you?  If our claim that we spent 14,000 in defective work, the balance it cost to complete would be 19?

A.  (Witness nodding head up and down.)

Q.  Is that a yes?

A.  I'm confused.

Q.  Plumbing, 33.

A.  Yes, sir.

Q.  I'll represent to you that the defect claim we're making for plumbing is 13,300, and I'm rounding --

A.  Okay.

Q.  -- or 13,700, so I'm rounding it up to 14. And I'm backing that down to 19.  14 and 19 is 33.

A.  Right.

Q.  And then on electrical cost to finish is 39,550.  But I'll represent to you that the claim for electrical is just shy -- I think it's 4,250, but let's call it 5, just to be conservative.  So, make that 34,550.  Now, can you add up those numbers for me?

A.  122,964.82 is what I got.

Q.  122,964.82 plus 317,900 equals what?  Can you

just add 317,900 to that number?

A.   (Witness complying.)  440,864.82.

Q.   Tell that to me one more time.

A.   $440,864.82.

Q.   Okay.  And that was only a handful of line items; 1, 2, 3, 4, 5, 6.  But there's a lot of other ones, aren't there?

A.   Yes.

Q.   So, if you treat it as a cost to complete analysis, you've exceeded the balance of the contract, haven't you?

A.   I don't know if you have the change orders included.

Q.   I'll represent to you that the testimony in this case is that this does include the change orders.

A.   I don't see how --

Q.   Do you see CO-1, CO-2, CO-3?

A.   Yes, sir.

Q.   Those are change orders, aren't they?

A.   Uh-huh.

Q.   Yes?

A.   Yes.

Q.   So, they are accounted for; right?

A.   Yes.

Q.   And they're being billed against.  So, with

that understanding now, if you treat this as cost to complete instead of defective work, you've exceeded the balance of the subcontract, only looking at six of those line items; right?

A. Yes.

Q. Okay. I'm almost done. Let's go to Exhibit Number 48, Tri-Bar. This is the meeting minutes. We've seen it a million times, but you're the guy that was there and they're your words, so I want to ask you about them. Now, if we go to the first page, Mr. Cluck again suggested that no reason was given other than Rod wanted to terminate. But what did Tom Pittman say right here? "Felt that we gave every chance; a lot of delays"?

A. Yes.

Q. There had been a lot of delays, hadn't there?

A. Yes.

Q. And there had been a lot of discussions about delays, hadn't there?

A. Yes.

Q. And there had been a lot of dissatisfaction on the part of the owner because of the delays, had there not been?

A. Yes.

Q. And your response immediately to that was,

okay. We're disappointed; we understand part of it. So, when he says, gave you every chance, lots of delays; your response is, we understand part of it. Right?

A. That's what it says. Yes.

Q. And it doesn't say anywhere in there that you were protesting, saying, no, there weren't any delays; you didn't give us lots of chances. You didn't say that, did you?

A. I was very discombobulated by the fact that we were being taken off the job. There were a lot of things I probably said that I didn't understand myself.

Q. That sounds like a no, you didn't say that.

A. That's what I just said.

Q. Okay. And then further down, Mr. Cluck didn't ask you about this either. It says, not seen the best side of SBS Construction for many reasons. You were acknowledging you didn't provide the kind of service that you expected to provide to your client, weren't you?

A. No, sir.

Q. Well, if we didn't see the best side of SBS, what side did we see, Mr. Schiffman?

A. You know, it's -- you're taking it out of

context. It's really saying that you guys didn't really see the best side of SBS for many reasons. And the many reasons are all the changes, all the things that took place, the lack of communication, et cetera, et cetera.

Q. Let's look at the next page. Here you said, this is a job site -- I understand. We're upfront forthright people. We had some problems and we're truly sorry about it. You're acknowledging that SBS had problems on the project, aren't you?

A. Yes, sir.

Q. And in fact, you're not just acknowledging it; you're apologizing for it and acknowledging responsibility for it?

A. I think that -- I think that was -- what I'm doing is just babbling at that point because I didn't know what else to say.

Q. Well, your babble was an apology and acknowledgement of problems; correct?

A. There were some problems. There's problems on every project that we're on. But they're always overcome. They're always worked on. They're always worked out.

Q. A little further down, Mr. Pittman says, contractually, we don't have to pay you until the

project is finished.  That's only true if you terminate for cause, isn't it, Mr. Schiffman?

A.  I don't know the legal definitions.

Q.  All right.  Fair enough.  You said -- I wrote this down.  You said, to your standards, meaning SBS's standards, the building was perfectly plumb.

A.  Yes.

Q.  Knowing what we know about this case and having heard the evidence we've heard, do you think it's safe to conclude that the owner's standards may be a little higher than your standards?

A.  I can't agree with that.  I'm sorry.

MR. SLATES:  That's all my questions.

THE COURT:  Mr. Cluck?

## REDIRECT EXAMINATION

### BY MR. CLUCK:

Q.  Okay.  Mr. Schiffman, I think you said you were very surprised by this meeting on February 5th?

A.  Yes.

Q.  Would it be fair to say you were blind sided?

A.  Oh, yes.

Q.  Totally taken by surprise?

A.  Oh, yes.

Q.  Okay.  Now, these meeting minutes -- these meeting minutes are minutes that somebody from Tri-Bar

came up with; right?

A.   Yes.

Q.   That's either a paraphrase or something like that; it's not a verbatim; right?

A.   There's a lot of words left out of it.  Yes.

Q.   Okay.  Let me ask you, at this point you were owed a whole lot of money, weren't you?

A.   Yes, sir.

Q.   And you'd like to try to at least -- at least salvage a possible, you know -- or at least be able to salvage and stay on this job; right?

A.   Yes.

Q.   Have you ever heard the phrase, don't pour alcohol on an open wound?

A.   Yes, sir.

Q.   Do you think if you sat there and said, you know, and made pointed comments about problems you had with Pittman and Grable and all those other difficulties that you'd had, do you think that would have put sugar on this deal?

A.   That was one of my exact thoughts.  No, I don't think it would have.

Q.   You think it might have helped them not pay you?

A.   Yes.

Q.   You ever hear the story, you catch more flies with sugar than you do with vinegar?

A.   Yes, sir.

Q.   Okay.  So, when you're trying to be nice in these quotes, you're not going to sit there and start pointing accusations just after he just got through saying, we want to be amicable?

A.   That's correct.

Q.   Right?  You're trying to be -- sort of get along to go along; right?

A.   Trying to handle a situation I wasn't prepared for.  But at the same time, not to make the owner upset or mad.  And so, we -- so it does not become less amicable.

Q.   Right.  Because what did he say?  Let's all get along.  Let's be amicable.  Hey, I'm going to get you paid.

A.   I'm going to pay you.  I'm going to pay your subcontractors.  I'm going to get this done as fast as possible.

Q.   Let me ask you.  On this $370,900.00 amount that Mr. Slates has pitched out here --

A.   Yes, sir.

Q.   Okay.  Let's take this -- let's be honest about it.  That 317 is no good; right?

MR. SLATES:  Objection, no foundation.

MR. CLUCK:  Sure, there is.

Q.  *(BY MR. CLUCK)*  Now, 317,900 --

THE COURT:  Wait a minute.  Wait a minute.  Wait a minute.

Q.  *(BY MR. CLUCK)*  -- you already testified that --

THE COURT:  Cluck, quiet.

MR. CLUCK:  Oh, I'm sorry.

THE COURT:  What's your objection?

MR. SLATES:  There's no foundation for this witness to testify about that number.

THE COURT:  Ask him what he knows -- if he knows where that 317 came from.

MR. CLUCK:  Okay.

Q.  *(BY MR. CLUCK)*  Well, let's assume that this is a number that Mr. Slates is going to try to say is the cost to complete.

A.  Yes, sir.

Q.  Okay.  And in there is a cost of $108,000.00 to completely remove the roof.

A.  Yes, sir.

Q.  Would that be a reasonable cost to complete this project?

A.  No.

Q. So, you would immediately deduct 108,00 out of that; right?

A. Right.

Q. So, that immediately knocks that down to 217,900?

A. Yes, sir.

Q. And that's before we go through and decide whether all this stain and cabinets and cedar plank -- cedar plank -- I mean, you know, painting, plumbing, electrical changes. Are you aware that the work that was done by the contractor that came on after you were a whole bunch of changes?

A. I don't -- I've not seen it myself. I was just told that.

Q. Okay. Have you seen any documents that say that these numbers are in any way the real cost to complete this project?

A. No, sir.

Q. Okay. So, when he was asking you all these questions, this -- these numbers are all -- you ever heard the phrase, garbage in, garbage out?

A. Yes, sir.

Q. Okay. And so, if this number here is wrong, then all these other numbers are wrong; right?

A. Well, the total would be wrong. Yes.

Q. Okay. And when you talked about these 18,000 and 17,000 and all this other stuff, to which there's been absolutely no evidence in this case so far; there's no way of knowing whether that's really the cost to complete; correct?

A. That's on our schedule of values, so I believe it is.

Q. So -- I mean, this is according to -- but you got this 317,900.

A. Right. I don't know that.

Q. Right. So, if you were to take all these numbers up and try to do with that, there's no way that could be right; okay?

A. (Witness nodding head up and down.)

MR. CLUCK: Pass the witness.

THE COURT: Okay.

MR. SLATES: Your Honor, just one point to clarify the issue that he raised about those numbers that I don't think was accurate.

THE COURT: As to the 317?

MR. SLATES: No, Your Honor. As to the other numbers.

THE COURT: They're the ones that came off that chart a minute ago; right?

MR. SLATES: Yes, Your Honor. I'd just

like to ask one question.

THE COURT:  I followed the numbers on the chart.  I verified those come off the chart.  The 317 I don't know about.

MR. SLATES:  I understand.  We haven't gotten there yet.  My point -- if I could just ask him one question.

THE COURT:  One question.

### RECROSS-EXAMINATION

**BY MR. SLATES:**

Q.  Those are your numbers -- SBS's numbers -- of the cost to complete; correct?

A.  That's what was on the draw statement.

MR. SLATES:  That's my only question.

THE COURT:  That's what I just said. Okay.  We'll recess for lunch until --

MR. CLUCK:  Thank you.  That's all.

THE COURT:  -- I know; you said that already -- 1:35.

(Recess taken.)

THE COURT:  Mr. Clark, your next witness?

MR. CLARK:  We rest, Your Honor.

THE COURT:  Okay.  Mr. Slates, are you ready to --

MR. SLATES:  Ms. Brazell will be calling

our next witness, Your Honor.

THE COURT:  Oh, excuse me.  Ms. Brazell, your first witness?

MS. BRAZELL:  Tri-Bar calls Victor de Anda, Your Honor.

THE COURT:  Sir, raise your right hand.

(At this time the witness was sworn in.)

THE COURT:  Sir, please state your name and spell your last name for the court reporter, please.

THE WITNESS:  Victor Noel de Anda, Jr. Last name D-E-A-N-D-A.

THE COURT:  Counsel, go ahead.

**_VICTOR de ANDA,_**

having been first duly sworn, testified as follows:

**_DIRECT EXAMINATION_**

**_BY MS. BRAZELL_**:

Q.  Mr. de Anda, can you tell us what your profession is?

A.  Structural engineer.

Q.  And what license do you hold as a structural engineer?

A.  It's a professional engineer's license from the State of Texas.

Q.   And how long have you been licensed?

A.   About 11 years.

Q.   And do you understand that you're here today involving a case about construction of an airplane hangar in Uvalde?

A.   Yes, I do.

Q.   And you were involved in that project?

A.   Yes.

Q.   And what was your role in that project?

A.   Providing from (inaudible) data plans for the project with the details and specifications on the project.

Q.   Can you walk me through generally -- if a contractor notices a discrepancy between metal building shop drawings, such as we had in this project, and your structural drawings, can you tell me generally what the process would be for the contractor to request clarification regarding that discrepancy?

A.   Yes.  They need to issue an RFI, or request for information.  And they will respond back with a statement of how to correct or whatever the question might be and also details if necessary.

Q.   And can you walk me through generally the process of what should occur in a project when you've got -- when you're seeking review and approval of

metal building shop drawings?

A.  The way the submittal process works, the general contractor asks for the supplier to provide the shop drawings.

Q.  Uh-huh.

A.  Then the other contractor will need to first review the shop drawings to see if they're in compliance with the architectural and structural plans.  If there are any discrepancies, they need to note them on the plans, then they need to submit to the architect who's the lead on the design team.  Then the architect will send the shop drawings to us and then we'll review it against our plans to see if they comply with ours.  If we find discrepancies, we'll note it on the plans.

Q.  And whose ultimate responsibility is it to verify the dimensions and coordinate the shop drawings with the other project drawings?

A.  The general contractor.

Q.  If we can look at SBS Exhibit 117.  And I believe -- can you tell me what that exhibit is?

A.  That's -- sheet S-3 is the foundation plan.

Q.  And I believe you just testified that it's the contractor's ultimate responsibility to coordinate dimensions and --

A.   That's correct.

Q.   And don't your structural drawings specifically make this notation in Exhibit 117?

A.   Yes.  On the foundation notes it specifies that they need to coordinate between the architectural, the structural --

Q.   Can you just read that note for us, note 5?

A.   "Contractor and subcontractor is responsible for verifying all dimensions of architectural plans before commencing any work.  The contractor and subcontractor shall report any discrepancies to the architect before the work has begun."

Q.   And is that same note found on any other sheets in Exhibit 117?

A.   On sheet S-4.

Q.   And what is sheet S-4?

A.   Sheet S-4 is the roof framing plan.

Q.   Let's talk specifically now about this project.  Were you involved in the concrete pour of the foundation for this project?

A.   We did a field observation report before they poured the concrete.

Q.   Okay.  And prior to the concrete pour, did SBS ever inform you of any discrepancy in the dimensions of the metal building shop drawings as

between your structural drawings?

A. No.

Q. Prior to pouring the foundation, did SBS ever request any modifications on your -- for you to modify anything on your structural plans?

A. No.

Q. If you'll look with me at SBS Exhibit 96. And it should be coming up on the screen. The second page of that document -- third page. Did you perform a field observation prior to the pour for this project?

A. Yes, I did.

Q. And is this your field observation report?

A. Correct.

Q. And what -- what date was this field observation?

A. August 9, 2012.

Q. And was that the same day that you physically went out to the site and took these pictures?

A. Correct.

Q. Do these pictures fairly and accurately represent what you saw when you went and observed prior to the pour on August 9th, 2012?

A. Yes.

Q. Can you just explain for my benefit what

we're seeing here in picture number 4?

A.   That's a spread footing for one of the columns and the perimeter grade beam.

Q.   This is the grade beam over here?

A.   Correct.

Q.   And where are the forms in conjunction with the grade beams?

A.   Aligned with the exterior face of the trench.

Q.   And this is how you observed --

A.   That's correct.

Q.   If we can look at Tri-Bar Exhibit 26.  Go to SD-1.  Okay.  Now, Mr. de Anda, you just testified that when you viewed the site conditions prior to the pour that the perimeter grade beam and footings were aligned -- and the forms were aligned with the edge of the trench; is that correct?

A.   That's correct.

Q.   And can you tell me if the condition that you viewed is consistent with your detail here on drawing SD-1?

A.   Yes, that's correct.

Q.   And can you just tell me generally what -- let me back up.  First, is this a detail drawing that you provided for this project?

A.   Yes, I did.

Q. And can you tell me generally what we're seeing?

A. That's the condition of the -- the perimeter grade beam with a masonry or CMU wall and reinforcing and the brick lug.

Q. And what is this right here?

A. That's the CMU wall -- concrete masonry unit -- and the reinforcing -- the bar that you see on the middle.

Q. If we can look at SBS Exhibit 18, second page of the e-mail. Mr. de Anda, is this an e-mail that you sent to Mr. Grable prior to the pour saying everything looks nice and clean?

A. Yes.

Q. And I believe you were responding to Mr. Grable's e-mail stating, "Photos from yesterday by Jack Green. They are pouring Monday a.m., starting at 3:00 a.m. Tom Pittman wants to check one more time." And this e-mail was sent on Saturday, August 18th. So, presumably, they're pouring a couple days later on Monday; correct?

A. Correct.

Q. Let's go down and look at those pictures. If you'll just scroll through 4, 5, and 6. Can you tell me, Mr. de Anda, do -- do any -- would any of those

pictures have allowed you to observe whether or not the forms were still aligned with the trench and grade beam?

A.   No.   Because that's taken from the outside. It's hard to tell what the condition of the inside is.

Q.   So, the -- the trench is over here, so you can't -- you can't see?

A.   No.

Q.   Okay.   So, when you are responding "everything looks nice and clean," that wasn't a specific comment; that was just more of a general -- everything from these pictures I've been provided look fine?

A.   Yes.   Especially where they straightened the beams of the interior that were all crooked.

Q.   Because there had previously been an issue with a bunch of --

A.   Yes.

Q.   -- crooked -- all right.   Mr. de Anda, we've heard some testimony in this case from Mr. Green that prior to the pour, he had a meeting with Mr. Grable and discussions regarding moving the forms out and extending the foundation.   And that after they had those discussions, they called you to get approval for this change.   Prior to the concrete pour, did Mr.

Green contact you to request any changes to the foundation?

A.   No, they didn't.

Q.   Let's assume for a minute hypothetically that he did call you to request a change.  What would your procedure or response have been if he said, hey, we're going to kick these forms out; what do you think?

A.   Well, first they need to send an RFI, the request for information.  And they would have to look at the plans and conditions and, if needed, provide all the details on how to proceed with new parameters.

Q.   And none of that was done here; right?

A.   No.

Q.   Because you were never asked?

A.   Exactly.

Q.   At the time that SBS was pouring the foundation, did you have any idea that they were not pouring the foundation per your structural plans?

A.   No.

Q.   Let's go ahead and go to Tri-Bar Exhibit 55.  Did you later -- later on in the course of the project become aware that the as-built conditions of the foundation did not match your structural drawings?

A.   Yeah, that's correct.

Q.   And do you remember about when that was?

This e-mail might help. Actually, let's go through something else first. Is this a true and correct copy of an e-mail exchange between you and Mr. Martinez and John Grable dated March 13th, 2013?

A. Yes.

Q. If you'll actually look with me at this one in the book; just review that one real quickly, that exchange.

A. (Witness complying.)

Q. Just let me know when you're done reviewing it.

A. Yes. There's some pictures of the perimeter of the foundation.

Q. And is that a true and correct copy of an e-mail exchange between you and Matt Martinez dated March 13th, 2013?

A. Yes.

Q. And does Exhibit 55 fairly and accurately represent the contents of the e-mail exchange between you and Mr. Martinez dated March 13th, 2013?

A. That's correct.

THE COURT: Is that Tri-Bar 55?

MS. BRAZELL: Yes, Your Honor.

THE COURT: Do you want to tender it to Counsel for objections?

MR. BROWN:  I have no objection.

THE COURT:  Okay.  Are you offering it at this time?

MS. BRAZELL:  Yes, Your Honor.

THE COURT:  Okay.

MR. CLARK:  Your Honor, the objection I have is that actually in Mr. de Anda's e-mail it says, "Attached are specifications."  The attachment, as I put in my objections with Ms. Brazell, is not there.  Somebody else's attachments and a different e-mail that are the pictures are there.

THE COURT:  So, for optional completeness, you want the attachments?

MR. CLARK:  Yes, Your Honor.

THE COURT:  Do you have the attachments, Counsel?

MS. BRAZELL:  I can offer a response, Your Honor.  This e-mail was produced by BoDen in response to a subpoena issued by SBS.  And we have it here in native form.  The e-mail that references an attachment is one down.  This is the response.  There was no attachment in this e-mail chain.  I went in and verified.  These pictures were in the body of the e-mail.  That's the reason they are attached and the detail is not.

THE COURT: Okay. 55, which you're admitting, does it refer to attached documents?

MS. BRAZELL: The second e-mail in the chain does, Your Honor.

THE COURT: That's part of your admission; right?

MS. BRAZELL: Yes, Your Honor.

THE COURT: Okay. Then where is the documents that are -- that need to be attached to be part of that?

MS. BRAZELL: They were not produced in response to the subpoena documents we received.

THE COURT: Let me see what you've got. And what will that do for you?

MR. CLARK: It won't. I just brought it up two weeks ago to just find the attachment. It's one that's referenced right there on the screen. It's just not there.

THE COURT: Objection is overruled. 55 is admitted.

Q. (BY MS. BRAZELL) Mr. de Anda, let's look first at the e-mail from Matt Martinez to you at the bottom of this chain. "Team, attached are some pictures taken by Daniel of as-built conditions of the hangar foundation. And as you can see, the lug at the

pilasters have no foundation below approximately 10 inches. We'd like to solicit any input for structural implications, repair, or reinforcement of this area to get us back to normal." And did you provide some detail as to how to get Tri-Bar back to normal on this issue?

A.   Yes.  To extend the foundation.  Yes.

Q.   And why was the as-built condition of the foundation an issue that -- that you guys needed to address and provide a fix for?

A.   Because we were carrying veneer that is heavy and cannot be carried in a small piece of a concrete ground without reinforcement.

Q.   What could potentially happen if you didn't reinforce?

A.   It can shear off; crack the edge.

Q.   Could it be a safety concern?

A.   That's correct.

Q.   Okay.  I'm going to switch gears on you a little bit.  There's been a lot of testimony in this case regarding the hangar doors of the hangar.  Did you at some point become aware that the metal building that was ordered by SBS was larger than the footprint of the foundation?

A.   Yes.  That's correct.

Q. Do you remember when you became aware of that?

A. After the building was being erected.

Q. So, SBS didn't -- didn't notify you of that issue --

A. Before? No.

Q. -- beforehand?

A. No.

Q. Did SBS ever consult you prior to performing field modifications on the hangar door to make it fit on the foundation?

A. No.

Q. Did you later learn that SBS did modify the building to fit it on the foundation?

A. Yeah. They were being -- they were carving the steel beams on the metal building to make it fit.

Q. And did you provide a detail, a fix, to this problem as well?

A. Yes. Later on we provided an extension on the foundation to fit the metal building.

Q. And why would this have been a problem -- why would have SBS's field modifications been a problem if they would have been allowed to stay as they existed without your fix?

A. The doors wouldn't fit on the -- on the

pockets provided.  Because the metal building made the doors bigger.

Q.   I just have one more question to ask you, Mr. de Anda.  We discussed earlier your observation report when you went out and physically reviewed the foundation pour.

A.   Correct.

Q.   Were you responsible for inspections on this job as well?

A.   No.  We're only doing per our contract general observations to see if they're complying with our drawings.  But not an actual inspection of the entire procedure of construction.

Q.   That wasn't your scope of work?

A.   No.

          MS. BRAZELL:  Thank you, Mr. De Anda.

          THE WITNESS:  Okay.

          MS. BRAZELL:  No further questions.  Pass the witness.

          THE COURT:  Do you want to go first?

          MR. CLARK:  Yes, if you don't mind.

### CROSS-EXAMINATION

BY MR. CLARK:

Q.   Do you have Exhibit 119 in front of you?

A.   Yes.

Q.   I'm going to ask you to look at the attachment of Exhibit 119.  Do you see those shop drawings?

A.   Correct.

Q.   And is that your stamp in the middle of those shop drawings?

A.   Yes, it is.

Q.   And what -- is that your handwriting that's underneath there?

A.   Correct.

Q.   And what does it say?

A.   "Architect to verify dimensions."

Q.   Okay.  And the larger 117 you were looking at comes out of that?

A.   Excuse me?

Q.   The 117 that you looked at at the very beginning comes out of what's in 119, doesn't it?

A.   117?

Q.   The big one that you had out.

A.   Oh, this one?

Q.   Yes.

A.   Oh, I'm sorry.  Okay.  Yeah.  What we do when we get the shop drawings, we verify dimensions with our guys.

Q.   Okay.  And so, you noted that there is -- you

bubbled in and said there's a problem with dimensions and you asked the architect to variety dimensions; right?

A.    Yes.  That's what I recall.

MR. CLARK:  No further questions.

THE COURT:  Mr. Brown?

MR. BROWN:  Thank you, Your Honor.

## CROSS-EXAMINATION

### BY MR. BROWN:

Q.    I just have a couple of questions.  You testified earlier that you do changes and revisions to plan -- or to designs of that nature; is that correct?

A.    Yeah.  When there is a request from the contractor, they see that something is calling for action, they request to make modifications.

Q.    How would you know that that, in fact, has been done?  How do you identify the kind of document that's it's been changed or revised?

A.    Well, we have to look at their request and then we have to analyze -- check our drawings and do a new analysis and new details.

Q.    And then when you reissue the document, do you note those changes?

A.    Yes.  You have to issue a detail for the RFI -- the response to the RFI.

Q. And is it supposed to be identified on the document as a revision?

A. Well, it's identified on the request for information that the contractor submits.

Q. So, in other words, it wouldn't just say it was the original; it would reflect it was amended or corrected?

A. On -- on the original plans?

Q. On the subsequent one that you're providing a response to.

A. Uh-huh.

Q. You would show that it had been corrected and modified?

A. Yeah. That it has to be modified. Correct.

MR. BROWN: Thank you. No more questions.

THE COURT: Ms. Brazell?

MS. BRAZELL: Nothing, Your Honor.

THE COURT: Okay. You can step down, sir. Thank you.

THE WITNESS: Thank you.

THE COURT: Next witness, Mr. Slates?

MR. SLATES: Yes, Your Honor. Tri-Bar calls Jennifer Swisher.

THE COURT: Ms. Swisher, up here, ma'am.

Same place.  Raise your right hand.

(At this time the

witness was sworn in.)

THE COURT:  Okay.  Please state your name for the court reporter and spell your last name for her, please.

THE WITNESS:  Jennifer Swisher, S-W-I-S-H-E-R.

**JENNIFER SWISHER,**

having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

**BY MR. SLATES:**

Q.  Ms. Swisher, how are you employed?

A.  I'm currently with Lewis Energy Group as the construction coordinator.

Q.  Were you involved in the Los Cerritos Hangar project?

A.  Yes.

Q.  What was your role?

A.  Construction coordinator.

Q.  Did your role change over time?

A.  Yes.

Q.  Can you describe what your original role was, then how it evolved?

A.  Originally, when I first was hired as the

construction coordinator, I developed through an assistance role into more of an assistant project manager's role.

Q. And tell us from kind of the -- as an assistant what you did, and then when you became an assistant project manager, to use that term, what you did.

A. First, it was really observing the projects; gathering information, documentation. Once we progressed with the project into a bigger -- I guess I proceeded into a bigger role as in going on sites, viewing progress, submitting everything to our owner.

Q. When did your role grow? Was it before or after SBS was terminated?

A. After SBS.

Q. Were you involved in an investigation into the quality of the work that SBS had in place at the time they were terminated?

A. Yes, but more so gathering information from the experts.

Q. Okay. Did you work with Daniel Boddie --

A. Yes.

Q. -- in conjunction with that?

A. Yes.

Q. So -- we're going to get to these documents

in awhile. But when you say collect the information, are you saying that you would receive information from Mr. Boddie and then put it into a document?

A. Yes, sir.

Q. Did you understand -- or let me ask you. What did you understand Mr. Boddie's effort to be in terms of what he was investigating?

A. Well, originally we wanted to scope out what was left on the job, what we had to finish. And then when we started actually investigating what that was, we ran into some other issues. And that's what Daniel and I worked on together.

Q. In conjunction with that work, did Mr. Boddie provide you with some photographs of defective conditions on the project?

A. Yes.

Q. Did Mr. Boddie also provide you with photographs of the conditions after those defective conditions were repaired?

A. Yes.

Q. And after having received those, did you coordinate with Mr. Boddie to put text boxes into the defective condition pictures that describe the conditions in the picture?

A. Yes, sir.

Q. Did you also coordinate with Mr. Boddie to create a spreadsheet that summarized all of the defective conditions, the cost associated with them, the pictures representing those conditions, and the pictures representing the repairs?

A. Yes.

Q. Do you recall -- there's invoice records within that spreadsheet. We're going to look at it shortly.

A. Okay.

Q. When there was an invoice that was for multiple items and it had a single price, do you recall how you went about determining what price to allocate to each item, or was that something that you relied on Mr. Boddie for, too?

A. We relied -- really relied on Daniel to do most of that, since he was on site every single day.

Q. Okay. I'm going to have you look at what's marked as Exhibit Number 20, and admitted for purposes of our record. Is that the deficiency report that you created based on the information received from Mr. Boddie?

A. Yes, sir.

Q. If I could have you look at Exhibit Number 21.

A.   Uh-huh.

Q.   Is that the corrective action report that you prepared based on the information you received from Mr. Boddie?

A.   Yes, sir.

Q.   If I could have you look at Exhibit Number 19.

A.   (Witness complying.)

Q.   Is that the spreadsheet that you prepared based on the information you obtained or received from Mr. Boddie?

A.   Yes, sir.

Q.   Okay.

MR. SLATES:  Your Honor, we'll reserve the right to move to admit these exhibits after we have the opportunity to examine Mr. Boddie.  But that's all I have for Ms. Swisher at this time.

THE COURT:  Okay.  Cross, Mr. Brown?

MR. BROWN:  Thank you, Your Honor.

### CROSS-EXAMINATION

**BY MR. BROWN:**

Q.   Ma'am, as to the pictures that are identified, did you personally take any of those pictures?

A.   No, sir.

Q.   So, they were just given to you?

A.   Uh-huh.

Q.   As to any of the statements that are contained in the following reports, did you personally investigate those facts?

A.   No.

Q.   And did you personally observe the information based upon those facts?

A.   Observed, yes.  But I didn't put any of those down from my opinion or anything like that.

Q.   So, it doesn't reflect your opinion or anything?

A.   No.

MR. BROWN:  Thank you.  I have no further questions.

THE COURT:  Mr. Cluck, anything for her?

### CROSS-EXAMINATION

BY MR. CLUCK:

Q.   Good afternoon, Ms. Swisher.  I just want to make sure I understand everything.  You're not here to offer any testimony regarding what went wrong or anything like that out at the Uvalde project; correct?

A.   No, sir.

Q.   I'm sorry?

A.   I just gathered the information that was

given.

Q.   Okay.   But you're not here to provide any testimony; all you did was just enter things that were -- into a spreadsheet package that were given to you by somebody else?

A.   Yes, sir.

Q.   And you didn't take any of the pictures, you didn't decide how to split up the costs, you didn't do anything like that; right?

A.   No, sir.

Q.   Okay.   You don't hold any specific licenses or hold yourself out as an expert, do you?

A.   No, sir.

MR. CLUCK:  No more questions.  Thank you.

THE COURT:  Okay.  Mr. Slates, anything else?

MR. SLATES:  No, nothing further, Your Honor.

THE COURT:  Okay.  Thanks for coming.

THE WITNESS:  Thank you.

THE COURT:  Next witness?

MR. SLATES:  Daniel Boddie.

THE COURT:  Okay.  Mr. Boddie, up here, sir.  All the way around here.  Good afternoon.  Raise

your right hand.

(At this time the
witness was sworn in.)

THE COURT: Have a seat, Mr. Boddie. Mr. Slates, go ahead.

**DANIEL BODDIE,**

having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

**BY MR. SLATES:**

Q. Mr. Boddie, can you tell the Court about your background in the construction industry, including your educational background?

A. Sure. I graduated from Texas A&M University, with a degree in construction science. I've been working in construction for probably ten years, anywhere from Washington, D.C. to Kansas, San Antonio. When I was in school, I was working for an electrical contractor. I've had my own company now for about three years. Started off with Turner Construction, the nation's largest general contractor. So, I've been doing this for a while.

Q. How did you get involved with the Los Cerritos Hangar project?

A. Through Tom Pittman. Working with Turner, I met Tom. We did a project together. And when I

started my own company, I reached out to Tom to see if he had any projects that we could look at together. And after that, he came forward after the whole ordeal with removing SBS from the equation and asked me if I'd like to take that one over and run it for him.

Q.   What did you understand your role to be on the Los Cerritos Hangar project?

A.   I was going to be the construction manager. So, the way that Tom approached me about it was to hold all the contracts through his company -- not Tom's company, but through Lewis.  And then I was going to manage all the trades on the site.

Q.   Did you also have conversations with Mr. Pittman about the condition of the SBS work?

A.   We did.

Q.   Were you charged with doing anything to investigate the condition of the SBS work?

A.   Yes.

Q.   What were you asked to do?

A.   I was asked to go around and -- and check the building, see if there were any defects in the workmanship.  Tom pointed out a couple areas to me that he knew about, including the hangar door pockets. Some of the big ticket items, like the framing, were discussed early on.  When Tom and I first met out

there, we walked around, you know, observed a couple things, a couple, you know, very obvious defects in the workmanship and the quality and, you know, started our log from there.

Q.   Did you solicit input from a metal building company?

A.   We did.  Speedway Erectors.

Q.   Speedway Erectors was the name of the company?

A.   Yes.

Q.   Did you accompany Speedway representatives for portions of their inspections?

A.   I did.

Q.   Did you have interactions with them about the things that they observed?

A.   I did.  We spent an entire day walking around looking at defects in the metal building, installation quality that wasn't up to industry standards.  And you know, we climbed up on the roof.  We were in man baskets.  We were pretty thorough in our investigation.

Q.   Did you personally inspect all of the conditions of the project?

A.   I did.

Q.   And did a Speedway representative provide you

with some photographs of conditions that he observed?

A. He did.

Q. And based on your personal inspection of the conditions, can you confirm that those photographs accurately reflect the conditions on the project at the time?

A. Yes, sir.

Q. Did you personally observe all locations where those photographs were taken?

A. Yes, sir.

Q. Did you also take photographs of the various conditions?

A. I did.

Q. Did you make observations about the conditions that you considered to be defective?

A. I did.

Q. And were you involved in evaluating whether or not the metal building was out of plumb?

A. I was.

Q. I want to direct your attention to SBS Exhibit Number 84, which is in a binder up there.

A. Which binder am I looking at now?

Q. I tell you what; Ms. Brazell is going to pull it up. That's probably the easiest way to do it. This is an e-mail, as you can see, from Matthew

Martinez to you and Tom Pittman with a copy to Tom Grable. And it's transmitting the building tolerances that he received from Schulte. Does that accurately reflect what that document is?

A. Yes.

Q. Do you recall receiving this?

A. I do.

Q. Did you review it to evaluate what the tolerances were for the building being out of plumb?

A. I did.

Q. And did you find some provisions that you thought would be applicable to that evaluation?

A. Yes, sir. Basically, right there in 7.13.1.1, if you look at the second -- that section B right there, it talks about industry standards for steel construction and how the columns are allowed to be installed.

Q. Uh-huh.

A. And essentially, what it allows for is -- do you mind if I get up and draw?

THE COURT: You do whatever makes you happy.

THE WITNESS: Drawing makes me happy.

THE COURT: Okay.

A. So, do you want to go into detail as to how

we measured the tolerances on the --

Q.   *(BY MR. SLATES)*  First let's figure out what the tolerances are.

A.   Okay.  So, on a column, if you're looking down a column, if this is your building line right here, being the exterior of the building.  You're allowed within the first 20 stories, according to American Institute of Steel Construction, that that column can lean 1 inch in the first 20 stories towards the outside of the building.  1 inch.

Q.   In 20 stories?

A.   20 stories.

Q.   How many stories is this building?

A.   Three max.

Q.   So, the math -- about a third of an inch?

A.   Yeah, give or take a little bit.  You can make that argument.  And then you're allowed -- so, it's 1 inch this way, 2 inches towards the interior of the building.

Q.   In 20 stories?

A.   In 20 stories.

Q.   Okay.  There's another provision I want to call your attention to that Mr. Key referenced during his testimony.  And I'll show it to you.  It's on the next page from where we were.  Mr. Key called our

attention to this --

A. 1/16 per story?

Q. Yes.

A. Yeah.

Q. You noticed that before?

A. Yeah. I noticed that as well. And you could easily say that we were way outside that tolerance.

Q. So, if we calculate, based on a three-story building, 1/16 of an inch, what would the tolerance be?

A. 3/16.

Q. So, using the language that you reference, the tolerance would be what number? Doing the calculation based on the language we looked at just a moment ago, it would be what?

A. It would be less than an inch, a third of an inch.

Q. And doing the calculation based on the section Mr. Key pointed to, what would be the tolerance?

A. 3/16.

Q. All right. Now I want to ask you, how did you go about determining whether or not the building was within plumb?

A. Sure. So, the first step, obviously, is to

walk around with a 4-foot level.  Slap it on the side of a column, see what the level reads out, you know, pull the level a little bit away from that column.  If that level is -- you know, pull away from the column and a substantial amount over 4 feet, you know that you're going to have a problem.

We identified that first.  And when we went to our columns, we were able to set up a laser level at the base of the column.  And that laser level is self-righting, so it shines directly up and down in a perfect plane.  So, we were able to measure basically up the column, measure this distance here, one in the middle, and one at the base and determine how the column was leaning.

Q.   Am I understanding your testimony correctly that you used a laser level to make that determination?

A.   Yes, sir.

Q.   And in using the laser level, what did you determine as to how far out of plumb the building was?

A.    It was 2 inches.

Q.   Does that exceed both of the tolerances that we just looked at?

A.    Yes.

Q.   Does it exceed them by what level of

magnitude?

A. A lot. You know, it's -- if you go by 3/16, I mean, you're talking an inch and 9/16 -- or an inch and 13/16 out of plumb. That's huge.

Q. Okay. You can sit back down.

A. Sure. (Witness complying.)

Q. All right. I want to talk to you about some of the other issues you evaluated other than just the building being outside of tolerance for plumb. Were you involved in work that was undertaken to address the various conditions that you identified as being defective?

A. Yes, sir.

Q. How often were you at the project?

A. Every day.

Q. Did you supervise the work that was performed to correct the defective conditions?

A. Yes, sir.

Q. Did you observe the work that was performed to correct the defective conditions?

A. Yes, sir.

Q. Based on these personal observations, did you develop an understanding of the time and materials that were needed to correct the conditions that you considered defective?

A.   Yes, sir.

Q.   Did you have ongoing communications with the subcontractors that performed that work?

A.   I did.

Q.   Did you participate with Ms. Swisher in compiling records to document the defective conditions?

A.   I did.

Q.   Did you review the invoices for the work performed to correct the conditions?

A.   I did.

Q.   Did you recommend them for payment to the owner?

A.   I did.

Q.   Did you provide photographs to Ms. Swisher for purposes of compiling a report?

A.   I did.

Q.   And did you coordinate with her on preparing that report?

A.   I did.

Q.   Did you provide descriptions to go in the text boxes to describe the defective conditions as part of that report?

A.   Yes, sir.

Q.   And those were your own personal opinions of

the defective conditions?

A. They were a compilation of myself, you know, conversations with Speedway, and United Erectors and, you know, the different variations of the different subcontractors that performed work on the project. You know, it was -- it was myself and a team of other people.

Q. Do the discrepancies in the text boxes represent the conclusions that you drew based on your personal investigation?

A. Yes.

Q. And if you can look at Exhibit 20, does that document include the photographs and the descriptions?

A. Yes, sir.

Q. And did you personally observe all of the conditions depicted in those photographs?

A. Yes, sir.

Q. Do those photographs accurately represent the conditions on the job at the time SBS was fired?

A. Yes, sir.

Q. And do those descriptions of those conditions accurately reflect your conclusions about why those conditions were defective?

A. Yes, sir.

MR. SLATES: Your Honor, at this time we

would move to admit Tri-Bar Number 20.

THE COURT: Any objection to 20?

MR. CLARK: Your Honor, the objection I have is, I subpoenaed from Mr. Boddie all of his records. This was not one of them. We had in our request for disclosure all expert reports. We didn't get this as being attributed to something that Mr. Boddie did. We simply got a stack of exhibits. So, I would object that it was not properly disclosed.

THE COURT: Is this the first time you've seen this document?

MR. CLARK: We saw it when we got their exhibits right before the last trial, and that was the first time we'd seen this exhibit.

THE COURT: Was that more than 30 days before trial?

MR. CLARK: It was more than 30 days before trial.

THE COURT: Okay. The objection is overruled. 20 is admitted.

MR. SLATES: Okay. 20 is admitted, Your Honor?

THE COURT: Yes, sir.

MR. SLATES: Thank you, Your Honor.

Q. (BY MR. SLATES) If we can move on to Exhibit

Number 21, is that the photographs that reflect the condition after the building was repaired?

A. Yes, sir.

Q. Did you take those photographs?

A. Yes, sir.

Q. Do those photographs accurately reflect the conditions as they existed at that time?

A. Yes, sir.

MR. SLATES: At this time we move to admit Exhibit Number 21 -- Tri-Bar 21, Your Honor.

MR. CLARK: No objection, Your Honor.

MR. BROWN: No objection.

THE COURT: 21 is admitted.

Q. *(BY MR. SLATES)* I want to now call your attention to Exhibit Number 19.

THE COURT: 21 was pictures?

MR. SLATES: It is corrective action photographs. Yes.

THE COURT: Okay.

Q. *(BY MR. SLATES)* Mr. Boddie, have you seen that spreadsheet before?

A. Yes, sir.

Q. And does it include a line item analysis of the defective conditions with reference to -- that may be my book, actually. There should be a set up here

that's the Court's.  There it is.  Okay.  Now, is Exhibit Number 19 a spreadsheet you've seen before?

A.   Yes, sir.

Q.   Did you provide input into that spreadsheet including the description of the deficiency column, the corrective action taken to address that deficiency, the invoice that's reflective of the work performed, the cost allocation, and then the photos that correspond?

A.   Yes, sir.

Q.   And are you the source of the substantive information in the spreadsheet?

A.   Yes, sir.

MR. SLATES:  Your Honor, at this time we move to admit Tri-Bar Number 19.

MR. CLARK:  Your Honor, I would object again that it was not timely disclosed.

THE COURT:  More than 30 days before trial?

MR. CLARK:  Yes, Your Honor.

THE COURT:  Okay.  19 is admitted.

Q.   *(BY MR. SLATES)*  Mr. Boddie, the question has been brought up previously about how you would allocate the costs if you had an invoice that had multiple line items for work performed, but a single

price.  How did you go about doing that?

A.  Sure.  You know, we worked with the subcontractor to determine what amount of work was -- was allocated to each action item on that invoice. And a lot of it was observation out in the field, tracking time and hours and how many guys were working on what activity.  You know, I kept daily reports of detailed items like that.  And I was -- that was how I was able to make those determinations.

Q.  So, you're the one that did those allocations?

A.  I helped to make these allocations.  Yes, sir.

Q.  Based on the information you obtained?

A.  Yes.

Q.  All right.  So, I want to hand you what I'm going to mark as Exhibit Number 70.  And I'll represent to you that what it is is a document that we created by consolidating Exhibits 19, 20, and 21, so that you have the line item that's reflected in 19, the deficiency photographs that are associated with that line item, and the corrective action photographs that are associated with that line item.  Okay?

A.  Sure.

Q.  So, we took your information and just made it

all into a line item tabbed summary.

A. I understand.

MR. SLATES: And, Your Honor, at this time we would move to admit Tri-Bar 70, which is a compilation of 19, 20, and 21.

THE COURT: Any addition information other than --

MR. SLATES: None at all. Well, other than the invoices. We did have the invoices, which they aren't 19. So, the invoice that's --

THE COURT: The invoices have been previously admitted?

MR. SLATES: Invoices that have been produced, but not previously admitted as exhibits. So, we'd be moving to --

THE COURT: Well, tender it to Counsel so they can see what the invoices are.

MR. SLATES: They have copies. We provided them copies.

THE COURT: They have a copy of 70, which you're introducing now?

MR. SLATES: Yes. And have had it for several months.

MR. BROWN: Well, I don't know about several months.

MR. CLARK:  Is that the one that you called 20?

MR. SLATES:  No.

THE COURT:  70.

MR. CLUCK:  What is this?

MR. SLATES:  That's it.  20 is just the pictures of the deficiencies.

MR. CLARK:  Okay.  We've had it for the same length of time, Your Honor.

THE COURT:  Okay.  So, 70 is a compilation of pictures, spreadsheets, and the other documents in Tri-Bar 19, 20, and 21; is that correct?

MR. SLATES:  Yes, with the addition of the invoices.

MR. CLUCK:  With the addition of the invoices?

THE COURT:  Right.  Which you've seen over 30 days prior to trial; correct?

MR. CLUCK:  Yes, sir.

THE COURT:  Okay.  70 is admitted.

MR. SLATES:  All right.

Q.  *(BY MR. SLATES)*  And I apologize.  This is going to be a little bit tedious.  But, Mr. Boddie, I need to walk you through the tabs in Exhibit Number 70 so that we can evaluate the defective conditions on

this project.

A. Sure.

Q. All right. The first tab is what?

A. The first tab is PEMB labor by United Erectors. It's installing roof insulation and new roof sheets.

Q. And why was that necessary?

A. The removal of the roof was necessary in order to rack the building; in order to bring it back the 2 inches that it was out of plumb. It was also necessary because the roof was installed improperly using the wrong clips. There were splices in the sheets which weren't allowed by the specifications. For those three reasons, we had to remove the roof and install a new one.

Q. If you can demonstrate for us at the easel what you mean by why you had to remove the roof to rack the building, and also the issue with the clips you just referenced, I think that would be helpful.

A. Sure. (Witness complying.) So, on any building that you build, your roof is -- your roof is your diaphragm of the building. Any time that you build a steel building, specifically a metal building -- if you look at the directions that are given in front of the documents, you can put the walls

on before you put the roof on, but you -- once you put that roof on, it pretty well racks that building into its current location.

So, being as how our building was -- this is a little dramatic, but leaning 2 inches; in order for us to pull these members back, we had to remove the roof sheets. You know, you run into the problem of -- with roof sheets like these -- these are standing seam roof sheets. Once they're seamed, you can't just take one out. You have to go all the way back to whichever one you want to get out. So, let's say your directional of your seams are running this way and you want to pull out a panel here. In the case of -- I guess we'll get to it later. But in the case of the spliced panel, you would have to take all of these sheets out in order to get to that panel.

Now, for us, it was -- it was a matter of solving three issues with this roof. Right. So, when we got the building back to plumb, we were able to lock the building back into place by putting a new roof system on. We were also able to correct the splices in the roof sheets and we were also able to correct the clips.

Q. Tell us what the clip issue is.

A. Okay. So, if you were to look through this

building, looking this way down this eave line right here, what you would see is that eave line was doing that number.  Essentially, there were three different types of clips used.  You have a high clip, a medium clip, and a low clip that was used all the way down the eave of this building, creating a wave effect.

The way that the metal building manufacturer recommends that you install these clips is one of two ways.  You can use a high, medium, and low here, floating clip, or you can use a uniform clip; you could use a high or a medium or a low across the entire building.  But that's not what they did.

Q.   Okay.  What did they do?

A.   They went across the roof sheets and would use a high, a medium, a low, a medium, a high.  There was no specific pattern to it across that eave.

Q.   Was there any consistency to how they used the roof clips?

A.   There was not.

Q.   What did that create in the field?

A.   It created a wave pattern in the roof. Essentially, with that wave pattern, it created inconsistencies in the roof which could have potentially caused leaks later on.

Q.   Okay.  If I can take you back up to the

witness chair.

A. Sure. (Witness complying.)

Q. Okay. So, we've also got some photographs at tab 1. We got the invoice, which speaks for itself, and the amount that you've allocated as reflected in the spreadsheet. But if we look at deficiency Exhibit Number 1 -- photograph number 1, tell us what we're seeing there.

A. What you're seeing -- if you look -- you can see daylight coming in through that roof panel right there.

Q. Right here?

A. So, you're looking underneath the ridge cap. And a piece of metal that is supposed to be a watertight system from creating -- it basically creates a condition where driving rain is supposed to be kept out of there. Unfortunately, they didn't use the right flashing piece right there and water was -- water could potentially be able to enter the building at that point.

Q. All right. Let's look at photograph number 2 in Exhibit Number 20. What are we seeing here?

A. You're seeing a condition where the roof sheets weren't cut short enough. Roofs -- these roofs are made to expand and contract. Essentially at that

point, those roof sheets were too close together and could have intersected with one another.

Q. And if we go to photograph 3 in the deficiency log?

A. You're seeing a lack of tape seal connecting with the roof panel system right there. You can see the wave in the tape seal beneath the end dam that would create an air gap or a void space where water could potentially get through.

Q. Is that a problem?

A. Absolutely.

Q. All right.

A. I don't want water in my buildings.

Q. I don't like it in mine either. Photograph 4?

A. Again, on the -- on the right side, you're seeing an air gap there where water could get in.

Q. Photograph 5?

A. You're seeing a condition looking from the eave of the roof up to the -- up to the ridge. You're seeing a -- a connection between the two roof panels.

Q. If you want to articulate with the photograph, feel free to come down.

A. Okay.

Q. I'm sorry. I interrupted you.

A.   No.  Here, I'll -- I think that's a better idea.  You're seeing the seam on a roof -- on two roof panels, you're seeing the condition that the different clips was causing with the roof panels, essentially creating a gap at the bottom.

Q.   Okay.  And if we go to photograph 6 on the deficiency log?

A.   You're seeing -- this is at the copula, looking up -- or looking down into the building.  You're seeing a cut roof sheet that wasn't flashed properly.

Q.   Is that the exterior of the building?

A.   That is the exterior.

Q.   If rain hits that location, what's going to happen?

A.   It's going inside.

Q.   And if we go to photograph 7 in Exhibit 20?

A.   You're looking up one of the rakes right there.  This piece was fabricated in the field.  This should have been a manufactured piece by the metal building company.

Q.   If we go to photograph 8, is that a similar location?

A.   It is.  It's just looking the opposite direction.

Q. All right. Photograph 9; is that another condition of flashing issues?

A. That is. It's another flashing issue. If you look to -- you've got some pretty bad welding marks that have burned up the roof system here, as well as the insulation down here.

Q. Okay. Photograph 10?

A. You're looking at the three different types of clips that were used on that job.

Q. When you talked about that undulating effect, how does that correlate to those clips?

A. You've got your high clip, your medium clip, and your low clip there. By using those different clips, essentially, you know, the high clip is going to push that roof to sit higher and the low clip is going to push that roof to sit lower.

Q. All right. Photograph 11?

A. That's a splice that was created in two panels.

Q. Photograph 12? It's not supposed to be like that, is it?

A. No.

Q. All right.

A. Not according to the documents.

Q. And I think Mr. Schiffman acknowledged that

earlier today, so let me move on.

A. Okay.

Q. Photograph 12 in Exhibit 20?

A. This is looking down the door pockets. You can see here -- this only happened at the door pockets where the roof actually tapered off onto the sides. It wasn't a uniform level condition.

Q. What does that say in the text box?

A. "Shows roof drop-off at front end wall. Same condition on both sides of the building due to improper field fabrication of shortened door pockets.

Q. Tell us what you mean by the reference to the field fabrication of the shortened door pockets.

A. Sure. I'll draw it. So, the roof system came down, and then where it hit the door pocket, it kind of curved off here. What happened is, when these door pockets were shortened up, a piece was fabricated to sit on top of a column. When they brought the columns in, it appeared to me as though calculations were done improperly. This slope right here should have been straight and level; but instead, this piece was cut too short. They tried to shim it up, if you will. And when they did that, it created the -- the slope in the roof panels.

Q. Is that associated with the field fabrication

of the hangar door opening that the Court has heard a lot about in this trial?

A.   Yes, sir.

Q.   All right.  On the next photograph 13 in Exhibit Number 20, is that the same condition, just a different view?

A.   It is.

Q.   Photograph 14 of Exhibit Number 20; is that another spliced roof panel?

A.   It is.

Q.   Photograph 15 of Exhibit Number 20?

A.   This is the ridge cap.

Q.   Where is that; at the top of the building?

A.   Yes, sir.  The very peak.  They're missing screws in here.  If you look at the construction documents from Schulte, there's an improper amount of screws that were included in that.

Q.   Okay.  Let's look at photograph 16.

A.   Same condition.  It's -- not as the previous, but at the ridge cap here, you've got an air gap allowing water to enter the system.

Q.   And is 17 the same issue?

A.   Yes, sir.

Q.   How about 18?

A.   That's a picture of the clips, looking

underneath the roofing system. We were able to pull up a panel and look at those.

Q. Okay. 19?

A. That's actually looking down the eave. And you can see the undulation in the roof panel as it goes up and down, right here being the most notable.

Q. Is that looking towards the front of the hangar?

A. That is.

Q. So, the structure that we see there, the metal structure extending out beyond the building, is that the wing wall that would hold the hangar door?

A. It is. And actually, if you look right here, that's the piece that's field fabricated. This column was cut down. This was field fabricated in order to try and make that slope work, but it was miscalculated.

Q. All right. Let's look at 20 of Exhibit Number 20 -- photograph 20.

A. You're looking here at a missing piece of right trim and a panel -- roof panel that was cut. Shouldn't have been cut that way.

Q. 21 of Exhibit 20?

A. Same panel. They should have fabricated a panel to meet that width.

Q.   Photograph 22 of Exhibit 20?

A.   That's looking at a clip underneath the --
the eave right there.

Q.   That's the variation in clips?

A.   Uh-huh.

Q.   Photograph 23 of Exhibit 20?

A.   You're looking up at the door pockets,
basically what I keep referring to as the
miscalculated column height.

Q.   And 24?

A.   You're looking at the door pocket from
further away, where you can see the drop-off and the
slope of the roof right there.

Q.   If you look up on the right side of the
photograph, you can't see the lines of the roof
sheet?

A.   Right.

Q.   But over the hangar door, can you see the
lines?

A.   You can.

Q.   Tell us what -- why that is.

A.   Essentially, there's two reasons.  All right.
One is, you've got longer panels right here.  So, you
should be able to see the little bit longer line, but
you should not see that shift in the slope right here.

The shift in slope is what's caused by the field fabrication of those door pockets.

Q.   26; is that the same condition?

A.   It is.

Q.   27 also?

A.   It is.

Q.   All right.  Let's go to photograph 28 of Exhibit 20.

A.   This is looking up at some of the wind bracing.  We had installed clips onto these in order to brace the CMU walls.

Q.   And 29?

MR. CLARK:  Mr. Slates, we don't have any of those in our book.

MR. SLATES:  I'm just going through 20 right now.  I'm not --

MR. CLUCK:  You just talked about 28 and 29.

MR. SLATES:  I'm just going through Exhibit 20 right now.

MR. CLARK:  This is Exhibit 20.

MR. SLATES:  No.  That's 70.

MR. CLARK:  Oh, okay.

MR. SLATES:  All right.

Q.   *(BY MR. SLATES)*  Okay.  We're on photograph

29 of Exhibit Number 20.  What do we see?

A.  Right here looking at -- we used a laser again to measure the plumbness of the door tracks up on the top of the main supports.  These pieces right here were fabricated -- field modified prior to us arriving on site, and it caused the hangar door track to be out of plumb.  It was basically a corrective action because the building was out of place, and the building was racked.  And so, what we knew is, once that building was brought back in, that these were going to be out of plumb.

Q.  Okay.  Let's go to 30.

A.  You're looking underneath -- this is the railing that supports the door.  These are all thread rods which were inserted into the concrete and a piece of angle that was supporting the -- the track right there.  The door was currently sitting on that door track causing a bend.

Q.  Is that supposed to be like that?

A.  No, sir.  In fact, you're not supposed to put those doors on until you pour the concrete.

Q.  31, is that the same condition?

A.  Yes, sir.  You can see here, you're actually missing -- you're not missing -- the nut is there, but it's not connected to the all-thread.

Q.   32?   Photograph 32 of Exhibit 20?

A.   You're looking at missing stitch bolts in two purlins.

Q.   33 of Exhibit 20?

A.   Same thing; missing stitch bolts.  You're looking at a clip where that purlin is supposed to be connected to that -- to that beam right there, and it's not connected.

Q.   34 of Exhibit Number 20?

A.   Same thing; you're missing bolts.

Q.   35?

A.   Missing bolts.

Q.   What does the -- what does the text box say on that one?

A.   "Mid span support beam installed backwards." And this is -- this is the same thing that we were talking about earlier.  That's the door track down here -- the supports for it.  And this piece right here was field modified and incorrectly installed.

Q.   Photograph number 36 of Exhibit 20?

A.   You're looking at the copula.  You're looking at the beam that was -- or yeah, you're looking at a beam that was welded to a column.  It wasn't welded all the way around.  Typically in this position, you'll see something that's welded on all four sides.

And any time a piece is welded on a metal building --
one, it's got to be done by a certified welder; two,
it's got to be approved by the metal building
company.

     Q.   37 photograph of Exhibit 20; what does the
text box say there?

     A.   "Column at pocket door was added onto the
top.  Bolts missing in connection due to the
misalignment."

     Q.   Where is that?

     A.   So, you're focusing on this piece right here,
and then it's missing these bolts right here.

     Q.   Is that the field modification the -- to the
wing walls for the hangar door?

     A.   It is.

     Q.   Show us how they field modified it, if you
can tell.

     A.   Well, it's kind of a bad picture to do that
on.

     Q.   Okay.  Yeah.  The next photograph is 38.

     A.   This is more showing the misalignment of the
door track.  You can see it curves in and out.

     Q.   39?

     A.   You're looking at purlins not being attached
to the clips right here.

Q.   Okay.  And photograph 40 of Exhibit Number 20?

A.   This is showing the spandrel beam up here. Where it was located when we got on the job, it was actually going to intersect through windows, and so it had to be relocated.

Q.   41 of Exhibit Number 20?

A.   You're looking at -- you're looking up at the copula.  You're looking at insulation that wasn't tucked.  You can also see, there were backup plates here that were supposed to be installed on all of these roof sheets that weren't installed.

Q.   Now, in photograph 42 of Exhibit 20, what are we seeing?

A.   This is looking at door pockets.  You're standing in front of the hangar looking out.  These pieces that are running here, John, these horizontal pieces were the ones that were field modified.  They were cut down in order to accommodate the foundation size.

Q.   Did that create a problem in the roof line that we saw earlier?

A.   It did.

Q.   If we go to 43 of Exhibit 20?

A.   You're looking back up at the copula again.

Insulation that wasn't tucked properly.

Q.   All right.  44?

A.   You're looking at the door here that was missing some X-bracing, missing a couple bolts.  You can see this -- this cutout right here in this beam was -- didn't have bracing supporting it.

Q.   All right.  45?

A.   Same thing.  Missing bolts.  You've got one clip here with one bolt in it.

Q.   Okay.  46?

A.   Same thing.  Missing bolts.

Q.   47?

A.   This is the wind bracing; again, missing clips that attached to the CMU wall.

Q.   If we look at 48, what do we see?

A.   You're seeing bracing that we had to install on that wall.  That being the windward side, there was a concern on our part that the wind could affect that CMU wall since it wasn't braced off to the wind braces on the building.

Q.   What's in the text box on that one?

A.   "Superstructure was erected out of plumb. End wall columns lean 2 inches towards the west.  No gap at bottom of column versus top of column."  So, if you look here, you got more light coming through down

here than you did up there.

Q.   All right.  And the next one is -- is photograph 49.  What do we see there?

A.   You're looking at what I refer to as basic red oxide framing.  This framing was installed not per the specifications that were on the architectural drawings.

Q.   Can we actually -- I think I have a -- actually, let's pull up Tri-Bar 27.  What do the structural plans call for in terms of the framing?

A.   So, this number right here; it's a little tough to read, I understand.  But essentially, this number right here is an identification code for a type of metal stud to be used.  If you were to give that to any metal stud supplier, they would be able to give you an exact piece.  It calls out the thickness, the size, the height -- or the length, rather, the gauge of the metal, what it's supposed to be finished as.  It's basically a very specific identification code.

Q.   And this is hard to read, but what is it supposed to be in terms of how far they're supposed to be off center?

A.   16-inches.

Q.   What does it say here?

A.   "All materials to be galvanize coded in accordance with ASTM and 8525 C-80 touch-up field welds with zinc rich paint."

Q.   Did SBS use galvanized materials?

A.   No, sir.

Q.   What did they use?

A.   They used basically red oxide primer.

Q.   Did SBS do 16-inch off center?

A.   No, sir.  They were 2 foot.

Q.   Okay.  All right.  Let's go back to Tri-Bar 20 and go to photograph 50.  And what do we have in our text box here?

A.   This is purlins that they were using for the roof system.  Essentially, what they were doing is they were creating a space by bending up the top of the purlin -- that purlin, when it's recalled out of the factory, looks like that.  What they were doing is bending this up, compromising the integrity of that framing.  So, had you put a load on top of it -- say, concrete -- it would have -- it would have come crashing down eventually.

Q.   And was that called for there?

A.   No.  It was not called to do that.

Q.   Okay.

A.   This isn't even the right member to be

installed as a -- as a roof frame member.

Q.   Go to photograph 51 of 20.

A.   This is where you -- we took the spacers out so that you can more clearly see the bends in the Z-purlins.

Q.   Okay.  Photograph 52 of Exhibit 20?

A.   Same thing, looking down the line.

Q.   What does the note say?

A.   "Spacing of the purlins did not match the architectural drawings located at 16 inches on center. Note, the box beam headers did not exist to frame the openings."

Q.   All right.

A.   So, typically, when you're using light gauge metal framing, you create box beam headers to go over windows, doors, et cetera.

Q.   How about photograph 53 of Exhibit Number 20?

A.   You're missing a double purlin in the inside corner.

Q.   54?

A.   This is again showing where we took out the bracing on the purlins.

Q.   How about 55?

A.   This is still showing the incorrect type of steel framing.  You know, things like rather than

cutting a hole for a pipe to fit in, you know, a 1-foot gap was cut and then the piece filled in.

Q. How about photograph 56 of Exhibit 20?

A. This is showing the clips on the wind bracing. You're also looking at the spacing of the studs that are above the CMU walls -- the doors for the track that's holding those studs in place.

Q. Let's go to 57.

A. You're looking at the -- us taking measurements of the -- the studs that are currently in place. That says 2 foot, but you can't read that.

Q. As opposed to 16 inches?

A. That's correct.

Q. Is 58 the same thing?

A. Yes, sir.

Q. Go to 59.

A. Same thing.

Q. And how about 60 -- photograph 60 of Exhibit Number 20?

A. This is looking at the door pockets and the start of making the extension on those to get back to (inaudible) the doors.

Q. All right. 61?

A. This is -- this is a picture of us taking down the -- the door pockets -- or the doors, rather.

Excuse me.

Q.   What does that text box say?

A.   "Hangar doors and pocket door columns out of plumb, incorrectly field modified.  Rather than correcting the footing, door pockets were shortened to match the concrete poured in place.  Need to remove and correct."

Q.   How about -- go ahead.

A.   I was just going to add that, in order to do some of the -- the work associated with moving the tracks for the doors and pouring the trough back for the door tracks, we had to remove the doors.

Q.   How about 62 -- photograph 62 in Exhibit 20?

A.   Same thing.  You're looking at the hangar door pockets.  This is progress of us taking down some of that steel.

Q.   Tell us what we see in photograph 63 of Exhibit 20.

A.   This is the trench drain that was installed when we got on-site.  These are -- these are actually survey stakes that were used to try and get that trench drain into its proper height or elevation.

Q.   Was it successful?

A.   No, sir.

Q.   Let's go to photograph 64 of Exhibit Number

20.

A. You're looking at the start of a CMU wall here. You're also looking at the corner of the foundation. Oh, I'm sorry. No, you're not. You're look at the end door pocket. So, this is where we fixed in that door pocket 2 and a half feet.

Q. Is that when you first learned that the foundation brick lug did not have a grade beam beneath?

A. This was part of it. The other part of the investigation was when we had to go and do our additional concrete for the brick lug around the pilasters. The drawings called for 12-inch stone to sit there and there was no concrete there for a 12-inch stone to sit on.

Q. Let's look at 65. What's that location?

A. You're looking at the same location. This is the door pockets.

Q. Okay. And 66?

A. This is the brick lug that I was referring to earlier. The distance from the CMU to the edge of the concrete needs to be 13 inches. There also needed to be concrete to fill in this area right here. So, this is where we really discovered the void underneath the -- the brick lug.

Q.   What should be underneath there?

A.   You should have grade beam there.

Q.   In other words, should concrete run down roughly 3 feet below that?

A.   It should.

Q.   Okay.  Was it that condition all the way around the building?

A.   All the way around.

Q.   67?

A.   This is looking down at that same location, taking a measurement of how far back that brick lug was -- or that grade beam.

Q.   So, in other words, is that measuring tape up against the grade beam?

A.   Yes, sir.

Q.   Is it measuring how far out it is to the brick lug?

A.   It is.

Q.   Is the next photograph the same condition in another location?

A.   It is.

Q.   68 and 69; is that the same issue?

A.   It is.

Q.   If you look at 70, are we again looking at the same concern?

A.   You are.

Q.   Let's look at 71 of Exhibit Number 20.

A.   This is -- this is showing -- between this picture and I believe the next one, you can see where the rebar didn't properly penetrate into the slab and either wasn't cast in place or it wasn't drilled and epoxied correctly.  It was embedded maybe 2 or 3 inches and you could easily pull it out.

Q.   Okay.  Let's go the photograph 72 of Exhibit Number 20.  Tell us what we see there.

A.   You're looking at what I hope is a temporary fix on a problem that was encountered.  But essentially, this brick lug here should have extended down here in order to accommodate the CMU pilaster going into the building.

Q.   What did they do instead?

A.   They threw a piece of CMU down and built on top of it.

Q.   How about photograph 73 of Exhibit Number 20?

A.   You're looking at -- essentially, the slab depression was in the wrong location.  It was -- it was supposed to be designed -- or it was designed to where this slab depression was supposed to meet the edge of the door when it was wide open.  The idea being that the clear span between the edge of this

wall, which should have matched up with the edge of the depression, was flush with the door allowing maximum room for both this pilot's office and a plane to enter the building.

Q. If we look at photograph 64, is that a related issue?

A. Yes, sir.

Q. Tell us what we see.

A. You're looking at the slab depression taking the measurement of how far it was off the framing.

Q. Look at photograph 75 of Exhibit 20 and tell us what we see there.

A. You're looking at the apron that wasn't poured.

Q. And what about Exhibit Number 76?

A. This is us going back and drilling and epoxying dowels in place. The drawings called for the dowels to be 1-foot centers. They were installed at 2-foot centers.

Q. Did you have to add material?

A. We did.

Q. Is photograph number 77 part of that process?

A. It is.

Q. And is photograph 78 also part of that process?

A.   No.  This is -- this is slightly different. This is an expansion joint material --

Q.   Okay.

A.   -- that had to be added in.

Q.   Is that called for in the plans?

A.   It is.

Q.   But it wasn't there when you arrived?

A.   It was not.

Q.   Is 79 the same issue with the expansion joint?

A.   It is.

Q.   And 80 is the actual pour of the concrete?

A.   Correct.

Q.   What do we see in photograph 81?

A.   You're looking at the trench drains.  The system that was purchased and called for was left on-site for us to install.  Essentially, we ran into an issue to where there were leave-outs left in place for these trench drains to go.  But if you can see here, you've got the slab elevation and then the top of the trench drain.  So, naturally, we had to go and cut out some concrete in order to install those trench drains to be flush.

Q.   What's wrong with that if it's not flush?

A.   It won't drain.  You're never going to get

water into it.

Q. Let's look at the next photograph. I think it's easier to see in the next photograph.

A. It is. You're looking in the opposite direction from inside looking out. And you can see that if water were to pond here, if you will, there's no way for it to escape into that trench drain.

Q. Okay. Photograph 83 of Exhibit Number 20?

A. You're looking below the doors.

Q. 84?

A. You're looking at wiring in the walls. The wiring was the wrong size for the load that the building needed to receive.

Q. What about photograph 85 of Exhibit Number 20?

A. The same thing looking at -- you're looking at wiring coming out of the slab that had to be demolished.

Q. Let's look at 86 -- photograph 86 of Exhibit Number 20.

A. Okay. Essentially, you're looking at conduit that was roughed-in with wire pulled to it. Typically, you don't pull wire unless you're terminating into something, whether it be a junction box, a panel, a trough, for that matter. You don't

see any of those in this picture.  All you see is conduit with wire coming out of it.  And it made no sense to us as to why --

Q.  Okay.

A.  -- there would be wire.

Q.  Let's change gears and look at the photographs of what you did to address these conditions.

A.  Sure.

Q.  Exhibit Number 21; what is the first picture we see there?

A.  Here you're looking at the ridge -- you're looking at a couple things.  So, you've got your gutters and downspouts on, you got your corner trim, your eave trim, you've got a fan that was installed in the copula up here.  You're also looking at your ridge cap with the proper amount of screws.  You're looking at a new roof.  There's really a lot to look at.

Q.  Okay.  Do you remember the picture we had with the screws earlier?

A.  Uh-huh.

Q.  How many more screws did you put on there?

A.  A bunch.

Q.  And is that, in fact, an entirely new roof?

A.  It is.

Q.   All right.  Look at photograph number 2.

A.   You're looking at the corrective action for the end dams.  You're also seeing -- I didn't note this earlier, but you're also seeing a greater amount of screws.

Q.   We saw photographs earlier where there were gaps in those pictures.  Do you remember that?

A.   I do.

Q.   Is that this same condition?

A.   This is at the same location.

Q.   That's what I mean.  Is this what you did to fix the gaps?

A.   Yes, sir.

Q.   Let's go to 3.

A.   You're looking at the same -- same picture of looking up the roof system, but you can see the gap here is greatly reduced.  You can also see the seam in the two roof sheets.

Q.   And is Exhibit 21, photograph 4 a similar photograph?

A.   Yes, sir.

Q.   It doesn't have a gap, does it?

A.   That's right.

Q.   Photograph 5 of Exhibit 21?

A.   You're looking down the -- the cupola line

here.  You're looking at gutters installed, flashing installed, soffits installed, wall panels installed, windows.

Q.   How about photograph 6 of 21?

A.   You're looking down the -- where the door pockets are.  Oh, no.  This is just on the main roof. Excuse me.

Q.   Okay.

A.   You're looking down and seeing the new roof system installed.  And actually, over here, you can see the old roof.

Q.   All right.  So, photograph 7?

A.   You're looking along the cupola again, seeing wall flashing, base flashing, soffits, eave trim, gutters, downspouts, windows.

Q.   Okay.  How about photograph 8?

A.   Here you can see the door pockets.  You're looking across the new roof system.

Q.   Can you see that same dip that was there before?

A.   No, sir.  It's been corrected.

Q.   What about Exhibit Number -- I'm sorry -- photograph number 9 of Exhibit 21?

A.   You're looking at the ridge cap --

Q.   Okay.

245

A.   -- with the proper amount of screws installed.

Q.   Photograph 10; is that another condition of the end dam?

A.   That's correct.

Q.   No gaps, are there?

A.   No gaps.

Q.   All right.  Photograph 11?

A.   You're looking down the ridge.  Same thing; looking at the copula.  Whole new roof system.

Q.   Okay.  Photograph 12?

A.   This is the same location where the original picture was taken.  And you note that you don't see the dip in the -- in the frame anymore.

Q.   All right.  13 is the same thing?

A.   Same thing.

Q.   Let's go to photograph 14 of Exhibit 21.

A.   This is the interior wall panels.  You can note the substantial difference in clips on the wind bracing.  You can also note the -- the angles here that were installed to brace the wall above the CMU.

Q.   Okay.

A.   And you're looking -- if you want to look over here, you can see the door tracks that have been corrected.

246

Q.  15?

A.  Same thing; you're looking at the wind bracing and all the clips.

Q.  How about photograph 16 of Exhibit 21?

A.  You're looking at wind bracing that's connecting purlins to the beams, essentially creating a way for those not to roll in conjunction with the bending.

Q.  Was the wind bracing there when you got there?

A.  No, sir.

Q.  Did you have to add it or have someone else add it?

A.  We had to add it.

Q.  Photograph 17 of Exhibit 21?

A.  You're looking up at the copula.  Here you can see one of the fans that was purchased -- the fan that was left on-site for us was too big to fit in the opening of the copula.  The drawings called for one fan.  Unfortunately, because that fan didn't fit, we had to get higher velocity fans and use two of them in order to move the same amount of air.

Q.  Was -- and it's the brand name, to explain the use of the vulgarity.  But the name of the fan that we see in that picture was a Big Ass Fan;

correct?

A.   This one right here.  Yes, sir.

Q.   But was the one that was supposed to go in the copula a Big Ass Fan?

A.   No, sir.  It was just an exhaust fan.  If you look at the size of it, in order to frame that thing out, you know, it's a pretty small fan in relation to to the Big Ass Fan below.  However, it's meant to exhaust jet fumes, plane fumes out of the building.  Those are a little more comfort oriented.

Q.   If the argument has been made in this case that SBS couldn't possibly be responsible for that fan because they didn't order the Big Ass Fan, is there a mistaken assumption in that argument?

A.   Well, let's not -- let's not confuse the Big Ass Fan with the exhaust fans.  There was an exhaust fan that was left on-site that was the wrong size.

Q.   Okay.

A.   That is the fan that had to be replaced which matches the cost allocation that we input into our spreadsheet.

Q.   Okay.  Let's look at photograph 18 of Exhibit Number 21.

A.   Okay.

Q.   What do we see there?

A.    You're looking at the front of the building. Hangar doors installed, all the sheet metal installed. You're looking at the trim going up the building.  You know, all the CMU and stone work is done.  You're basically looking at a finished exterior product there.

Q.    Okay.  Let's look at photograph 19 of Exhibit 21.

A.    Okay.  This is the interior.  There's a couple things you can see here.  You can see the bracing on the beams to the -- to the purlins.  You can see all the paneling that's done inside.  You can see all the conduit that we had to re-run.  You can see the light fixtures installed.  You can see Big Ass Fan installed again.  You can see the other exhaust fans on the opposite side of the copula installed under there.

Q.    Okay.  If we look at photograph 20 of Exhibit Number 21?

A.    You're looking at a -- basically a level up against the column --

Q.    Okay.

A.    -- after the building was racked on location.

Q.    And if we go to photograph 21?

A.    You're looking at us pouring the grade beam

in order to support the -- the stone walls.

Q. What did you have to do to do that?

A. We had to excavate out. We had to install pins into the grade beam. You know, it was a pretty drawn-out process by going back to Victor de Anda and having him come up with the design; us renting equipment; us buying material, labor. I mean, it was just a pretty long drawn-out process.

Q. Was that done to address the fact that the brick lug didn't have the grade beam support below it?

A. That's correct.

Q. So, were you essentially extending the grade beam out?

A. We were.

Q. Let's look at photograph 22 of Exhibit 21. Is that the same condition, just looking down the grade beam line?

A. That's correct. You're seeing the hairpins that were doweled into the existing grade beam and the rebar that was run horizontal to support that beam.

Q. 23; is that after the concrete pour?

A. Yes, sir.

Q. And what is 24?

A. Same thing, except with the door pockets.

Q.    Is that where the hangar door walls were extended?

A.    That's correct.

Q.    How about 25; is that again a photograph of where the hangar door walls were extended?

A.    Yes, sir.

Q.    26; what do we have there?

A.    You're looking at the trench drains that were installed.

Q.    Have you now got them in the same plane as the floor?

A.    That's correct.

Q.    And will it drain now?

A.    It will.

Q.    And what about photograph 27; is that the same thing?

A.    Same thing.

Q.    All right.  You can take your seat again.

A.    (Witness complying.)

Q.    If I direct your attention back to Exhibit Number 19, that's the spreadsheet that summarizes the costs; right?

A.    Yes, sir.

Q.    And were you involved in -- I think I already asked you this, but I apologize if I'm going to repeat

myself. But were you involved in the submission of those payment applications -- or the payments -- the applications for payment for that work and the approval of those payments?

A. Yes, sir.

Q. And did you allocate the cost based on your understanding of the work performed?

A. Yes, sir.

Q. And if we go through each item, there's a cost associated with it that's listed in the spreadsheet?

A. Correct.

Q. And if we total up the total costs of that work, what is the number?

A. $317,995.74.

Q. All right. Now, we've heard some argument in this case -- or testimony, at least, in this case that this wasn't really defective work; it was just finishing up what SBS started. Either way, was it costs that you had to spend to get that metal building finished?

A. Absolutely.

Q. And with respect to the quality of the work that you observed -- that SBS had performed, what were your conclusions about the quality of that work?

A.   I would say it was fairly low quality work.

Q.   And how did the quality of the work, once the corrective action had been completed, compare to what had been there before?

A.   I'd say it was a very high quality of work.

Q.   All right.  Let me call your attention to Tri-Bar Exhibit Number 23.  Is that essentially just kind of an overview -- well, actually, can you tell us what that is?

A.   Sure.  It's a set of meeting minutes that I produced after a meeting with myself, Tom, John Grable, Matt Martinez discussing all the deficiencies on-site that we knew at this time.

Q.   And is it -- would it be fair to say that it's kind of a general summary of what we just went through in detail?

A.   Sure.

Q.   And is that a -- did you create that document yourself?

A.   I did.

MR. SLATES:  Your Honor, at this time we move to admit Tri-Bar 23.

MR. BROWN:  No objection, Your Honor.

MR. CLARK:  No objection, Your Honor.

THE COURT:  23 is admitted.

Q. *(BY MR. SLATES)* If we go to Exhibit Number 22, is that a document that you received from Speedway in response to your engaging them to assist you with the investigation of the conditions on the project?

A. It is.

MR. SLATES: At this time we move to admit Tri-Bar 22.

THE COURT: Objections, Mr. Brown?

MR. BROWN: Let me go back and look at it, please. We have no objection to 22.

MR. CLARK: I have an objection. That document is hearsay because it's -- it's just a list. And it's -- half the list is new stuff. It's stuff that's being added later. What it's being offered for is --

THE COURT: Let me see, Mr. Boddie.

THE WITNESS: Yes, sir.

THE COURT: Thank you.

MR. SLATES: Your Honor, we're just offering it as part of the due diligence that Mr. Boddie performed in undertaking his investigation of the defects.

THE COURT: Is it a document prepared by Speedway?

MR. SLATES: It is.

THE COURT: Okay. Objection is sustained.

Q. *(BY MR. SLATES)* Now, let's talk a little bit about what isn't in this $317,000.00 number. Is your time to evaluate this and supervise all this work included in that number?

A. No, sir.

Q. Is the time that Tom Pittman spent to evaluate these conditions and respond to them included in that number?

A. No, sir.

Q. What about the architect, John Grable's, time?

A. No, sir.

Q. All right. If we look at Tri-Bar Exhibit Number 9, I'll represent to you that this is the retainage draw that SBS submitted after they were terminated; so, the last draw we've received from them. If we look at the schedule of values for the balance to finish, do you see that column?

A. Sure.

Q. What's the total balance to finish at that point?

A. 480 grand, roughly.

Q. All right. And granted that all of the work

you did wasn't on the metal building, but a lot of it was, is that fair to say?

A.   That is fair to say.

Q.   On the metal building, they originally scheduled $355,000.00 for that?

A.   Correct.

Q.   What percentage complete did they show?

A.   They showed a 98.51 percent complete.

Q.   Did that coincide with what you saw when you got on the job site after they'd been terminated?

A.   Absolutely not.

Q.   What percentage complete would you say they were at that point in time?

A.   60, 65.

Q.   And did you have to supervise work to complete the rest of the work?

A.   I did.

Q.   And did -- the costs were associated with that, I take it?

A.   Absolutely.

Q.   Were those costs included in Exhibit Number 19, the summary of offset claims?

A.   Are you asking about my supervision costs or just the direct sub costs?

Q.   The sub costs.

A. Sub costs are included. Yes, sir.

Q. Okay. And if we kind of take out -- or try to, at least, take out of the equation some of things that are in the offset number, what -- you had to do all the other work to finish the project, too; right?

A. As far as?

Q. In other words, you got a project that's partially complete when you come on?

A. Right.

Q. Now, there were some changes made to that project that increased the scope. No question about that; right?

A. Sure.

Q. But in addition to the additional scope, you had to finish the original scope?

A. Absolutely.

Q. So, you -- did you have to do everything that's in this balance to finish column, essentially, and then some?

A. More or less. Yeah. You know, if you look down here at items like concrete paving and curbs; we had to finish that.

Q. Well, I don't want you to skip past the general conditions. Did you have general conditions costs?

A.   Sure.  We had labor -- we had, you know, temporary laborers, we had equipment that had to be rented, we had toilets, Dumpsters.

Q.   So, you had to have all the same type of stuff that SBS did?

A.   Sure.

Q.   Go ahead.  I interrupted you.

A.   Okay.  So, you look at concrete paving and curbs; you know, we obviously had to finish that. Mezzanines; we had to finish those.  Concrete stain --

Q.   Let me slow you down a little bit.  You had to -- we saw the pour on the apron; right?

A.   Uh-huh.

Q.   Do you remember how much that cost approximately?

A.   Oh, I'd have to go back and look.

Q.   I don't believe that's in 19.

A.   It's not?

Q.   I don't believe it is.

A.   Okay.

Q.   But roughly, they're showing a $46,500.00 balance on concrete.  Does that -- is that roughly equivalent to the cost that you incurred in completing it?

A.   I'd say it's a little less.

Q.   A little less than you incurred?

A.    (Witness nodding head up and down.)

Q.   Okay.  And if we go to -- keep going.

A.   Okay.  Mezzanines; we had to -- we had to pour the mezzanines.

Q.   Is that dollar amount more or less than the amount you incurred to do that?

A.   It's substantially less.

Q.   Okay.  And if we keep going?

A.   Concrete stain, we obviously didn't stain the concrete.  We installed epoxy, and so that's masonry CMU.  This one jumps out at me.  93.36 percent complete.  If you look at some of those pictures, I mean, the door pockets aren't even completed. Pilasters don't go all the way up.  I mean, there's no way I'd say that was 93 percent complete.

Q.   How much did it cost, roughly, for you to complete the masonry CMU and masonry stone work that was necessary?

A.   It was -- it was substantially more than that.  I'd say -- I want to say, John, it was 120 to 150 grand.

Q.   Okay.

A.   Just for the CMU.  Not the stone; just the CMU.

Q.   Okay.  With respect to the cedar plank
cladding, did you install cedar plank cladding on the
building?

A.   No, sir, we didn't.

Q.   Okay.  That was taken out?

A.   That was taken out.

Q.   All right.  Were there some paint costs
incurred?

A.   There were actually metal costs that were
incurred.

Q.   Okay.  What were those costs, roughly?

A.   I'd say probably about $80,000.00 in metal,
easy.

Q.   All right.  Plumbing; did you have plumbing
expenses to complete?

A.   We did.  In fact, we had to tear out and
relocate the majority of the plumbing that was already
roughed-in to the slab.

Q.   And did you have -- why was that necessary?

A.   Part of it was their plumbing was in the
wrong locations.  Another part of it was some of the
changes that had to do with the redesign of the
project.

Q.   Okay.  Electrical; you had cost to complete
the original electrical scope of work?

A.   We did.

Q.   If we look down at the $400,000.00 number, if you assume that the -- the metal building issues were taken out of the offset, where would you come out roughly on how much of that was not metal building? If you could do the math based on the spreadsheet or just ballpark it for us.

A.   Over a hundred grand.

Q.   Okay.  They had -- SBS had, at the time of its termination, an estimate of $400,000.00 to complete the remaining scope of work at that time.

A.   Right.

Q.   How does that number compare, roughly, with what it cost for you to complete the remaining scope of work, without the additional work?

A.   Right.  I'd say it's pretty -- pretty low compared to what we had to spend to complete it.

Q.   Was it -- was your cost as much as or more than that $400,000.00?

A.   Oh, it was way more.

Q.   Not including the additional work.  Just for the original scope.

A.   Just -- just for the original scope; I mean, you're talking about $400,000.00 -- you're exclude the deficiencies from that -- I mean --

Q.   If you do the deficiencies together with the cost to complete the original scope, what's the rough estimate of that cost, based on your work on the project?

A.   I'd say you'd easily add another 2 to 250 -- 250,000.

Q.   So, $650,000.00, roughly?

A.   Sure.

Q.   What was the total cost -- do you recall the total cost of construction including SBS and your work?

A.   It was -- it was slightly more than 4 million.

Q.   Okay.  So, you're excluding an awful lot of stuff from that number, aren't you?

A.   Absolutely.

Q.   In other words, if you included all of it, this number would be somewhere around the order of 3.2 million, because they performed roughly 800,000 worth of work?

A.   Sure.

Q.   But you're not asking for 3.2 -- or Tri-Bar is not asking for 3.2 million; they're saying their cost to complete with defects was 650?

A.   Sure.

MR. CLARK: Excuse me, John. Are you modifying it? Because all I saw on your disclosure responses was 317.

MR. SLATES: No. We're claiming an offset of 317. I'm saying if you treat it as you guys are, as cost to complete, that number is 650.

MR. CLARK: Sorry. I don't recall ever -- Your Honor, I just object because we haven't claimed a cost to complete. That's not in our --

THE COURT: He's saying his only claim is the offset of 317. Right?

MR. SLATES: That's right, Your Honor. The argument has been made that this wasn't defective work; it was cost to complete.

THE COURT: Okay.

MR. SLATES: If you do the analysis that way, that's the number you come out to.

THE COURT: Got it.

Q. *(BY MR. SLATES)* Let me show you Tri-Bar 62 and ask if you were the author of that document?

A. I helped to make this, but I didn't author it. It was a culmination between myself and Jennifer Swisher.

Q. Okay. Was there substantive content in that document something that you authored?

A.   Sure.

Q.   Was that Jennifer's opinions or your opinions?

A.   It was -- it was mostly mine.

Q.   Okay.  If I could get some context here, this is July 11, 2013 from Jennie Briggs.  And there's an assessment of some Robertson Electric draws.  Did you perform that assessment?

A.   Myself and -- as well as C&S, Bob Carnwath sat down and reviewed those -- those costs and looked at the pay applications that were submitted and made those assessments.

Q.   Did -- does the -- Exhibit Number 62 -- it's in your book up there.  Does it accurately reflect your conclusions and opinions in that regard?

A.   Yes, sir.

          MR. SLATES:  At this time, Your Honor, we move to admit Tri-Bar 62.

          THE COURT:  Any objections to 62, Counsel?

          MR. BROWN:  Your Honor, my question, as I said then, are these comments in the section, and whether those are his comments or someone else's comments.

          THE COURT:  He said there were two other

people that composed making this 62.

MR. BROWN:  I object to this language. Unless he's the author of that language, this is hearsay.  As to the rest of the document, I have no objection.

MR. SLATES:  Mr. Boddie, are the comments and reasoning; are those yours, based on input that you received in your own personal opinions?

THE WITNESS:  Yes, sir.

THE COURT:  Mr. Clark?

MR. CLARK:  I didn't have an objection to this one, Your Honor.

THE COURT:  Okay.  62 is admitted.  What is it?

MR. SLATES:  Robertson completion analysis.

THE COURT:  Okay.  Thank you.

Q.  *(BY MR. SLATES)*  Walk us through what you're doing here and what your conclusions are.

A.  Sure.  What you're looking at is essentially draws 3, 4, 5, and 6 of what Robertson billed for. So, they billed for insurance, slab rough-in, light fixtures and install, electrical gear equipment and install.  So, if you're looking at draw 3, you're roughly looking at slab rough-in.  Okay.  They

roughed-in the slab. Light fixtures and installation. There were light fixtures that were left on the site. And between myself and Bob Carnwath, we inventoried and reviewed those light fixtures and we determined that the value of those things were approximately $10,000.00. If you can see a typical markup on light fixtures is about 20 percent, bringing you to a value of 12,300.

Gear and equipment install; there was a little bit of gear that was left on the site. Not much. What they're billing for in this pay app specifically is $5,120.00 for insurance and mobilization. 2,240 in addition to the 12,160 that they had already earned. So, my assessment was, even if they marked up the $10,000.00 in light fixtures at 20 percent, you know, that 2240 was -- was slightly above reasonable to bill for here.

Branch conduit and wire; they're billing for $11,100.00 in conduit and wire. We valued -- myself and Bob valued the amount of conduit and wire that was installed as far as branch circuits was roughly $3,000.00. The temporary power they're billing for here, there was no temporary power to the building. There was no line that was run. We actually had to go in and trench our own line from

some of the existing houses over to this area.  So, I'm not quite sure what they were billing for there.

If you look at draw 4, you take all those numbers from draw 3 and move them over one column to the left.  Light fixture install; they're billing for another $11,200.00.  As we already discussed, that was excessive for what was provided on-site or left on-site.  Gear and equipment install; there wasn't anything installed, so I didn't feel like that money should have been allocated to a fair amount to pay out.  Branch conduit and wire again; we only valued it at about $3600.00 worth of work completed.  And temporary power, again, for $1250.00.  There was no temporary power.

Draw 5, demobilization.  I estimate that $6,000.00 for demobilizing from Uvalde to San Antonio is a little high, so we deducted a thousand dollars from that and came up with a fair amount of approximately 5000.

Q.   Okay.  And one more draw.

A.   Draw 6.  They drew another $1280.00 for insurance and mobilization.  We got $1150.00 for slab rough-in.  There was no contest to that.  2560 in light fixtures and install.  You know, this is obviously retainage adjusted to what we felt was

applicable on draws 3, 4, and 5. Gear and equipment install, $910.00. We made adjustments to what we felt was applicable in 3, 4, and 5. Same thing with branch conduit and wire for temporary power. We took out completely because we had no evidence of temporary power ever being on-site.

Q. So, the lien amount as reflected in Exhibit Number 62 is $60,990.00. Do you see that?

A. I do.

Q. And after adjusting it for your evaluation of each of those draws, you believe the actual value of the work in place is 12,401; correct?

A. Correct.

Q. Did -- you weren't on the project in January of -- of 2013, were you?

A. I was not.

Q. Did you ever see C&S's original bid for the original scope of work?

A. I believe so.

Q. Did you see it before you did this analysis, or did you only see C&S's bid for the modified scope of work?

A. I think I saw C&S's bid for the modified scope of work. I'm trying to remember.

Q. If it was sent on January 14th 2013, would

that have been before you were there?

A.   It was.

Q.   All right.  Let me just ask you this.  Did you base this analysis at all on C&S's number?

A.   No.  This was -- this was all based on evaluation of work completed on-site.  It was not compared to --

Q.   All right.  I want to compare it to C&S.

A.   Okay.

Q.   The contract amount, as indicated here, is 128.8.

A.   Okay.

Q.   If we look at Tri-Bar 44 --

MR. BROWN:  Your Honor, one of the things I want to do is to object, at least as to the extent that he is tendering what I'd assume is an expert report on my client's billing, which was never provided.  There's never been a contrast or anything else as to C&S.  So, if that's what he's doing --

MR. SLATES:  I'm just offering the -- it's already been admitted.  It's the bid.  I was just going to compare the contract of the bid and compare it to Mr. Boddie's analysis.  Because I think they were remarkably similar.

THE COURT:  Does Mr. Boddie's analysis

include an analysis of Robertson's work?

MR. SLATES: That is an analysis of Robertson's work.

THE COURT: That is already in what's been admitted?

MR. SLATES: Yes.

THE COURT: Okay. So, what's your objection, since it's in evidence already?

MR. BROWN: That he's doing the compare and contrast now as to providing an expert report or an expert analysis to what C&S allegedly has done and my client. There's been no report tendered on that. There's been no investigation tendered on that.

THE COURT: Is there any --

MR. SLATES: That's not what I'm doing. All I'm going to do is some math.

MR. CLARK: Your Honor --

THE COURT: No, no. But you're getting in C&S stuff. And did you evaluate C&S work? C&S, the electrical people that came on and worked with you, I presume?

THE WITNESS: By evaluate, what are you referring to? Do you mean, did I look at this before they started and say whether or not this was fair and reasonable?

THE COURT:  As to C&S.

THE WITNESS:  No, because I wasn't involved at that point.

THE COURT:  Okay.  He was not involved with the C&S evaluation.

MR. SLATES:  I understand.  I'm not going to go into the substance of what C&S did.  I'm just going to look at the amount of their bid compared to the amount of Robertson's bid and see how the difference compares to Mr. Boddie's -- I'm not going to ask him anything about C&S other than what's the amount.

THE COURT:  Well, if C&S's contract amount is 128 --

MR. SLATES:  No.  This is Robertson's contract amount.  Robertson's contract amount -- just so you can see where I'm going with --

MR. CLARK:  Can I launch an objection, Your Honor, in the interest of time?  The only disclosure response that they have is an offset of $4,535.00.  This other stuff is not in their disclosure responses as an offset against Robertson.

MR. SLATES:  I'm not seeking an offset against Robertson, Your Honor.  I'm just giving you some context.

MR. CLARK:  In which case this is all irrelevant.  Because the $4,535.00 isn't even in any of the numbers he just put up on the board in that last sheet.

THE COURT:  Well, I believe --

MR. SLATES:  It's in the --

THE COURT:  Wait a minute.  I believe there was discussions about C&S had a much higher bid and everything.

MR. SLATES:  They had a lower bid, to be clear.

THE COURT:  A much lower bid.  And so, I guess we'll let Mr. Boddie analyze it for a second.  So, the objection is overruled.

Q.  *(BY MR. SLATES)*  So, the difference between Robertson's contract and C&S's bid for the same work was 52,800; right?

A.  Right.

Q.  The difference between your evaluation of the work in place and Robertson's lien amount was 48,000.  Those are pretty close, aren't they?

A.  They're pretty close.

THE COURT:  Let's take a break, Counsel; our afternoon break.

MR. SLATES:  Your Honor, I've got three

more questions and I'll be done with this witness.

THE COURT: Okay.

Q. *(BY MR. SLATES)* Based on your experience in the construction industry, how would you characterize the overall quality of SBS's work on this project?

A. I'd say it was lower than industry standard.

Q. Would you have accepted this quality of work if you were the owner of the project?

A. Absolutely not.

Q. Would you ever hire SBS to build anything for you?

A. No, sir.

MR. SLATES: Okay. No further questions.

THE COURT: Okay. Let's take a 15-minute break. You can step down, Mr. Boddie. 15 minutes.

(Recess taken.)

THE COURT: Y'all have a seat, please.

THE COURT: Mr. Brown, he's all yours.

MR. BROWN: Thank you.

### *CROSS-EXAMINATION*

*BY MR. BROWN:*

Q. When were you hired again?

A. In February.

Q. February?

A. Yes, sir.

Q.   When did you take the pictures?

A.   February.

Q.   February?

A.   Most of them.  Some of them were March, some were April, some of the corrective actions were May, June, July.

Q.   I want to talk specifically about Exhibit -- I want to say -- I think it's 86 in your Tri-Bar Exhibit Number 20.

A.   Okay.

Q.   When was that picture taken?

A.   That was taken mid-February.

Q.   So, February 15th, February 16th?

A.   It must have been after February 18th because that was my first day on the job.

Q.   So, it was after February 16th?

A.   Uh-huh.

Q.   Did you take the picture?

A.   I did.

Q.   Okay.  Now, you're aware that Mr. Robertson took pictures on that day; correct, on the 24th?

A.   Of February?

Q.   January.

A.   Oh, no, sir.  I'm not aware of that.

Q.   Let me show you what's in our Exhibit Number

13. Is that what that site looked like in February?

A. It's close.

Q. But not quite, is it?

A. Well, I guess my question back to you is, what location is this top picture in? Are you presuming that it's the same location as this?

Q. Well, considering my client is the one that took it, he's saying it is.

A. Okay.

Q. They weren't the same, were they?

A. No. It looks like -- if you're saying that that picture in that location and this picture are the same location, I would say there's more conduit.

Q. There's more conduit. Which plan did you look at?

A. Which plan?

Q. Well, you assessed and you stated that my client's work was inadequate; right?

A. I believe I said the wiring was undersized. Yes, sir.

Q. Okay. That would be pursuant to a plan that requires them to use specific wiring; right?

A. Well, not necessarily. Wiring is sized per the National Electric Code. So, it's based on distance, load size, everything else, is the way the

wire is sized.

Q. Distance, load size. Which plan did you look at?

A. I've looked at many plans, sir.

Q. Did you look at the original plan that Mr. Robertson was under?

A. I have seen those. Yes, sir.

Q. Did you look at it?

A. Absolutely.

Q. Okay. Is that the plan that was in effect when you took the picture?

A. No, sir.

Q. So, the plan had changed?

A. Yes, sir.

Q. Had that site remained pristine and no one touched it?

A. No, sir. C&S had taken over before I was brought on board.

Q. So, the site most probably had been altered; right?

A. If my recollection serves me right, I believe Robertson was out and C&S was brought in within a day or two.

Q. And in fact, C&S Enterprises was already on-site on the 23rd; isn't that correct?

A.   Of?

Q.   January.

A.   Yes, sir.

Q.   And they were working on the site?

A.   Well, let me back up.  Before I say yes, sir, let me say I assume so, because C&S was on the site when I was there.

Q.   And they were working the site?

A.   They were.

Q.   And with all probability, the site had been altered; isn't that correct?

A.   Yeah.

Q.   Okay.

A.   Absolutely.

Q.   Now, with regard to the picture that you have, that appears to be two stories; right?  There's a first floor and a second floor; right?

A.   I see framing for a first floor.

Q.   I want you to examine --

A.   I see framing for a first floor.  I don't see any -- I don't see any joists over here or any framing above a first floor that would lead me to believe that there's a second floor.

Q.   Now, we have the existence of what appears to be more conduit in Mr. Robertson's picture than in the

picture you're talking about; right?

A.   I think you did that backwards.

Q.   There's more wiring in his picture; correct?

A.   I'm sorry?

Q.   There's more wiring in his picture.

A.   You're saying there's more wiring in this picture?

Q.   Yes.

A.   No.   There's wiring here, there's conduit here.

Q.   Let's look at this real carefully.   Your statement is that conduit rough-in and wire were pulled; right?   That's your note.

A.   That's correct.

Q.   Okay.   And the wire pulled had an incorrect length in size; right?

A.   I didn't say it was length.

Q.   Huh?

A.   I believe I said size.   I don't believe I said length.

Q.   Oh, no.   It says length and size.

A.   Where?

Q.   So, that would be error; right?   You were mistaken; right?

A.   On length?

Q.   Yes.

A.   Sure.  My apologies.

Q.   Okay.  Now, in addition, you've stated that when you assessed and reviewed Mr. Robertson's demobilization costs, you demobilized him to San Antonio; correct?

A.   San Antonio surrounding area.  Yes, sir.

Q.   Okay.  And you assessed it at $5,000.00; correct?

A.   Correct.

Q.   What would be the demobilizing cost to Houston?

A.   Well, you figure Houston is another three hours, so that's roughly 180 miles.  Give them 55 cents a mile.  So, what is that, another $90.00, plus, you know, time.  So, let's say you got two guys. Electricians, you can roughly say, you know, 20 bucks an hour, so 20 times six is, you know --

Q.   20 times six is what?

A.   -- 120.

Q.   120.  So, you're saying an additional $150.00?

A.   If you're looking at it from a time standpoint to get from San Antonio to Houston; fuel and labor.

Q. So, you're aware that he demobilized to basically Humble, Texas?

A. Okay.

Q. Did you know that?

A. No, sir. I assumed he was from San Antonio.

Q. You assumed. Did you investigate to find out?

A. No.

Q. Well, it seems a little bit strange to me that you're their expert; you're supposed to investigate your facts, and you assumed.

A. Well, we're talking about 120 to 150 bucks. But I mean, Houston to San Antonio is not -- you know, we bring subcontractors in from Dallas and Houston and surrounding areas all the time. You know, their mobilization and demobilization costs aren't that great. You know, I thought I was being generous with $5,000.00. If you really want to look at it, I mean, we can really break this down.

Q. I'm certain you felt you were generous. But my question to you, more importantly, is, you're indicating that his work was -- at least the wiring -- was incorrect, but you really can't tell me whether you looked at his plans. Right?

A. I believe I told you that I did look at the

plans.

Q. When plans are adjusted on a site, are they supposed to mark the fact that there are revisions?

A. Meaning, if an architect comes out with a change, is -- are you asking me if there's a way that that architect can tell you that there is a change in an area?

Q. That's right.

A. Sure.

Q. It should indicate that they've been revised; correct?

A. It doesn't necessarily have to, but it's a courtesy.

Q. Well, if someone doesn't give you a request for a proposal and merely inserts changes into a plan, would that be appropriate to do?

A. I'm not sure I follow.

Q. If someone gives you one set of plans --

A. Okay. So, I've got a contract set of plans. Okay.

Q. And then between point A and point B, they give you another set of plans, but don't identify the changes, would that be a little confusing?

A. Not necessarily.

Q. Why wouldn't it be?

A.   Well, because you're getting new plans. You're going to obviously look at them and find out what's changed; and then if there's any cost associated with that, you put in a request for a change order.

Q.   So, that's what you're supposed to do; right?

A.   That is what you're supposed to do.

Q.   Okay.  When you reviewed C&S Enterprises' proposal, you indicated that it's roughly -- should be $76,000.00; right?

A.   C&S's proposal?

Q.   Uh-huh.  That's one of the last questions you were asked.

A.   Right.  Their proposal states $76,486.75.

Q.   And that would be what you would expect the contract to be; correct?

A.   Not necessarily.

Q.   Why wouldn't it be?

A.   Well, it's going to depend on what set of drawings that they're contracted to.

Q.   So, if the proposal that they're doing is different from the contract that they're doing, then the contract might be different?

A.   Repeat that again.

Q.    If the proposal is based on a certain number of plans and information that a contract is supposedly based on, then the contract should be for the same amount as the proposal; correct?

A.    Yes.  Your proposal will match a -- typically a set of drawings.

Q.    And if it's not, then it would change; correct?

A.    Correct.

Q.    So, then, you would expect that if the proposal is for the same amount of work that you bid on, then the contract amount should be for that amount; correct?

A.    If it's tied to the same contract documents.

Q.    Correct.  So, would you be able to understand -- I want you to go to -- I'll get you Plaintiff's Exhibit 22-A.  At the very top where it says contract amount, what's the amount that's stated there?

A.    Total contract amount looks like 115,163.

Q.    Certainly different from the proposal amount; right?

A.    Sure.

Q.    So, either the contract is written on a different set of work or somebody increased the value on the proposal; right?

A.    Well, I think -- I think where you may be confused is, you're not seeing any kind of increase on here for changes, so --

Q.    Well, that's not true.

A.    Look at the date on here, 7/25/13.

Q.    7/25/13.

A.    Versus the date on the other one.  So, the plans changed from 7/25 to whatever the -- Exhibit 44 was introduced -- which it's dated January 14th of 2013.  You're talking about six months of difference when a building changed pretty substantially.

Q.    You agree with me, the contract amount doesn't change?

A.    Why would it not?  Your contract amount is an absorption of your original contract plus change orders.

Q.    The contract is what the -- the work you agreed to perform is for; right?

A.    No.

Q.    It's not?

A.    So, what you're not understanding and what I'm saying is, you can have an original contract amount and a current contract amount.  You're looking at a bill from C&S that has a total contract amount.  To me, that says that he's got an original contract

amount of 76 plus change orders.

Q.   Except the extras that are down there account for extra work; right?  There's an amount down there for extras.

A.   I see draw 1, draw 2, draw 3, draw 4, draw 5, balance due.

Q.   If you look right below the total contract amount, the next line says, extras to date.  Do you see that?

A.   Sure.

Q.   How much is reflected in extras to date?

A.   Well, I'm having a real hard time reading that.  I'm going to guess it's either 27 or 37.

Q.   It's $87,893.00.

A.   Okay.

Q.   And it reflects at the bottom line -- the next sentence underneath that says, "And the total new contract amount is $203,056.00"; right?

A.   Sure.

Q.   Now, go to 22-B, which is the very next one.

A.   (Witness complying.)

Q.   Do you see it?

A.   I do.

Q.   Even though on 22-A the new contract amount is 203, that same stated original contract amount of

$115,163.00 is written at the very top, isn't it?

A.   Sure.

Q.   And then on the next line, the interest to date, reflects $100,093.00; correct?

A.   Correct.

Q.   And then it indicates that the total new contract amount -- that is the total amount that was paid out on this contract -- was $215,256.00.  Do you see that?

A.   I do.

Q.   That's decisively more than 128,000; wouldn't you agree?

A.   128 being Robertson's contract?

Q.   That's correct.

A.   That's correct.

Q.   And of course, this represents changes that occurred.

A.   Sure.

Q.   Now, when you -- I want you to go to Plaintiff's Exhibit 13, which I will represent to you are pictures taken by Mr. Robertson on the date that he left.  Do you see the pictures?

A.   I do.

Q.   Did the site look like that when you were there?

A.    It's pretty tough to make out.  Can we get some clear pictures maybe?

Q.    (Complying.)

A.    These are the same?

Q.    Yes.

A.    I'd say it looks similar; not necessarily exact.

Q.    Things had changed when you got there?

A.    Sure.  There had been another electrician working for there for presumably two or three weeks.

Q.    Let's go to 14.

A.    Okay.

Q.    Did you examine those locations also?

A.    I'm familiar with these locations.  Yes, sir.

Q.    You didn't find any deficiencies there, did you?

A.    These are the same locations that we had to pull the wiring out and rewire it in order to make sure that it was the correct wire size.

Q.    You don't identify them in any of your deficiencies as written in your report, do you?

A.    Specifically?

Q.    Specifically.

A.    No.

Q. No. Let's go to 27. Now, you only identified allegedly three pictures for deficiencies; correct?

A. There were three pictures that were included in that report. Yes.

Q. Okay. But when we go to your corrections -- and I believe that's -- is that 23; Tri-Bar's Exhibit 23?

MR. SLATES: Yeah.

Q. *(BY MR. BROWN)* And I went down this. I see foundation; correct?

A. Correct.

Q. Grade beam issues?

A. Correct.

Q. Brick lug?

A. Correct.

Q. Door pocket?

A. Correct.

Q. Structure masonry?

A. Correct.

Q. Framing, steel, and roofing?

A. Sure.

Q. Masonry? Not one issue for electrical, is there?

A. You're right.

Q.    Now, I want to go to Tri-Bar Exhibit 21, page 19.

A.    Okay.

Q.    Remember I was asking you about locations that were one story, and now it was two story?

A.    No.  I don't recall you asking me the difference between -- you asked me if a picture looked like it was one story or two story.

Q.    Right.  I was talking about this one.

A.    Okay.

Q.    And you were so kind to correct me and say, well, it's not that one.  But the area here is different.  It went from one story to two stories, didn't it?

A.    Correct.  It did.

Q.    And the amount of wiring that would be required for -- going from one story to two story would be different, wouldn't it?

A.    It would.

Q.    You'd need more; right?

A.    You would.

Q.    But when my client was doing the work for that particular site, it was only called to be one story.  Were you aware of that?

A.    Yes.

Q.   So, you're not saying that in any site like that that he needed more wiring, are you?  You're not saying that, are you?

A.   I'm not sure that I follow.

Q.   You're not saying that he required more wiring for a site that would not have required it at the time that he was doing the work?  You're not saying that, are you?

A.   Okay.  One more time.  You're asking me if I'm -- if I'm saying that Robertson Electric would need more wire on the site than would be required to fulfill his scope of work?

Q.   No.  What I'm saying is that if the location where my client was required to do work was specifically only to be one story; correct?

A.   Okay.

Q.   It wouldn't need the same amount of wiring as a two story place would require; correct?

A.   Correct.

Q.   So, you're not suggesting to this Court for any such location as is reflected in Exhibit 19 that any of your representations would include such a location?  You're not saying that, are you?

A.   I'm still not following what you're --

Q.   Did you account for all the changes that took

place between my client's original plans and when you did your review?

A.   From the point that your client was contracted until he was fired, you're asking me if I reviewed every single one of those documents?

Q.   I'm asking, did you review his plans?  You said you did; correct?

A.   Robertson's?

Q.   That's correct.

A.   That's correct.

Q.   And I'm saying, did you take into consideration at the time you did your report the fact that his original plans and what you were doing now had changed?

A.   Yeah.  Absolutely.

Q.   So, then, there would have been supplies that were no longer necessary; correct?

A.   Can you be more specific?

Q.   If the plans changed that eliminated something and he did work on a plan that required it and it's no longer required, then that particular item would no longer be required, would it?

A.   So, you're saying if he put a plug in location A and the plans changed and no longer required a plug in location A, that there would still

be a plug there?

Q.   If he put the plug there, it would be there when you got there; correct?

A.   Okay.  Yes.

Q.   And if it had changed, it would no longer be required to be there?

A.   It would no longer be required to be there, but it would still be there.

Q.   Correct?

A.   Presumably, yes.

Q.   Well, light fixtures -- if the light fixtures were called to be in one specific location and then that had changed, then it would have to be in a different location when you got there; right?

A.   Right.

Q.   Okay.  Did you take that into consideration when you priced my client's work?

A.   When I did my evaluation on what I thought he was owed?

Q.   Yes.

A.   Absolutely.

Q.   And that's your representation?

A.   That's my representation.

Q.   Just like you took his going to Houston into consideration, but you didn't know; right?

A.   Right.

Q.   Right?

A.   Do I need to repeat myself?

Q.   You didn't take it into consideration because you guessed?

A.   You were correct.  I did say right.

Q.   Okay.  I want you to look at Plaintiff's Exhibit Number 34.

A.   Okay.

Q.   Have you ever dealt with City Electric Supply?

A.   You know, I can't think of it off the top of my head.  I'm familiar with who they are, but I can't think of a time when I would have --

Q.   They're located in Houston, aren't they?

A.   I don't remember.

Q.   Excuse me?

A.   I don't know.  I don't see an address on here.

Q.   The 281 area code puts them in Houston.

A.   There you go.  I'll accept that.

Q.   Have you ever dealt with Crawford Electric?

A.   I have.

Q.   They are a reputable company?

A.   Yeah.  They're a pretty big supplier.

Q. What do they price the gear that my client purchased there?

A. It looks like they got two options; one at 3250 and one at 5950.

Q. And what is the price at top?

A. You're asking me option 1 or option 2?

Q. The price at the very top, please.

A. Oh, 15,900.

Q. Through Exhibit 34, it represents Crawford's billings for electrical gear and supplies that my client paid for. Are you saying that Crawford, that you just represented to be a legitimate recognized company, shafted my client?

A. No, I wouldn't say that.

Q. Okay.

A. Why would I --

Q. So --

A. I would -- I would say maybe he overpaid or could have shopped around and gotten it cheaper, but I wouldn't say he got shafted.

Q. Okay. So, your statement is, should have shopped around, maybe could have found it cheaper; right?

A. Sure.

Q. But otherwise, those are legitimate bills;

right?

A. It appears so.

Q. Ever dealt with Elliott Electric Supply?

A. No, sir. Can't say that I have. Is that who this is?

Q. That's the very last one.

A. So, we're on the last page? Elliott Electric Supply? Okay.

Q. Did you investigate any of these bills?

A. No. This is the first time I've seen these bills. Why would I have seen these?

Q. So, Mr. Slates didn't share this exhibit with you, so that you could render a more accurate opinion about costs and expenses that my client incurred?

A. Well, I'll tell you what Mr. Slates was referring to is, back when there was word that Robertson was trying to get additional funds out of Lewis Energy, we did an assessment of the costs that, you know, we had at hand, which were pay applications. And this is back when Lewis and Robertson were trying to negotiate and settle out of court, you know --

MR. BROWN: I will object to any discussion about settlements.

A. Okay. Fine. Sorry.

Q. (BY MR. BROWN) So, as I understand it, you

come on board after and you -- deficiencies and your corrections make no mention to electrical at all; correct?  Correct?

A.   No.  There are, I believe, three pictures of electrical deficiencies that --

Q.   You make no mention of corrections; correct?

A.   There are no pictures of corrected items in there.

Q.   So --

A.   Just what you see here --

Q.   -- your --

A.   -- on picture 19 and 21 where you can see, you know, the light fixtures, conduit installation --

Q.   And that picture --

A.   -- for overhead doors, stuff like that.

Q.   Uh-huh.

A.   And obviously there were --

Q.   And that building and that picture reflects the condition of the property when you took the picture; correct?  Correct?

A.   Can you repeat that?

Q.   That picture reflects the condition of the property when you took it?

A.   Are you asking me if I modified the picture?

Q.   I don't believe you modified it at all, sir.

A.    Okay.  I just --

Q.    My --

A.    -- I want to make sure I understand what you're asking me.

Q.    But as you've already noted, things changed; correct?

A.    Right.  I didn't modify this picture in any way.

Q.    Thank you.

          MR. BROWN:  I pass this witness.

          THE COURT:  Mr. Clark?

          MR. CLARK:  Yes, Your Honor.

### *CROSS-EXAMINATION*

*BY MR. CLARK:*

Q.    Mr. Boddie, you mentioned a change that was done to part of the roofing system, and you said, if I understood you correctly in your testimony, that all that stuff has got to be approved by the metal building company before you can do it.  Did I understand your testimony correctly?

A.    I believe I was referring to welding of the beams to columns.

Q.    Okay.  So, when it comes to something like that, you would defer to the metal building company that designed it?

A.  Yes, sir.  And let me expand on that further, if I can.

Q.  Well, if you'll just answer my questions. Your attorney can come back in a minute.  I'm just trying to get through my questions as quick as possible.

A.  I understand.

Q.  But you would defer to the metal building company?

A.  Correct.

Q.  And the engineer who put it together; right?

A.  Correct.

Q.  Would it surprise you to learn that the roof dip that you criticized was actually approved by the metal building manufacturer in this case?

A.  It wouldn't.

Q.  Would it surprise you to learn that that's an accepted method to have the roof dip in the industry?

A.  It would.

Q.  Would it surprise you to learn that the end dams that you criticized were found to be perfectly acceptable by the building manufacturer?

A.  Absolutely.

Q.  Would you be surprised to learn that the

building manufacturer's representatives found nothing wrong with the roofing system or the construction that they saw out there on the project?

A. Yeah. Absolutely. I mean, Schulte is a very reputable company. I cannot believe for a second that a representative from Schulte would go out there and approve what's pictured in those pictures.

Q. Okay. What you saw was, what you said, 60 to 65 percent complete; correct?

A. Correct.

Q. Now, what was not out there, but what was in your, quote, corrective actions were the gutters; correct? The gutters weren't up yet when you went out there?

A. Correct.

Q. But they were in your corrective action pictures?

A. Correct. They were in the pictures.

Q. Okay. The soffits weren't out there when you went out there; correct?

A. They had a limited amount of PBD panel that was left on-site, but it was not installed.

Q. Was it -- in your corrective action, they're up?

A. Sure.

Q. Okay. The -- we did the gutters, the soffits, the downspouts. Those were on your finished product, but they weren't out there originally; right?

A. Right.

Q. Now, those things hook over the -- they connect over the top of the roof panels; correct?

A. The gutters?

Q. Yes.

A. They actually go underneath the roof panels.

Q. Okay. And they hook -- but they hook in; right?

A. Yes.

Q. Okay.

A. I'd have to really look at the drawings, but most of them do.

Q. Now, you had trouble, when you were out there -- United Erectors was one of the ones that was doing metal work for you; correct?

A. Yeah. United Erectors did the building corrections.

Q. And even you had trouble getting your subcontractors paid, specifically United Erectors; right?

A. There was some delay in payment. Yes, sir.

Q. Okay. And in particular, if you'll just

remember this, it sinks in.  Exhibit Number 9 has to do with citing nonpayment, United Erectors has left the project.  That happened under your watch, didn't it?  Do you remember the incident?

A.   Yeah.

Q.   Because Robert -- he's referenced in the e-mail.  What's his last name?

A.   Arredondo.

Q.   Arredondo.  He sent you a text message that says something to the effect of, Mr. Lewis hasn't paid -- or Mr. Lewis won't pay me; I have to pull my men off and go to another job for next week and I'll come back in two weeks.  Something to that effect; right?

A.   Right.

Q.   Yeah.  And as was written, I don't blame him.  I'd pull off, too.  Do you remember that correspondence?

A.   Uh-huh.

Q.   Okay.  People like that have to get paid or they go somewhere else, don't they?

A.   Sure.  You know, Mr. Arredondo is -- he's a small company.  He operates in very small margins.  You know, he's got to make payroll.

Q.   Right.  Exactly.

A.   Can I say that I blame him?  Not necessarily.

Q. Right. And with Morrell Masonry; Morrell is actually another one of those companies that was out there before; right?

A. Right. We had to buy the same block to match what was already purchased out there.

Q. And they were demanding cash as well; right?

A. I don't specifically recall.

Q. Do you recall putting their invoices on Mr. Pittman's AmEx card? If you look at Exhibit 64, you can see it.

A. Sure.

Q. "Can we put this on your AmEx again"? That's from you to Mr. Pittman?

A. Yes. I do recall that.

Q. Okay. Mr. Pittman was willing to do that for -- for you. Did you know that Mr. Pittman was not willing to do that for SBS?

A. Well, I believe there was -- I believe you're confusing the backstory in order to get the -- get the funding. So, the reason that it went on his AmEx is to expedite getting block out there.

Q. Exactly. That's what I mean.

A. Okay.

Q. Okay. Now, at the end of the -- you mentioned -- would it be improper -- or would you call

it defective if you had to have something that was a shim that was under a column and you had to grind it off; if it was left unground, would that be a defect?

A.   A shim underneath a column?  What kind?

Q.   Just out in the open on the floor.

A.   Typically, you don't shim columns with -- with a stake or a rod.  You shim them with, you know, washers or something of the like.

Q.   If you had to come back and cut off a shim, would that be something that would be a corrective action?

A.   Sure.

Q.   Okay.  What about if there's tape torn insulation; is that a corrective action for a defect?

A.   Sure.

Q.   What about if you have to reroute conduit; is that corrective action that would be for a defect?

A.   Sure.

Q.   What about having to cut off bolts?

A.   Absolutely.

Q.   What about gouges in the wall?

A.   Absolutely.

Q.   What about repairing separated joints on conduit?

A.   Absolutely.

Q.   What about repairing CMU blocks that have electrical outlets that were wrongly fitted?

A.   Absolutely.

Q.   Okay.  I just read a handful off of the punch list -- your punch list from November 5th of 2013.  Do those sound familiar?

A.   Yeah.

Q.   Okay.  You found 86 items -- 86 pictures that you took of Select Building Systems.  Do you know how many items are on your punch list when you're completely done with the project?

A.   I don't recall.

Q.   Would it surprise you to remember that it's 217 items?

A.   Sure.

Q.   And what did you do with respect to each of these items?

A.   I fixed them -- or I made the subcontractors fix them.

Q.   Right.  And then -- but it wasn't -- Mr. Lewis wasn't entitled to a whole payment from you because these existed on the day that this punch list was done; right?

A.   Well, if you look at the point of retainage that's held --

Q. I didn't ask you about retainage. I said Mr. Lewis didn't withhold payment from you at this point -- actually, that's just a bad question. I'll --

A. Yeah. I was going to say, because I --

Q. I'll withdraw the question.

A. Okay.

Q. But you did have 217 punch list items even when you were done with the project.

A. Sure. I wouldn't say we were complete, though. You know, I would say, you know, you're not complete until the owner as accepted the building.

MR. CLARK: No more questions.

THE COURT: Mr. Slates?

MR. SLATES: Thank you, Your Honor. Just to clarify a couple of things for the record before I ask my redirect questions. We confirmed that the documents 19, 20, and 21 which were previously indicated to have been produced two months ago were produced on October 29th, 2013. And in fact, Exhibit Number 20 was part of our MSJ response that was filed last summer. So, I just wanted the record to be clear on that.

THE COURT: Well, they were admitted; right?

MR. SLATES: Pardon?

THE COURT:  They were admitted; right?

MR. SLATES:  They were.  I just -- I didn't want the record to be incorrect on that.  With respect to this issue here, there was a representation made that this wasn't in our discovery responses.  It is in our discovery -- I'm sorry.  I'm gesturing.

THE COURT:  That's okay.

MR. SLATES:  It's late.  The analysis of the value of Robertson's work that Mr. Boddie did, it was suggested maybe that's not in our discovery responses.  It is in our discovery responses.  In fact, it tracks almost verbatim from the exhibit.

THE COURT:  Okay.

MR. SLATES:  This is the responses.  And we're not claiming that -- that Robertson owes us money.  We're just saying the amount that's owed to Robertson, if any, isn't 60; it's 12,400.

THE COURT:  Okay.  Show them the discovery responses because they're -- but we allowed that, so --

MR. SLATES: Yeah.  No, no.  I --

THE COURT:  I know.  Don't get your feelings hurt.

MR. BROWN:  I'm not disputing that.  What I dispute --

MR. SLATES:  I just -- it's not my feelings.  It's my integrity that I feel has been assaulted.  What I --

THE COURT:  Then you're in the wrong business.

MR. BROWN:  For the -- for the benefit of the record --

THE COURT:  The only place worse would be Washington, so stay away from there and you'll be okay.

MR. BROWN:  What I disputed was the fact that he was tendering for purpose for an expert report and recommendation that he had not qualified --

THE COURT:  Okay, Mr. Brown.

MR. BROWN:  That's what I was --

THE COURT: Let's redirect Mr. Boddie so he can go somewhere else.

MR. SLATES:  Okay.

### REDIRECT EXAMINATION

**BY MR. SLATES:**

Q.   If you look at Exhibit Number 49 quickly?

A.   Plaintiff's, ours, or yours?

Q.   Yeah.  It's SBS 49.

MR. CLARK:  Your Honor, I don't believe that was part of anybody's -- was that part of your

examination?

MR. BROWN: No.

MR. CLARK: Then this is outside of the examination -- prior examination.

MR. SLATES: Mr. Brown suggested that the scope of C&S's work was $115,000 and that that was --

MR. CLARK: Sorry. Not my issue.

THE COURT: Are your feelings hurt again?

MR. SLATES: No, that's not feelings. That's just -- I'm making the record.

THE COURT: Oh, okay. Let's ask a question of Mr. Boddie.

MR. SLATES: Pardon?

THE COURT: Let's focus on this man.

MR. SLATES: Yes, Your Honor.

THE COURT: Let him get through.

Q. *(BY MR. SLATES)* Mr. Boddie.

A. Yes, sir.

Q. There were questions raised about C&S's bid of $76,000.00 versus its contract amount of 115; right?

A. Right.

Q. The record reflects that the bid was submitted on January 14th, 2013. That's Exhibit Number 44. Exhibit Number 49 shows that Kyle Kieke is

telling him that he's waiting on MEP drawings to be coming; right?

A.  Yes.

Q.  And that's February 1st?

A.  Correct.

Q.  Do you know how the scope of work for electrical changed from the time that C&S submitted its original bid and those new drawings came out?

MR. BROWN:  We're going to object, because if he does --

THE COURT:  Legal objection.  Just not a speech.

MR. BROWN:  One, the item that he's addressing was not produced in discovery at all.  This doesn't show a change order.  This doesn't show a request for change and show a proposal for it.  Shows nothing.  And so, he's testifying -- or attempting to testify with this witness over something he hasn't produced in discovery.  So, I'm objecting to it.

MR. SLATES:  These are admitted exhibits, Your Honor.

THE COURT:  It's in evidence.

MR. BROWN:  No.  He's -- what he is saying is that this is the item that is somehow going to justify the difference between the 76,000 and the

115,000. That's what he's attempting to do. And there is nothing that ties this in in any way, shape, or form to that. And that's what --

THE COURT: Let's see -- well, there's no legal objection there, so let's see what he's trying to tie.

Q. *(BY MR. SLATES)* If the scope of work change after C&S submitted its original bid for $76,000.00 expanded, would its original contract amount have gone up?

A. Yes, sir.

Q. And if Mr. Kieke had told all of us that that, in fact, is exactly what happened, would that explain why the C&S original contract amount is 115 and not the 76?

A. Yes, sir.

Q. All right. Mr. Brown suggested that you didn't have any evidence of construction defects. Can you turn to -- I'm sorry -- electrical defects. Can you turn to Exhibit Number 70? That's the binder that compiles 19, 20, and 21. And quickly, tabs 33, 34, and 35 of that binder, are those all electrical defects with certain costs associated with them?

A. The pictures?

Q. No. I'm in the -- I got you in the wrong

book.  That book.

A.  "Remove existing wire to 120 volt wall outlet in hangar area and replace with larger wire to allow for voltage drop."  Yes, I would say that would be a defect.  Tab 34, "Reconfigure wall outlets and J-boxes for required louvers and masonry block walls in hangar areas to reflect engineering drawings."  Yes, I would say that's a defect.  Tab 35, "Relocate fixtures in hangar area to reflect engineered drawings in hangar area."  Yes, I would say that would be a defect.

Q.  Okay.  Last question.  Mr. Clark reminded you that you had a 218 item punch list on the project at the end of the job.  Do you recall that?

A.  Yes, I do.

Q.  Did it cost you anywhere near $318,000.00 to fix those punch list items?

A.  No.

Q.  About how much did it cost?

A.  I would say, if you were to put a value to that punch list, you're talking 10 grand or less.

MR. SLATES:  No further questions.

THE COURT:  Okay.  You can step down, sir.

THE WITNESS:  Thank you.

THE COURT:  Next witness, Mr. Cluck -- or

Mr. Slates.  I'm sorry.

MR. JONES:  Tri-Bar calls Steven Mowrer. He's in the hall.

THE COURT:  Okay.  Up here, Mr. Mowrer. Raise your right hand.

(At this time the

witness was sworn in.)

THE COURT:  Have a seat, Mr. Mowrer.  And spell your last name for the court reporter, please.

THE WITNESS:  M-O-W-R-E-R.

## DIRECT EXAMINATION

### BY MR. JONES:

Q.  Mr. Mowrer, good afternoon.  I know the hour is late, so we'll try to be brief.  Could you tell us a little bit about yourself?  Where did you grow up? Where did you go to school?

A.  My name is Steven Mowrer.  I grew up in Pennsylvania.  I went to school at Lebanon Valley College; got a degree in accounting and management and MBA there also.

Q.  Okay.  And what's your MBA in?  Is it in accounting as well?

A.  Master's of Business Administration.

Q.  Okay.  And what about your employment history?

A.    I've been a corporate controller for 20 years and I've got three years as chief financial officer.

Q.    All right.  How long have you been with the Lewis Group?

A.    4 years, 7 months.

Q.    Okay.  And what's your current position?

A.    Corporate controller.

Q.    What does the corporate controller do?

A.    Financial records, financial reporting, budgeting, insurances, internal controls, accounting policy and procedures.

Q.    Okay.

A.    Job costing, fixed assets.

Q.    Are you the controller for Glacier Cap Management, LLC as well?

A.    Yes, sir.

Q.    And I know that they've had a name change, but was that also true back in the 2012/2013 time frame?

A.    Yes, sir.

Q.    And what is the relationship between Glacier Cap and Tri-Bar?

A.    They're affiliated companies with common owner, Mr. Rod Lewis.

Q.    Okay.  How did you become involved in this

hangar project down in Uvalde?

A. As the controller for the company, I'm responsible for all invoices -- accounts payable invoices that come in, getting it recorded into our system, approving them, getting payments out.

Q. All right. And did that role change over time?

A. No, sir.

Q. Okay. Did -- did the project and the contractors working on the project change?

A. Yeah.

Q. In other words, what you did for Glacier Cap while SBS was on the job, how did it transition into what happened after SBS was terminated?

A. Well, Glacier Cap was the construction manager, which was the liaison between GC and the owner, Tri-Bar. Then in February of 2013, that relationship changed when SBS was terminated as the GC. Glacier Cap Management then assumed the role as the GC until the project's end.

Q. And in your capacity as controller, did your responsibility remain the same to oversee the invoicing and payment of pay applications and things of that nature?

A. Yes, sir.

Q.   All right.  In the five years -- or almost five years that you have been with the Lewis Group, approximately how many projects would you say that the Lewis Group has worked on?

A.   Well over a hundred.

Q.   All right.  And you're familiar with the projects as part of your job; is that right?

A.   Pretty much every one of them.  Yes, sir.

Q.   Okay.  Are you aware of any other project that has been built during your time there with Mr. Lewis and his companies where there's been any kind of lawsuit filed for some kind of -- some kind of reason like we're here today?

A.   No, sir.

Q.   Or an arbitration?

A.   No, sir.  Nothing.

Q.   Or even a mediation?

A.   No, sir.

Q.   I'm going to switch topics for a second, then ask you to look at a notebook -- the Tri-Bar notebook. Here we go.  I'd like to turn your attention to Exhibit 19.  This is a reduced copy of a document that is in evidence.

MR. JONES:  Your Honor, I do have a legal sized copy of this that's more friendly on the eyes if

you'd rather see this.

THE COURT: Sure. Thank you.

Q. *(BY MR. JONES)* Mr. Mowrer, what is Exhibit 19?

A. This is a spreadsheet that was put together by Glacier Cap personnel listing invoices, contractors, invoice numbers, and the type of work that had to be done to correct work that was done by SBS that was not according to design.

Q. Okay. And were the invoices actually paid by Glacier Cap?

A. Yes, sir.

Q. Based upon your review and analysis of the invoices submitted by the various subcontractors associated with this work that's described in Exhibit 19, what is the total amount that Tri-Bar paid to correct or remediate SBS's work?

A. $317,995.74.

Q. I'm going to switch gears again on you. Did Glacier Cap also make payments to -- I'm sorry -- did Glacier Cap also make payments to the subcontractors -- some of the subcontractors of SBS after they were terminated?

A. Yes, sir.

Q. And if you would, turn to Exhibit 28 in that

same notebook.

A.   (Witness complying.)

Q.   Does that consist of the check stubs for at least some of the -- looks like all of the ones that Glacier Cap paid?

A.   Some of them.  Yes, sir.

Q.   Okay.  There's another notebook up there that's called SBS.  Let's look at that one.  Looking at Exhibit 23, there's a listing of the -- of the payments that were made.  And you can also look at it on the screen, if you'd like.  The amounts paid directly by Tri-Bar.  Is that what actually was paid by Tri-Bar?

A.   Looks like it.  Yes, sir.

Q.   Okay.  And why were -- why did you authorize -- or why did someone authorize and direct you to pay these invoices for subcontractors that were working while SBS was on the property?

A.   Well, the general manager at the time that was working for us worked with the subcontractors to continue the construction of the project.  So, when SBS was terminated, we worked with a subcontractor to see if they would still continue the project so we could get the project done in a timely manner, and they agreed.  So, we just made direct payment to them.

Q. Okay. And did you also obtain lien releases from those subcontractors?

A. Yes, sir.

Q. Okay. I know it's tempting, but you need to wait for me to finish my question.

A. Okay.

Q. You know what I'm going to say, but the court reporter has a hard time taking down two people talking at once. And would that be shown in Exhibit 29 in the SBS notebook -- I'm sorry -- the Tri-Bar notebook?

A. Yes, sir.

Q. Okay. I'm going to take this notebook away from you for a minute so you don't have to worry about that one. I'm going to change over to now the pay application process that was used for Tri-Bar. And I'd like for you to take a look at tab 1 -- or Exhibit 1 in that notebook.

A. (Witness complying.)

Q. As a preliminary matter, you're familiar with the hangar project being basically a million two starting out?

A. Yes, sir.

Q. Were you aware of the time frame that was established for the hangar to be substantially

complete and then certified as complete?

A. A little bit less than six months, sir.

Q. All right. And did it have a specific number of days -- 173 days?

A. Yes, sir.

Q. Okay. And looking at draw request number 1, that was paid; correct?

A. Yes, sir.

Q. And now, if you look at Exhibit 2, that's another -- another SBS payment application. Was that also paid?

A. Yes, sir.

Q. So, roughly after two months, you had -- or Tri-Bar has paid approximately $200,000.00?

A. Yes, sir.

Q. All right. And turning now to pay app number 3, what is the amount of that pay app?

A. The work completed for that period was $31,000.00.

Q. Did that -- as a controller of a project that has a timeline, did that concern you?

A. Yes, sir.

Q. Why?

A. Well, the project was $1.2 million, which should have been done over a period of six months -- a

little bit less than six months. So, for cash budgeting, you're looking at about $200,000.00 per month. And after the first two months, we only saw $200,000.00 in progress billings. We expected to see 4. And after this third pay app, this was only $31,000.00. So, we were only at $231,000.00 in progressive billings when we expected to be up to about $600,000.00.

Q. And did you -- were you, in fact, instructed to hold on to this pay app for a while to see if any work was going to be done?

A. Yes, sir.

Q. All right. Now, turn to pay app number 4 that is dated, I believe, October 31st; is that correct?

A. Yes, sir.

Q. All right. So, that covered work that was supposed to be done during the month of October?

A. Yes, sir.

Q. Well, let me back up just for a second to pay app 3. If you'll turn with me to tab 36 -- or Exhibit 36, that is a letter from Mr. Grable in connection with pay app 3; is that correct?

A. Yes, sir.

Q. All right. What does -- what is said by Mr.

Grable under paragraph 3 -- and actually, this is Mr. Grable's letter. You can see on the top right. What is the date of that letter?

A. October 5th, 2012.

Q. And what does he -- what does Mr. Grable say in paragraph 3 of that letter dated October 5th, 2012?

A. "SBS stated still on target for main steel frame delivery to site on October 15th, 2012. This matches current updated schedule. Erection will begin the same week of delivery."

Q. So, we're looking at 10 days that they were going to have the -- the main steel frame delivered to the site. Did you believe that was going to happen?

A. No, sir.

Q. Did it happen?

A. No, sir.

Q. Now, turning to what I originally asked you about, Exhibit 4. That's the pay app for -- dated October 31st, 2012; is that correct?

A. Yes, sir.

Q. What is the amount of that pay app?

A. $3,541.66.

Q. And what month are we in now?

A. This is for the period ending October 31st,

2012.

Q. So, that's how many months from inception of construction?

A. That's four months.

Q. All right. Did this concern you, that you were receiving an invoice for only $3,541.66 in month four of this project?

A. Yes, sir.

Q. Why?

A. Total pay apps for four months only accumulated to about 240 or $250,000.00. After four months, I would expect it to be about $800,00.00 into the contract by now. So, that was substantially behind.

Q. Mr. Mowrer, let me show you what has been marked as Exhibit 71, Tri-Bar. What is that, sir?

A. This is a letter from the architect, John Grable, with an update on the Los Cerritos Hangar.

Q. And was this part of the draw packet that was received by you?

A. Yes, sir.

Q. Okay.

MR. JONES: Your Honor, we move to admit Tri-Bar Exhibit 71.

THE COURT: Any objections?

MR. CLUCK:  Since you've already gone into it, we don't have any objection.

MR. BROWN:  I have no objection.

THE COURT:  Okay.  71 is admitted.

Q.  *(BY MR. JONES)*  There's been some talk in this trial about Mr. Lewis issuing a stop payment edict in October.  Make no more payments to this company until we see something going on.  And we knew nothing about it.  Nobody told SBS.  Nobody told anybody.  Pittman never told us.  Nobody ever told us. Is that true?

A.  No, sir.

Q.  What does Exhibit 71 show?

A.  It's a letter dated November 10th, 2012.  And it states in here that the owner is holding back draws until SBS can deliver PEMB as scheduled, and cc SBS construction Jack Green.

Q.  Okay.  Well, Mr. Grable approved the draw application, so why is the owner holding it?

A.  Well, the -- at this point the work was completed, but they were still way behind schedule. So, we were just holding off the payment until they would get substantially caught up with some work.  And at this point, at 11/10 when this letter was dated, we still had not even received the metal for the erection

yet.

Q.   Was there a concern about that?

A.   Yes, sir.

Q.   And if you would now turn to pay app number 5.

A.   (Witness complying.)

Q.   What's the bulk of this pay application for?

A.   The bulk of the pay application was for the metal that was delivered to the site.

Q.   Okay.  And so, I believe this pay app was actually paid in January.  Does that sound familiar to you?

A.   Yes, sir.

Q.   As well as 3 and 4?

A.   Yes, sir.

Q.   Why were those pay apps now paid in January of 2013 after the delays?

A.   We were waiting for substantial completion of SBS to correct the metal structure.  So, once it was delivered there, then they started working on erecting it.  And at that point we were willing to go to payment in January.

Q.   And then pay app number 6, if you turn to tab 6 in your notebook there.

A.   (Witness complying.)

Q.   Was that pay application paid?

A.   No, sir.

Q.   Why?

A.   The GC, SBS, was terminated as the GC.  And also the work that was done was considered substandard and not to the design that was specified.

Q.   And when did this pay app come in?

A.   This pay app would have crossed my desk somewhere -- period ending December 31st, 2012.  So, I would have got it probably mid to late January -- probably mid-January I would have gotten it.

Q.   And by then, was there a concern about whether SBS was even going to perform on their contract?

A.   Yes, sir.

Q.   And does this chart that we have up here show the different pay apps -- and we've already covered pay apps 1 through 6.  Do you know anything about pay app 7, 8, or 9?

A.   I know of them, but they did not cross my desk for approval.

Q.   As far as you're concerned with regard to change orders, were there any change orders that impacted the delivery date for the building?

A.   No, sir.

MR. CLUCK: Object, Your Honor, speculation.

THE COURT: Sustained.

Q. *(BY MR. JONES)* Did you do any investigation into the pay -- the change orders and how they might affect the delivery of the building?

A. No, I did not do that. That would have been Glacier Cap Management.

MR. JONES: I'll pass the witness, Your Honor.

THE COURT: Mr. Cluck?

## CROSS-EXAMINATION

### BY MR. CLUCK:

Q. Mr. Mowrer, did I hear you say a minute ago that the reason that you were withholding -- or that the payment was being withheld on the contract is you were waiting for substantial completion? Did I hear you right?

A. Yes, sir.

Q. Okay. You said you've had a chance to review this contract. Tell me, where in the contract did Tri-Bar and SBS -- where does it provide for that payment is dependent upon substantial completion of the drawings?

A. It doesn't say that in there.

Q. Okay. Where did that -- where did that right come from?

A. I probably got that from the owner, sir.

Q. Oh, so, you got an instruction from Rod Lewis?

A. From the owner. Yes, sir.

Q. Okay. The owner is Rod Lewis --

A. Not directly from him --

Q. Let's not -- it's late in the afternoon. Let's not mince words. You got your marching orders from Rod Lewis; correct?

A. Not from him directly.

Q. Okay. Who gave you those marching orders?

A. That would have been from the construction manager.

Q. Who was the construction manager?

A. Mr. Pittman.

Q. Okay. And Mr. Pittman told you not to pay any of these bills; right?

A. That is correct.

Q. Okay. Now, let me ask you, after SBS was off the job, did you also receive some instructions not to pay your subcontractors?

A. No, sir.

Q. Why were those subcontractors not paid?

A.    Which ones?

Q.    Well, like United Erectors, the masonry contractor.  Do you not remember those?

A.    Oh, we paid subcontractors, sir.

Q.    Okay.  Well, let me ask you.  You -- matter of fact, they had to leave the job; right?

A.    I'm not familiar with which ones that --

Q.    Why don't you look at SBS number 8.

A.    Okay.

Q.    Okay.  And this has already been admitted. Isn't it a fact that John Grable is writing to Tom Pittman, who is giving you your marching instructions, says, "We're back in the SBS grind with us pushing the unpaid.  Doesn't seem right."  Isn't that right? Isn't that what it says?

A.    That's what it says, sir.

Q.    If you look to the next page, look at the next page over.  Thomas Pittman writing again to Mr. Grable.  "Ironically crews are pulling off because I can't get them paid.  The cheapest best guys have to be paid every week.  Steve Mowrer in accounting told me, that's not going to happen."  Do you see that?

A.    I'm looking for it.

Q.    Do you want me to point it out to you?  Do you remember saying that to Mr. Pittman?

A.   No, I do not, sir.

Q.   Thomas Pittman; do you see that, May 19th?

A.   Uh-huh.

Q.   Okay.  Do you see that?

A.   Yes, sir.

Q.   Okay.  Do you see where it says, "Steve Mowrer in accounting told me, that's not going to happen"?  Do you see where it says that?  My question is, do you see that?

A.   I see that.  Yes.

Q.   Okay.  Does that refresh your recollection?

A.   No, sir, it does not.

Q.   Okay.  Are you saying you didn't say that?

A.   I don't recall saying that, sir.

Q.   Okay.  Do you think Mr. Pittman was making that up?

A.   I don't remember saying that, sir.

Q.   Okay.  Let me ask you.  So, at least in May, Mr. Pittman or the subcontractors weren't getting paid; correct?

A.   Subcontractors were getting paid.  We were paying the subcontractors.

Q.   Well, subcontractors were walking off the job, weren't they?  Isn't that right?

A.   I don't know.  I wasn't out there, sir.

Q.   So, you sort of weren't involved in that?

A.   Not on-site, sir.  No.

Q.   Okay.  Now, this exhibit -- this letter dated November 10th, 2012, that was about holding up the draws and not paying any more; right?

A.   Excuse me, sir?

Q.   The exhibit, November the 10th, that you just -- you just looked at.

A.   Uh-huh.

Q.   Okay.  Now, that draw contains $16,000.00, doesn't it?  You approved it.  I mean, you were involved in it; right?

A.   Draw 4 was about $3500.00.

Q.   Okay.  Well, let me ask you.  Draw 6 -- draw 3; when was that paid?

A.   It was in January, sir.

Q.   Okay.  Why wasn't that paid?

A.   They were held, sir, because the work wasn't being performed.

Q.   Isn't it a fact that the $16,000.00 was for the concrete that was delivered to the site and poured?

A.   16,000 was on that pay app?

Q.   Right.  On pay app 3.

A.   Okay.

Q.   And in fact, it got poured?

A.   I believe -- yes, sir.

Q.   So, it's for work that was done; right?

A.   That was work that was done, sir.  But not necessarily --

Q.   Okay.  So, when Mr. Lewis decided unilaterally not to abide by the contract way back in September, you can't tell me a single provision of the contract that supports that, can you?

A.   Not in the contract.  No, sir.

Q.   Is there something else?

A.   Whatever the owner and the GC agreed to, sir. I don't know.

Q.   Okay.  Do you have anything that shows that the owner, Mr. Lewis, and SBS agreed not to be paid?

A.   No, sir.  I don't have anything.

Q.   Okay.  I just want to make sure.  Okay.  Do you have any evidence that shows that this letter was ever actually sent to Jack Green?

A.   Evidence?  No.  Just that he's cc'd.

Q.   I know.  But you have no personal knowledge about this letter, do you?

A.   No, sir.

Q.   Okay.  Matter of fact, until you were here today, had you seen it before?

A. Yes, sir.

Q. Okay. When did you see it?

A. It's in the actual files that we have and keep in our records in our office.

Q. Okay. And so, when Rod decreed that nobody is to get paid, that never changed, did it?

A. I'm sorry, sir?

Q. When Rod Lewis decreed that no one was to be paid, that's what this letter is about; correct?

A. Not -- no. It says SBS, sir.

Q. I'm sorry?

A. SBS.

Q. Okay. Who was Rod Lewis supposed to pay?

A. SBS.

Q. Okay. And who didn't Rod Lewis want to be paid?

A. SBS, sir.

Q. Okay. And you said that they should be paid when there was -- when the PEMB was supposed to be delivered; right?

A. My instructions were that once there was -- the PEMB was there and there was work behind it, they were making way on it, then yes, we would make payment.

Q. In November they must have been doing work,

because golly, $271,000.00 worth of bills.

A.    That's because the material was just delivered.  It doesn't necessarily mean the work was done.  They can bill us once the stuff is delivered.

Q.    So, you think that when they -- when John Grable approved the pay draw for number 5, that the work wasn't done?

A.    He's approved what we were --

Q.    That wasn't my question.  Do you remember my question?

A.    Repeat it, please, sir.

Q.    My question is, so, your instructions were pay when the PEMB was delivered; right?

A.    My instructions were to pay when it was -- work behind -- once the PEMB was delivered and there was substantial work --

Q.    What does the letter say?

A.    "Owner holding back draws until SBS can deliver PEMB as scheduled."

Q.    As scheduled.  When it was delivered.  When was the PEMB delivered?

A.    I don't remember the exact date, but it would have been mid-November sometime.  It was after the date of this.

Q.    Matter of fact, it was like two or three days

after this letter.

A.   Okay.

Q.   When was it paid in November?

A.   January.

Q.   Oh, January?

A.   2013.

Q.   So, it wasn't paid in accordance with Mr. Grable's instructions?

A.   Not according to that.  No, sir.

Q.   Okay.  Matter of fact, really when you look at these, none of these were paid on time under the contract, were they?

A.   Not according to the terms.  No, sir.

Q.   Not according to the chart.  Let me ask you, when you're a little subcontractor, what do you think happens to you when you don't get paid on time?

A.   I couldn't tell you, sir.

Q.   I'm sorry?

A.   I -- I don't know, sir.

Q.   You don't know.  Think it might hurt your business?

A.   I don't know what his financial means are, sir.

Q.   I guess when you're a big company, that's not a big issue.

MR. JONES:  Objection, argumentative.

THE COURT:  Overruled.

MR. CLUCK:  Pass.

THE COURT:  Mr. Brown?

MR. BROWN:  Just a couple.

## CROSS-EXAMINATION

### BY MR. BROWN:

Q.  Mr. Mowrer, back in April of 22 of 2012 -- excuse me -- 2013, before the lawsuit was filed, did Mr. Robertson call you about getting paid?

A.  I don't recall getting phone calls.  I might have gotten phone calls, but I don't remember a particular one, sir.

Q.  Okay.  Isn't it true you called him back on the 22nd of April?

A.  I don't know if I called anybody back that day, sir.  I might have, but I don't know for sure.

Q.  Okay.  Do you recall it at all?

A.  Sir, I don't.

Q.  Okay.

A.  It was three years ago.

Q.  All right.  Fair.

MR. BROWN:  Thank you.  No further questions.

THE COURT:  Mr. Jones?

MR. JONES:  Yes, Your Honor.

## *REDIRECT EXAMINATION*

**BY MR. JONES:**

Q.   Mr. Cluck asked you about whether payment was being held pursuant to Exhibit 71, the letter, until substantial -- or were you looking for -- was Mr. Lewis looking for substantial work?

A.   Substantial work.

Q.   And when Mr. Grable sent his letter, did you assume that it had been received by SBS Construction?

A.   Yes, sir.

Q.   And did you ever hear any complaint by SBS Construction about holding up of draws 3 and 4?

A.   No, sir.

Q.   They never called you?

A.   Not that I recall, sir.

MR. JONES:  That's all, Your Honor.

THE COURT:  Okay.  You can step down, sir.  Thank you.

THE WITNESS:  Thank you.

THE COURT:  You're through.  Next witness?

MR. SLATES:  Your Honor, at this point, Tri-Bar rests.

THE COURT:  Okay.  Any rebuttal, Mr.

Brown?

   MR. BROWN:  No, Your Honor.

   THE COURT:  Anything else from y'all?

   MR. CLARK:  Can we do a brief closing statement?

   THE COURT:  Well, yeah, you get to do that once we get through with all the evidence.

   MR. CLARK:  Oh, I'm sorry.  We don't have anything else, Your Honor.

   THE COURT:  So, everybody closes; right?

   MR. CLARK:  Yes, Your Honor.

   MR. BROWN:  Yes, sir.

   THE COURT:  Okay.  Who is Plaintiff?  Do you want a few minutes to get ready?

   MR. SLATES:  Yeah.  Can we take a break?

   THE COURT:  Okay. Sure. Yeah.  Ten minutes, then we'll go.

   (Recess taken.)

   THE COURT:  Y'all have a seat, please. Are y'all ready for closing arguments?

   MR. SLATES:  Yes, sir.

   THE COURT:  Okay.  We'll do Mr. Brown, Mr. Clark, Mr. Slates, and then Mr. Brown for rebuttal, if any.  Okay?

   MR. BROWN:  Okay.

THE COURT:  Do you want to start?

MR. BROWN:  Any time estimate, Your Honor?

THE COURT:  Any time you want.  No time limits.  Yeah.

MR. BROWN:  Really?

THE COURT:  Midnight.  You can ask the bailiff.  We do it.

MR. BROWN:  Okay.  Are you ready?

THE COURT:  Yeah, I'm ready.

MR. BROWN:  May it please the Court, Defendants and respective clients, we've had this trial.  And for my client, it's been two and a half plus years waiting.  And the reality here is that we have come to learn more about what happened in the last, really, month because of information that was turned over.

The reality here is that Robertson Electric entered into an agreement to do electrical work for SBS, who was under contract to do work for Tri-Bar, who was owned by Rod Lewis.  During the course and scope of all this, he enters into the agreement, begins to work as he's supposed to; and lo and behold, he comes back in December, receives another plan.  Simply sits down with the plan, begins

to look at it, and notes changes. He alerts the proper channels at SBS; say, look, there are changes here. There are things that are not in the original plans. And they tell them, submit the change order. He does exactly what he's supposed to do.

Little did he know that doing what he's supposed to do would literally lead in this. Because -- because he puts them on notice for doing what it appears, and I believe the evidence supports, is the pattern and practice of Tri-Bar. They want something for nothing. And if they will connive, congeal, deceive, they will do each and every last one of those things to accomplish it.

They want this Court to believe that the reason for his termination and the termination of his business is because his price order and what he was proposing to do was too much. During the entire scope of this trial, they never explain how he gets -- how that particular document gets to him. They know it's turned over. How were things changed? Why were things changed? Why was it sent to him without the proper indication showing there had been revisions? Silence.

But then they have the gall to say what he's supposed to do is do it either for nothing or for

a value that they never ever suggest to be.  They say it's too high.  Well, they never said what they think it should be.  They just keep saying it's too high.  And so, he's working.  And then we get -- during the entire scope and course of this trial, we've had at least six, if not seven, alleged reasons for his termination.  One was during the scope of this matter -- it was because his billing practice was supposedly strange.  The Court heard the arguments here in our motion for summary judgment.  That's what they said.  Not one shred of evidence about it.  Not one.

The next was, well, it's just he didn't man it.  But when Pittman, who I must admit, I've wanted to get at Pittman for at least two years.  It was somewhat refreshing and somewhat disappointing at the same time to get to talk to him.  Because he makes no sense.  He's certainly not honest.  And the reality here is, what he says is, well, I had all these concerns about Robertson Electric.  They didn't man appropriately.  They didn't man in November.  He was shocked to find out my client wasn't even there in November.  Didn't have to be there in November.  So, he was engaged in fabrication.  That's what he was doing; just fabricating.  He was engaged in the process of locating other subcontractors to include

the eventual replacement of my client, which was C&S Enterprises.

And the first alleged position is that, well, they did the work cheaper. Well, at this point in the game, we don't even know what work they were doing, and we really don't know what it is that was supposed to be done cheaper, allegedly. We do know that their contract was priced $30,000.00 more than what they proposed to do it for. We do know that on top of that, when it ends up, the entire cost of their contract is 215,000 plus. But some of that is understood because the real reality is that Rod Lewis is engaged in a habit of the constant re-change, re-adoption of the work site. And that happened.

But the reality is, what was left out of what they proposed my client identified. And that is, in his change orders he identified the work that had to be done. And when he looked at the work that they proposed had to be done in the proposal, he looked and could identify, these are the things that aren't being identified. These are the things that have to be done.

What they then do and what Tri-Bar does is they get Mr. Boddie. And Mr. Boddie wants to come across as neutral and wants to come across as a, quote

unquote, neutral expert. He wasn't. His sole objective was to try and fabricate information. But the reality is, when asked, what did you consider, well, in one instance, well, I didn't investigate that. I just thought. You're making recommendations that you consider, but you're not showing that you considered anything. You don't know where he lives, so you don't know where he demobilizes to. You don't know what anything is. What did you consider? Did you look at the contracts? What was supposed to be done? He was evasive. Why? Because he wasn't up there to really assist this Court and give expert information, to guide the Court or to guide the factfinder as to what may very well be. He was there to present the side of Tri-Bar. And the side of Tri-Bar is just fiction, if nothing else.

The scope of their argument is this: Everybody else is to abide by the contract but them. Every witness that they put up there -- did you see our contract? Did you see what you're supposed to do? This is what you're supposed to do. This is how you're supposed to do it. But it's their contract. They're supposed to know it better than anybody else. And they didn't abide by it at all.

And so, their saving grace really is

their argument -- and if they wanted to be -- we didn't do it, but you didn't do it either. That's their argument. But my client abided by this contract. He documented. He followed it. He did everything he was supposed to do. He worked. And what they want to say is, well, now there's some things that he did wrong. Things that they never -- let's assume for the moment that what they're saying is true. Let's assume he did some things wrong. You never tell him? You're so concerned about something being done right that you don't alert somebody to, okay, possibly something was done wrong?

Our contention and my client's position said, no, he didn't do anything wrong. He took pictures of the site when he left it. He followed the contract -- the original plan to the letter. And when he was terminated, he made it a point to say, tell me what I did, if I did anything. Contacts SBS; what did I do? Initially, there's no response. But they eventually tell him, you did nothing wrong. He gets a call and they tell him the reason -- real reason they want you gone is because they want to go with somebody else.

Well, we now know that that was in progress, at a minimum, since October. But we know

for a fact November 2nd and on it was. They never account for the fact that they didn't trench. They never account for the fact they didn't permit. They never account for the fact that they're the cause of any alleged delay that my client had. And the -- the testimony uncontroverted from SBS is that, at a minimum, he's on progress. He's where he's supposed to be. From my client, says, I was ahead of where I was supposed to be. I was waiting for work. And on that, he sends out an e-mail and says, hey, I'm being held up. I need -- these things are the things holding me up. Let me know when it can be corrected, so I can get it done. As far as documentation is concerned, again, he's the one that did it.

So, we have established a breach of contract. And we've established there's been tortious interference. In order for Tri-Bar to establish their position of justification, what they have got to show -- because it's their burden -- is that that -- not just that -- they state, well, we had a superior right. We had a superior interest. You can state you can fly. You've got to prove you can.

And the reality is, that definitely didn't happen with Mr. Pittman. Because Mr. Pittman could not establish any of the things that they allege

had happened. The right arises from their contract to do whatever it is they're going to do and whatever it is they're going to assert. Their contract expressly says that there is no flow-down provision and there is no contractual obligation established. That's what their contract says. It also says that in order for them to assert themselves into it, there's documentation that they're required to do. There are notices.

Well, if there are legitimate problems -- and I think there certainly was some concerns -- why don't they just put it in writing? They sent all these e-mails, so it's not like it wasn't possible for them to write. Why didn't they? Because that wasn't their real concern. Their real concern, when you look through their correspondence, is they wanted to screw over SBS. And they didn't care who they hurt in the process. They wanted to reassume, for whatever reason, and that's what's in their e-mails. It's not anything I'm manufacturing. It's what they write.

They hurt my client, who was innocent, in the progress. And then they try to come up with all these alleged matters. They are really saying, on one issue, to give them, again, the benefit of their argument that basically 3,000 or $4,000.00 worth of

alleged work that is alleged to have been done wrong justified terminating without any notice, without any concern, a $120,000.00 contract. Really, that's their -- that's their position on that. And their position is, well, because of a change order that you told us about -- we didn't tell you about; you told us about -- that you're pricing it too high. They never tell anybody it's being priced too high until they get in a phone conversation with Mr. Green or Mr. Schiffman. And they don't put that in writing.

They say that we're motivated by economic interest because C&S Enterprises can perform the duties cheaper. You can't tell it by the cost. You can't tell it by the items they left out. And there's some question as to whether we are talking apples and oranges, because of the constant state of flux of the work that needed to be done. Even in their last exhibit, the exhibit dealing with the change from a one level to two level was a change between information in less than a month. Because if you take his testimony as true, then on January 23rd, this thing is one level. By February 15th, it's constructed to be two level.

So, I don't know. But I do know this. They didn't carry their burden of establishing that

they had a superior interest.  The Defendant's position is, just because we said it, just because he had an alleged good faith belief.  Good faith is established by character and it's got to be assessed. You look at that.  And he wasn't honest.  And it's just that simple.

THE COURT:  Let me ask you this.  What are your causes of action against the Defendant?

MR. BROWN:  You're talking about Tri-Bar or --

THE COURT:  Well, I know your contract is --

MR. BROWN:  Yes.

THE COURT:  Yeah.  Tri-Bar.

MR. BROWN:  We actually have two.  But they -- they spring out.  The first -- the tortious interference is definitely against Tri-Bar.

THE COURT:  Uh-huh.

MR. BROWN:  The other springs out because of the conduct that occurs during the course.  And that is, their contract expressly provides that they could have assumed control over the subcontractor. And they do that by putting it in writing and notice. They could have done it.  They didn't.  But it's clear that's what they did.  They -- Mr. Pittman terminates

my client and then, in that same course, doesn't direct SBS to hire the subcontractor. They assumed that role. They replaced the subcontractor. And they had that right only after they tortiously interfered. That's when it sprang out. That's when it occurred.

Before then, they could not have done what they did. But after which, because the way their contract is structured, is when it does occur. And a that is why we believe that there is an oral contract that establishes at that point the existence of an obligation that they owed to Robertson Electric for performance. So, there are two --

THE COURT: A contractual obligation by them terminating SBS and then stepping in as --

MR. BROWN: Not terminating SBS. Because at the point that they terminate --

THE COURT: SBS.

MR. BROWN: -- REI, SBS is still on-site. They're still on-site.

THE COURT: Okay.

MR. BROWN: So, they haven't -- they don't terminate --

THE COURT: Okay.

MR. BROWN: -- Robertson Electric until the following week or two weeks later. He's

terminated on the 23rd. They're terminated on February 5th.

THE COURT: Uh-huh.

MR. BROWN: So, the obligation at that point, pursuant to their own contract is, they could have assumed the authority to step in and act. But there was a provision that they had to obtain the architectural certification, they had to give the requisite notice, and then they could have done it, under their own contract. They didn't. But I believe the Court, in equity, has the right to assume or can take charge of the fact that that's what they did do and deal with the reality of the situation.

And so, those are the two theories that we have. Again, there's no question they tortiously interfered. The issue -- the other, again, occurs after the tortious interference. And again, I researched that point. Both can occur. We're only entitled to one relief. We're only entitled to one judgment. And one goes off of the --

THE COURT: Well, you can stack them alternatively and see what the Court of Appeals does.

MR. BROWN: Well, that's true, too.

THE COURT: That would be the smart thing to do.

MR. BROWN:  That's true, too.

THE COURT:  Okay.  Thank you.  Tell me --
real slow, because I'm not very smart --

MR. BROWN:  That's not true.

THE COURT:  -- how do you get to the
contract?  How do you get to the contract against
Tri-Bar?

MR. BROWN:  Okay.  Let me get to their
contract.

THE COURT:  And did you have an affidavit
mechanic's lien?

MR. BROWN:  I'm sorry?

THE COURT:  Did you have file an
affidavit mechanic's lien or was that SBS?

MR. BROWN:  No.  We filed a lien.  We
have a lien against their property.

THE COURT:  And the lien is in evidence;
right?

MR. BROWN:  (Nodding head up and down.)

THE COURT:  Okay.  So, you have a suit to
foreclose on the lien?

MR. BROWN:  No, not yet.  We held off
pending --

THE COURT:  When would you like to do
that?  I mean --

MR. BROWN: When would we like to foreclose?

THE COURT: There's no suit to foreclose the lien in your pleadings? I'm just asking.

MR. BROWN: No. Well, the jurisdiction -- at least, based on what we read and what I understood -- venue will be proper for foreclosure on our lien, I believe, in Uvalde. That's where the property is.

THE COURT: Okay.

MR. BROWN: So, if I'm reading it wrong, then -- but that's what I read. The -- let me get to it. There's a section where -- first and foremost, with regard to their right to change the work, they don't comply with. At 14.2.2, they have to obtain certification -- if it's -- they're going to go for cause, then they would have to obtain a certification by the initial decision maker. After that, then they have to give the requisite notice to SBS of seven days, which does not flow.

The next thing is, under the owner's right to stop work, which is 2.3, and then the owner's right to carry out the work, which is 2.4; that is where it states that if the -- if the contractor here defaults or neglects to carry out the work, then after

-- there's a ten-day notice requirement, and then after that, the owner may commence to continue correction of such default or neglect. And that is, in essence, what Pittman testified to. That's what he said. That's what he did. That's why he did what he did.

And so, it is at that point that the contract, at least the oral contract and their assumption into that right and into that role takes place. But again, it occurs after they engaged in a tortious interference. So, our position --

THE COURT: You're saying that they took -- the tortious interference began -- what you're saying is -- rolling down the hill -- where they told SBS, you get rid of Robertson or you're gone?

MR. BROWN: Right. And that occurs January 14th.

THE COURT: So, is that taking control of the contract at that time? Is Pittman being agent for the owner?

MR. BROWN: No. They take --

THE COURT: No?

MR. BROWN: They take control of the contract at that time when they hire C&S. That's when it occurs. Because if all they had done was

terminated and nothing else, there's only tortious interference.  But when they then assume control over C&S by hiring them and managing it and then directing someone else to do it, they then stepped into that function.

THE COURT:  Okay.  How does that help Robertson?

MR. BROWN:  Well, what it does is that it establishes two avenues of relief.  Under the tortious interference, the damages are the same.  The case law makes it clear that when you look at the damages for tortious interference --

THE COURT:  Just see if you can connect up -- do you have any contractual rights?

MR. BROWN:  I'm sorry?

THE COURT:  Contractual cause of action rights.  I hear your argument on tortious.  For Robertson.

MR. BROWN:  Right.

THE COURT:  You're saying they didn't take over until after they fired Robertson?

MR. BROWN:  Correct.

THE COURT:  So, they have no contract.

MR. BROWN:  It's when it springs in.  I mean, that is our position.

THE COURT: Give me the legal spring in to help -- tell me how -- do you have any -- I thought you pled a contract cause of action.

MR. BROWN: We have.

THE COURT: Okay. How did you accomplish that evidentiary-wise?

MR. BROWN: What we did evidentiary-wise is we established their breach or their assumption of the exercise of that section. That is paragraph --

THE COURT: 2.3 and 4?

MR. BROWN: Yes. And that's where it occurs. I mean --

THE COURT: So, 2.3 and 4 of the AIA contract is where you believe, if any, route that Robertson becomes --

MR. BROWN: That's correct. And if the Court finds not, then not. But that's where we believe it occurs because that's where they --

THE COURT: Is that the only two places I should look to see if it comes true?

MR. BROWN: Yes.

THE COURT: Okay. That's all -- I'm just trying to see -- I've read your causes of action. I'm just trying to see how you believe you've accomplished -- because I'm not going to rule now.

I'm going to look at this a little more.

MR. BROWN:  No, I understand.

THE COURT:  Because you're going to give me the attorney's fees.

MR. BROWN:  Right.

THE COURT:  So, you should have it out by Friday.  Is that okay?

MR. BROWN:  Yeah, that's fine.  I can have mine.

THE COURT:  Do you want it Monday so it doesn't disappoint you?

MR. BROWN:  It is what it is, Your Honor. Your Honor, you know --

THE COURT:  Okay.  Things could be better, things could be worse, or as they are?

MR. BROWN:  Yeah.  I mean, it is what it is.  You know, my client has been patient.  We've been patient.

THE COURT:  Okay.  I'm just asking you how you -- I understand how you're running your route on tortious interference, but I'm just trying to see what you believe from your pled cause of action.

MR. BROWN:  Right.  And that's how we believe we get there.

THE COURT:  Okay.  I'll look at that.

MR. BROWN: And again, you know, that's just when they -- when they do it. Because the -- while they are engaged in acts -- to say that they don't have the right to look for other people, they clearly would have the right. They didn't have the right to act on what they did until they complied with their contract, which they didn't do. And it's at that point that it arose.

THE COURT: Yes, sir.

MR. BROWN: And so, that's where we stand. And again, you know, I thank the Court for the time for the argument, you know. I'm more accustomed to a limitation. But the Court has heard our --

THE COURT: Time's up.

MR. BROWN: -- the Court has heard our damages, so I say thank you.

THE COURT: Oh, you did a good job, Mr. Brown.

MR. BROWN: Thank you, Your Honor.

THE COURT: Mr. Clark?

MR. CLARK: Yes, Your Honor. Termination for cause, termination for convenience. We kind of have to start there. Your Honor, I'm going to be talking about Plaintiff's Exhibit Number 1 and Plaintiff's Exhibit Number 17. I'm going to start

with 17, which is the AIA general conditions, if you want to have that just to have it out. I'm going to go through it right quick. Was it a termination for -- for cause? And I think the answer is no, established by the evidence, established straight out of Mr. Grable's mouth. Because under 14.2.2, the wording here is crucial. That the owner may terminate the contract if one of four conditions exist. Mr. Pittman tried to claim that number 1 was the one that existed; that it repeatedly refuses or fails to supply enough proper skilled workers or proper materials. 14.2.2 says when any of these conditions exist, and Mr. Pittman said it existed, then upon certification by the initial decision maker, Grable, and sufficient cause exists to justify such action, then we get to the next part.

But let's just stop right there. Because I asked Mr. Grable, did you send the notice; he said no. Ms. Brazell actually asked Mr. Grable, did you send -- were you instructed by Mr. Pittman, the owner's representative, to say that there were not enough workers out there; and he said, yeah, I was instructed to do that. Why didn't you send the 72 notice? Because I felt we could get it worked out; that we had gotten past these issues.

So, not only did Mr. Grable, the initial decision maker, not issue the certification; he refused to issue the certification and didn't. Not just accidently or negligently, which actually is what I thought was going to happen when we came in here. But on purpose because he thought we had gotten past the issue. And that was a request from the owner as an owner's directive.

Now, if you look at that -- the rest of that clause, it says, then they also have to give the contractor seven days notice. We know that didn't happen either. The words mean something that there are two conditions that must be met and neither one of them got met. Now, what's kind of interesting about this is --

THE COURT: Who's the decision maker?

MR. CLARK: The initial decision maker is the architect.

THE COURT: Architect? Okay.

MR. CLARK: And that's in the contract documents.

THE COURT: Okay.

MR. CLARK: So, the initial decision maker is the architect, Mr. Grable.

THE COURT: Okay. I remember that.

Okay.

MR. CLARK: Okay. So, the -- what's interesting about this provision, 14.2.2, is that what the owner may do in this paragraph is not terminate the contract right here. It says that the owner may -- after they do those -- if they get the certification and give the notice, they may terminate employment of the contractor and may -- and then there's three things they can do; finish the work, collect for damages, and recover costs in excess of the contract price. Then the contract terminates.

Contrast that -- let's compare -- when you look at the termination for convenience. Your Honor, here is the termination for convenience clause on the next page, the 14.2.1.

THE COURT: But still as factfinder, the Court considers whether they had cause under 14.2.1; right? The -- repeatedly refuses or fails to supply enough properly skilled workers.

MR. CLARK: Correct. They -- I didn't -- I was not even going to get to that issue, but obviously they have to have proven that first. And I think there was contradictory evidence as to whether we had -- as to whether SBS had repeatedly refused to put skilled workers out there.

THE COURT: Well, the evidence we have is a credibility issue, whomever I --

MR. CLARK: It is. It is. But then for the termination for cause, then you have to have those other two conditions as well.

THE COURT: Right. But you say it's for convenience because they found a better supplier?

MR. CLARK: It doesn't matter what reason they had. They could have just not liked Mr. Schiffman. They could have just not liked the answers they were getting. They could have just not liked anything about SBS. Mr. Lewis could have just gotten up and said, I don't like the color of their shirts. And a termination for convenience requires absolutely no reason at all.

THE COURT: Right.

MR. CLARK: Zero. Which is why that is not a breach if he --

THE COURT: But the facts you developed was, they found a cheaper price or whatever.

MR. CLARK: It was. I like to find a motivation in people and not believe that they do things willy-nilly. But it really doesn't matter why he did it. It was just done.

THE COURT: No, I understand.

MR. CLARK: And so, he can terminate the contract at any time for convenience without cause. Now, in that case, it's not terminate the employment of the contract. In 14.4.1, it's terminate the contract for the owner's convenience. And when that happens, the contractor is given no rights. The contractor says, cease operations. Don't bill anymore. Don't incur any more costs. And then the remedy -- there's one remedy, and it's in 14.4.3. The contractor shall be entitled to receive payment for work executed, costs incurred by reason of termination, along with reasonable overhead profit and work not executed. That's it. So, under a termination for convenience, it's a termination of the contract. And a termination of the contract is like being dead. You either are or you aren't and the contract is dead.

And so, when the owner terminated the contract, the contractor, SBS, had nothing else to do. We offered to do some stuff. But we didn't have any more obligations under the contract. At the same time, they didn't have any more rights under the contract. When you terminate it, it's terminated. It's done. There's no other clauses in that 14.4. If you look back in 14.2, Your Honor, you'll see that

there are actually qualifying words that are used in there, where it says, the owner may, upon certification of the contractor, may, without prejudice to any other rights or remedies of the owner. Okay. Those aren't -- those words are not present over in the termination for convenience. They are present if it's a termination for cause.

THE COURT: Yes, sir.

MR. CLARK: And the same thing was kind of true with -- if you look in 14.4.3, the termination for convenience when it says they get payment; it doesn't say except as provided elsewhere. It doesn't say without prejudice to the rights of others. It doesn't say subject to this section or that section or something else. Like it does under the termination for cause. And Mr. Slates got up in his opening statement and said, you remember how this fits under paragraph 12 of the AIA contract, where it talks about prior to substantial completion X, Y, and Z, and the owner can do this, that, and the other. X, Y, and Z talks about substantial completion; before or after substantial completion. It doesn't say, if we find something after termination, then we can do this. The only thing that talks about what happens after termination is if there's a termination for cause. If

it's a termination for convenience, it's just a termination of the contract. It's over. It's done with. You have to add words to the contract in order to get where Mr. Slates wants to go.

Not to mention, under 14.2.4, which is the termination for cause; if you look down at the very bottom of what happens at the very end when we're at today's point. 14.2.4 says that two things are supposed to happen. The contractor is supposed to submit a final pay application to the architect. We did it. Mr. Grable got -- the documents are in evidence. We delivered them to Mr. Grable. Mr. Grable admitted he got our pay applications 7, 8, and 9. Then the owner is to submit any costs that he has under that termination to the architect. And it says -- the very last sentence says, the amount to be paid shall be certified by the architect, the initial decision maker, upon application. And this obligation shall survive termination of the contract.

So, even if this was a termination for cause, our application is in Mr. Grable's pocket. They never put on any evidence at all that they put their application in front of Mr. Grable. Mr. Grable is not a Tri-Bar employee. He's not with Glacier Capital. The fact that they have a document that Mr.

Mowrer created or Ms. Swisher created or whoever that has numbers on it doesn't put it in Mr. Grable's hands. 14.2.4 says it's got to be in Mr. Grable's hands. And that obligation shall survive termination of the contract.

So, whether it's termination for cause, they didn't comply with the elements and put their numbers in front of Mr. Grable. And if it was a termination for convenience, then there's nothing that gives them the right to an offset.

So, what happened in this case? I think what happened in this case was that the termination was done as a matter of convenience. I think Mr. Pittman kind of flew off the handle and just said, fire them, get rid of them, and made it happen. I don't think they went back to the attorneys again to do it -- to do it right. I think they could have done it right, but they didn't do it right.

And then after the fact, when Mr. Schiffman and Mr. Morgan didn't just go off into the night and eat their loss, that's when Mr. Pittman came back and said, I'm going to crush them. And now the prices escalate. But you heard Mr. Pittman. He said he was out there all the time. Whether he was or wasn't, I don't know. He said he knows as much and is

as smart as an engineer, an architect, and other professionals.  If he was out there all the time, he should have seen these other defects.  Because they were not obvious to him in November, December, and January when he was out there all the time.  But as soon as SBS is gone and he walks the property, all of a sudden, they're obvious.  You can see the building leaning from left to right.  One of those two things isn't right.  And so, either Mr. Pittman wasn't doing his job before, and then just started to do his job after the termination, or he was doing his job all along and knew that this is how construction projects look at this particular stage of the -- of the construction and didn't have any problems with it until he decided to issue the termination.

          And you heard Erick Key from Schulte come in.  He does metal buildings all the time.  He's familiar with the roof system that SBS -- that SBS puts on.  He looked at every one of those -- most of those pictures and said, yeah, those are temporary.  Those are not the finished product.  Yeah, that looks sloppy now, but they're going to put gutters over it and they're going to put this.  The end dams, the dip in the roof; those are all accepted building methods.  Can two contractors -- can Mr. Boddie have a

disagreement about how he would do the building?  Yes.
In fact, Schulte does their metal roofs one way and
SBS does their buildings -- their metal roof slightly
different.  Does that mean one is wrong?  No.  It just
means one does it one way and one does it the other.

Were there problems on this job?  Yes.  I
think the best description came in one of the e-mails.
It was actually an e-mail that Mr. Boddie wrote.  It's
Exhibit 71.  Where he said it appears the problems
were the result of miscommunication.  I think that's
an understatement.  We have people talking past each
other and nobody knew exactly what they were supposed
to be doing because we had plans going back and forth
and I don't think anybody was communicating.  They
were talking, but they weren't communicating.

There were obviously multiple reasons why
the project was delayed.  And was there fault on both
sides?  I think absolutely there was.  I think we have
people that are holding payment.  People that knew the
concrete needed to get paid.  People that could have
paid the concrete people.  People that were standing
on principle.  And I think a lot of egos got in the
way here and things didn't gel.

But were the delays a big issue?  No.
Mr. Morgan said in paragraph 4.3 when they got to the

delay damages, that 4.3 of the contract, which is Robertson Exhibit 15, that parties inserted none. They also waived consequential and incidental damages as between each other.

Did the parties have remedies that they could have exercised for all of these problems? Yes. They all had notice issues. They all could have -- we could have stopped work. They could have terminated us. They could have suspended work. Everybody could have -- could have done something or should have done something or would have done something if, if, if. What happened was what we've got. And that was, everybody kind of kept moving along. And as Mr. Grable said, they tried to get past the issue. And so, you get down to the point where you end up with a termination that has to be for convenience because the cause elements don't exist.

Was it a great business decision for Mr. Lewis? No. He -- we have a guaranteed maximum contract; $1.2 million. If he really spent $4 million, as was suggested -- and I don't think the numbers add up that high. I think it's more like 1.8. But if he really spent $1.8 million to get this project done, he really should have stuck with SBS because we were going to end up having to finish it

for $1.2 million. So, the damages that he incurred were brought on by himself. He had us under contract. And he had us with a guaranteed maximum. No matter what we were billing, we were going to be stuck with it. We were going to be doing work for free.

Now, as to Robertson; did SBS breach the contract with Robertson? We terminated. We didn't have a right. I think the answer is yes. We really haven't contested that at all ever since the beginning of this case. We've always told them that it was at Tri-Bar's instructions. You know, I found it kind of humorous when Mr. Slates asked his question of Mr. Robertson and said, now did SBS give you written notice of this termination? No. Did you know that SBS is complaining about lack of written notice about us? Yeah. But the difference is, we admit that we breached the contract with Robertson because we didn't give him notice. We could have gone through and found something or made up a reason. We just did what we were told. Theirs is the same way. They didn't give us notice. That's a breach of contract or it's a termination for convenience.

One of the questions I have that -- that Mr. Brown did not raise is, in Exhibit 68 that they threw up here on the last day, they go through and

they say, okay, we did a forensic analysis of Robertson's work and he had -- he's claiming that he's owed $60,669.00. And we've gone through and done all these offsets and we show that in -- that by our calculations, he's only owed 12. And that was in March of 2013. We're now in March of 2015. Why in the world, if you admit that you owe him $12,000.00, did you not send him a check for $12,000.00? Doesn't have to have a lien release. Doesn't have to have anything else. If you owe him the $12,000.00, send him the $12,000.00. We'll fight over the difference. I can't answer that question. I think it's a -- I think they should have done that.

In our contract with Robertson; do we owe him $869,000.00? No. We have a pay-when-paid clause. And obviously, the owner was holding payments in part because of something Robertson did, so there's nothing wrong with the way that we have the clause written. How much is Robertson owed for the breach of contract? We have an exclusive remedy provision that has the damage numbers in it. And he's owed for the work and material that he had out there on site. He billed us $54,996.00. That's what we've included in all of our applications. That's what we think we are required to pay him, if and when we recover from Tri-Bar. If we

don't recover from Tri-Bar, then Mr. Robertson, I don't think, can recover from us.

THE COURT: 54,900 what?

MR. CLARK: 996.

THE COURT: Okay.

MR. CLARK: There was an additional $6,000.00 that he had for demobilization cost. But the demobilization is a consequential damage. And under 11.04 of our contract with Mr. Robertson, he's not entitled to get consequential damages from us. Might the $6,000.00 be something that he could recover as tortious interference damages from Tri-Bar? Yes. That would fit legally under that. So -- but as far as the measure of damages, Mr. Robertson said that the cost to complete by C&S was the same or more than his contract amount. And looking at the measure of damages, he's then not entitled to any extra damages from SBS.

On attorney's fees, when you get Mr. Brown's application for attorney's fees and you see mine, you'll see that when it comes to segregation of attorney's fees, you'll see that the bulk of Mr. Brown's time was spent on his issues with Tri-Bar; not SBS. You'll see that the motions to compel discovery that he was talking about were not filed against SBS.

When he sent us requests for production of documents, we answered every single one of them without a single objection. So, I would say that maybe 10, 15 percent of Mr. Brown's total attorney's fees would be attributable to the SBS breach of contract. But we'll put those in the affidavits.

As it relates to Tri-Bar and our damages, I think -- I mean, 14.4 just doesn't have any exceptions to it. It says that we get -- shall be entitled to payment for work executed. And I think that's an interesting and great place to make the point that it doesn't say payment for work completed. It says payment for work executed. Because the idea behind a termination for convenience is that it was terminated before it was finished. And as Mr. Boddie said, this project was 60, 65 percent completed at best. We have costs incurred by reason of termination, which we have none. And then we have -- along with reasonable overhead and profit on the work not executed. So, we've proven up on the payments for the work not executed, which includes Mr. Robertson's work, however it's valued, was the $304,000.00 that's in Exhibit Number 23. All of our numbers are right out of Exhibit Number 23. The profit is defined in the -- in the primary contract to be the contractor's

fee, which is 8 percent. That's what that calculation is at the bottom. You take the work not done yet and you apply 8 percent, that's the $32,000.00 profit.

On the prejudgment interest, we have sued under the Prompt Pay Act. And so, prejudgment interest is going to be statutory and not contractual. We can worry about that post judgment if -- if the need be. As to our attorney's fees, I incurred almost nothing in relation to the claim involving Mr. Robertson and his claim. Almost all of my fees were in connection with the claims raised by Tri-Bar. And so, I'll be seeking the majority of my fees, which are about $95,000.00, from Tri-Bar for their breach of contract.

And I would close with -- you know, there's a lot of people out there that have not been paid that did work on that project. And I'll close with -- from Exhibit 8 with Mr. Grable's words. It's not right in my mind to tool around with the working man's paycheck.

THE COURT: Okay. Thank you. Mr. Slates?

MR. SLATES: Thank you, Your Honor. I know it's late. I'll try to be brief.

THE COURT: It's early. It's not

midnight yet.

MR. SLATES: We still got time. We know that there were schedule problems on this project. We know from Exhibit Number 32 and lots of testimony that they missed their original deadline, they missed their revised deadline, and they missed their third deadline on delivering the building. But we also know that -- that Erick Key, the gentleman from Schulte, according to him, he was telling them, you know, I can't meet this schedule. I'm too busy. I can't do this. But that never makes its way to us. Instead, it's, we'll have it to you in three weeks, we'll have it to you in five weeks, we'll have it to you by October 15th. But that never happened. So, apparently they weren't telling us what Schulte Building Systems was telling them.

And this pattern of -- of not being upfront and honest continues throughout the case. You've got the situation with the brick lug, where they moved the forms out to create the brick lug without telling anybody. Now, Jack Green says that he told John Grable and Victor de Anda that, but they both categorically deny that fact. Then with respect to the field modification issues that come up. You have the wind bents where, yeah, okay, they're moving

some poles around. But in response to that issue being raised, in Exhibit Number 55 of SBS, Steve Schiffman makes a firm commitment that he will not make and will not allow any other field modifications to be made without giving notice to the owner and getting approval. But then we find out after the fact, they didn't just move some poles around. They cut a building down so that it would fit on a foundation.

And this -- this pattern of misleading Tri-Bar wasn't just on the project. It's been in this case, too. We were told that they had a superintendent on site every day and that they weren't allowed to work on weekends. But then when I cross-examined Kyle Kieke, we found out that wasn't true. We were told -- we've already talked about the testimony about the brick lug, which is controverted by Mr. Grable and Mr. De Anda. We were told that they were going to show that the building was in tolerance. When Mr. Key got up here, I think we got a little surprise and found out that, in fact, it was out of tolerance; that the tolerance was 1/16 inch per floor, not the 4 inches per floor that had been represented.

We've been told that they didn't know -- that this whole idea of the -- the decision to

withhold money was some sort of super secret thing that was never conveyed to them. For the past three days, that's what they've said. But you just found out in the past few hours that that's not true. That Mr. Grable had said in November, we're holding pay applications until we get the building delivered. And building delivered doesn't just mean the material there. It means erected.

THE COURT: Does it say erected?

MR. SLATES: No, it doesn't. But I think --

THE COURT: Okay.

MR. SLATES: -- I think the term delivered -- the building delivered is somewhat ambiguous. It could mean the material only. But I think what they were looking for was --

THE COURT: If I get the building delivered, then I can start working on it.

MR. SLATES: Yeah. I think the idea was, we want to see real progress.

THE COURT: Start working on it.

MR. SLATES: Yeah. And then lastly, with respect to Robertson, he was adamant that nobody ever told him that the owner thought the number was too high. He's got a $60,000.00 bid and the owner has got

a $21,000.00 bid that he's comparing. And he says over and over, nobody ever told me that. But then we looked at his affidavit from the motion for summary judgment, where he clearly said, SBS told me that the owner wasn't happy with my number.

And so, the misleading information has continued. I want to talk about breaches. And we'll get to the termination issue in just a minute. But first of all, let's look at some of the other breaches. 3.8 says you're supposed to have a superintendent on site at all times. We know that didn't happen. 7.8.1 says you're supposed to provide notice to the owner if you're going to do business with a related entity. We know that didn't happen. 3.10.3 says you're supposed to meet your current schedules. We've seen two schedules that have been supplied in this case. They didn't meet either one of them. 3.12.5 through 3.12.8 are the provisions that require them to review the shop drawings and to identify discrepancies and report those to the owner. They didn't do that. 3.2.2 is the section that says if you know of an inconsistency that exists, you need to submit an RFI and get guidance. The field modified the building without ever notifying the owner that they were doing that. Those are all breaches.

So, before we even get to this termination in February, we've had numerous breaches on this project by SBS. Let's talk about the termination. You heard Steve Schiffman say today that the delay problem was ongoing. It was something that was being talked about and the owner wasn't happy and they were on them, writing them to get this thing done. So, the idea that there wasn't an awareness on SBS's part that the owner was not happy with the way the project was going in terms of the schedule is -- really ridiculous.

If you look at Tom Pittman's statements -- and I know you've seen them before, but I want to read them one more time. At the meeting, there's no way to reconcile his statement with this being a termination for convenience. What he says is, absolutely contractually, we don't have to pay you until this project is finished. Mr. Clark just walked you through the termination for convenience. It says pay now. Pay when you terminate.

THE COURT: Uh-huh.

MR. SLATES: For Mr. Pittman to say contractually we don't have to pay you until the project is finished, that is by definition a termination for cause. What does he go on to say? He

says, we're not going to do that. We don't feel like that's a good business decision for either of us. I don't want to start posturing one way or the other. Finish it in a businesslike manner. He's trying to be a standup guy and get these guys paid, even though he's got justification to terminate for cause. And let's talk about that justification. Failure to apply enough properly skilled workers or materials. They've had recurring problems with that. Steve Schiffman acknowledged it.

THE COURT: Okay.

MR. SLATES: They try to make two arguments to defeat the termination. One is, you didn't provide the right notice. John Grable didn't send a notice. Tom Pittman didn't send a notice. That's true. But you've seen the provision. It is not a notice and opportunity to cure provision. It is a notice provision. We're going to terminate you. Once that notice goes out, there's nothing the contractor can do to get the thing back out of the ditch.

THE COURT: But you can't send the notice until you get the certification from the initial decision maker. And that doesn't exist, does it?

MR. SLATES: There is no written

certification.  You are right.  But what John Grable says --

THE COURT:  Is that a condition?

MR. SLATES:  No, it's not a condition if you've satisfied the requirement -- I think the reason the initial decision maker is there is for a check, if you will.  You want somebody else to weigh in to say, is it appropriate to terminate.  And they did that.  They talked to John Grable before they terminated.  John Grable said from the stand that termination was justified.  And Tom Pittman said that he talked to Grable and that Grable did not say that it was inappropriate to terminate.  That in fact, he agreed that it was appropriate to terminate.  With respect to --

THE COURT:  So, why does the AIA contracts have this in there?  Upon certification, to get supposedly independent third party as initial decision maker to certify that one of the four causes for termination exists?

MR. SLATES:  As I said, I think it's -- it's created, in my opinion, to present a check on an owner before they pull the trigger on a termination.

THE COURT:  Yeah.

MR. SLATES:  And my point is, they did go

to Grable. They did talk to Grable. Grable was on board with the termination. Now, did he send out the notice -- and that's an important point. Mr. Clark inflated the certification and the notice issue. Mr. Grable never said, I didn't certify that termination for cause was justified. What he said was, I didn't send the notice of intent to terminate because I was hoping we could work it out. Those are two different things.

THE COURT: Well, Grable wouldn't send a notice of intent to terminate, would he? Grable.

MR. SLATES: The point is that he was asked to --

THE COURT: Well, yes or no?

MR. SLATES: -- send this notice by Pittman. There was an e-mail. I don't remember the exhibit number. Pittman says, hey, I want you to send them a notice that we intend to terminate. And he said, I never sent that because I was hoping we could work it out. He never said, I didn't agree that termination was justified. In fact, he specifically said that he agreed that termination was justified. So, the check has been met. The third party has said the owner was right. The owner was justified. This was appropriate.

THE COURT: Does anybody have any cases on that? Certification issue in that contract? This has had to come up before.

MR. SLATES: I do not, but can certainly look into it.

THE COURT: Well, yeah. Give that to me if you can find something.

MR. SLATES: Okay.

THE COURT: Anybody.

MR. CLARK: It's going to be an arbitration clause and there's going to be very few on it, but we'll give it a shot.

THE COURT: Okay.

MR. SLATES: The key thing that's going on at the time of the termination -- or the key piece of information that's not known at the time of termination is all these defects and the magnitude of the defects and the cost of repairing those defects. So, you've got Tom Pittman, who is saying, look, I'm terminating you for cause, in so many words. He's saying, I don't have to pay you until the project is done. But I want to take care of you. I want to get you taken care of. At that point, he doesn't know about the scope of the defects. So, he asks for an investigation to be performed. And that investigation

identifies a number of problems.

          You heard from Mr. Boddie.  He described what the defects are.  And we know how much it cost to fix those defects.  You can call it -- you can call it defective work.  You can call it cost to complete.  If you call it defective work, our number is 317,995.74.  If you call it cost to complete, our number is 650,000.

          There's a complaint here that, you know, you never sent us the list of defects.  Well, we didn't have the list of defects complete in the cost associated with it done -- we didn't even have the project done before this lawsuit got filed.  So, yes, the list of defects didn't go to them before the lawsuit got filed, but it did go to them in the context of this lawsuit.  So, the idea that we were somehow hiding that from them is completely untrue.

          With respect to the defects, they billed 98.5 percent for the metal building at the time they're terminated.  And yet, you saw how much work had to go into getting that building finished and the cost associated with doing it.  So, you've got -- if you do the math in the context of these numbers, the amount that they claim that they're owed is roughly 305, which would equate to roughly a $13,000.00 award

to Tri-Bar. If you do it this way, the balance on their contract, you'll -- the remaining balance -- this is a balance owed.

THE COURT: I got it.

MR. SLATES: The remaining balance of work to be performed was 400,000. You saw that on Exhibit 9. So, that would produce a $250,000.00 number. And Mr. Cluck pointed you to the language that says that the architect has to certify the payment after the termination. That goes both ways. What that provision says is, if money is owed to them, the architect has to certify that money is owed to them. Neither one of us have introduced evidence that the architect says, you're owed this much money or the architect says you're owed that much money. So, that's a wash. With respect to Robertson -- unless you have any other questions on the SBS aspect of this.

THE COURT: No. I got it.

MR. SLATES: Okay. With respect to Robertson, there is no evidence of a contract. I think you've already touched upon that with Mr. Brown, and so I won't spend any time on it. Other than just to say, you asked me a question the other day about oral contracts.

THE COURT: Yes, sir.

MR. SLATES: The evidence in this case is uncontroverted that Mr. Robertson and Mr. Pittman never spoke to one another. In fact, that's one of the things that he complains about. So, there can't be an oral contract. With respect to tortious interference --

THE COURT: Any e-mails between them about a contract?

MR. SLATES: None whatsoever.

THE COURT: No communication?

MR. SLATES: No communications at all.

THE COURT: Okay.

MR. SLATES: There's not a written communication. There's not an oral communication. In fact, that's one of the things, as I said, that they complained about. Turning to the tortious interference issue -- again, we believe the law is that there are three grounds on which to avoid tortious interference. One is, we had the legal right to require SBS to make a change, and we believe we've established that based upon the incorporation of the A201 general conditions into their subcontract, and the fact that the A201 allows for a termination for convenience. You may agree or disagree with me on

that.

THE COURT: Yes, sir.

MR. SLATES: I don't know how you can possibly disagree on the next two points.

THE COURT: Okay.

MR. SLATES: The second one is that the person who undertook the conduct had a good faith belief that they had their right to do that. And Tom Pittman told you that. He told you that he believed that he had the right. He told you that it was his good faith belief that he had the right. That he had no malice towards Robertson. He's sitting there --

THE COURT: He told him he's going to destroy anybody in his way.

MR. SLATES: No -- no, sir. He never --

THE COURT: Crush. Excuse me.

MR. SLATES: He said that about Steve Schiffman. He never said anything like that about Mr. Robertson.

THE COURT: Okay.

MR. SLATES: And with respect to the good faith belief, he's sitting there with a bid for 60,000 and then 56,000 and then one for 21,000. That's before he's gotten the 32.

THE COURT: Uh-huh.

MR. SLATES: Mr. Robertson's own words: Whichever one gives us the best deal is the one we go with. He believed he had the right to go with the lower bid. He believed he had the right to tell SBS to make a change so that he could go with the lower bid. He had a good faith belief that he had the right to --

THE COURT: That's what any good businessman should do; right?

MR. SLATES: You go out of business real fast if you go with the high bidder every time.

THE COURT: Unless you sign a contract.

MR. SLATES: No. I think if you're in the construction business and you go with the high bidder every time, things are going to go bad for you real fast. But let me just get to the last point. And I want to quote Mr. Brown on this.

THE COURT: Uh-oh.

MR. SLATES: He says, if you say you can fly, you've got to prove you can. Our last point is that we have a superior interest.

THE COURT: Yes, sir.

MR. SLATES: And the owner has a superior interest. I can say that. The owner owns the property. The owner occupies the property. The owner

pays for the property. But you don't have to take my word for it. You can take Mr. Robertson's word for it. Because I asked him those same questions from the stand and he said yes to every one. So, I'm flying right now because I have proven that the owner has a superior interest through Mr. Robertson's testimony.

THE COURT: Yes, sir.

MR. SLATES: That's all I have, Your Honor.

THE COURT: Okay. Thank you. Anything else from anybody?

MR. BROWN: Just briefly. With regard to the attorney's fees issue, I do agree that the majority of my fees are -- and will be in my affidavit -- where incurred against Tri-Bar. And with regard to the damage issue, I would simply say -- I think it's 9.031 of -- of the SBS/Robertson contract.

THE COURT: What exhibit is that, please?

MR. BROWN: That would be Exhibit 1. And we believe it will address it. It does start off that in the event of any damages, but there is a provision in there dealing with the fact that -- that if -- where in the event the subcontractor is liable, then the contractor entitles himself to projected overhead, corporate office, overhead profit, et cetera,

liquidated damages.  And that section would have to be reflective.  I mean, it would just have to be.  It's in the contract, so if it applies one way, it applies the other.

THE COURT:  Okay.  I'll look into that. Anyone else?  Mr. Clark?

MR. CLARK:  No, Your Honor.

MR. CLUCK:  Thank you for your time, Your Honor.

THE COURT:  Okay.

MR. BROWN:  Thank you.

MR. CLARK:  Oh, when do you want the attorney's fees affidavits?

THE COURT:  Get them by -- I'll have the order within three days after I get everybody's, so I'd like to have them by Friday.  Can y'all do that?

MR. SLATES:  Close of business Friday?

THE COURT:  Yes, sir.  Can you do that?

MR. SLATES:  Sure.

MR. BROWN:  Yes, sir.

THE COURT:  And your fee -- your time sheets or whatever you need to back it up on it. Redact whatever you want for work product, if it matters at this point.

MR. CLARK:  We actually already have them

in evidence, but we'll attach them to the affidavit so it's --

THE COURT: Well, I've got it if you just refer me to where to look in all this. Okay.

MR. CLARK: Okay.

MR. JONES: Will there be any time for objections to affidavits? Seems like there should be.

THE COURT: What do you want? Let me ask you this. Did anybody put on evidence from their clients that they agreed to hire attorneys and agreed to pay reasonable and necessary attorney's fees?

MR. CLARK: I did.

THE COURT: You did? I didn't hear it. Want me to consider that? Nobody wants me to consider that; right?

MR. BROWN: No, Your Honor.

THE COURT: Okay.

MR. JONES: We promise we did. But maybe affidavits by Friday and objections by Tuesday or --

THE COURT: Tuesday at 5:00? Tuesday at midnight?

MR. JONES: I'm sorry?

THE COURT: When do you want them, Mr. Jones? Just tell me. How about Tuesday at 5:00?

MR. JONES: For objections?

THE COURT:  Responses -- your responses to --

MR. JONES:  Okay.  Assuming that affidavits are delivered to us --

THE COURT:  Let's make sure we deliver something by 5:00 on Friday.  In hand by 5:00 on Friday.

MR. SLATES:  Your Honor, thank you.

THE COURT:  Okay.  It was a pleasure listening to all of y'all.

MR. JONES:  Thank you for indulging us on our time.

THE COURT:  Thank y'all.

THE STATE OF TEXAS  *

COUNTY OF KENDALL   *

I, TAMI L. WOLFF, Certified Shorthand Reporter in and for the State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing or orally by counsel for the parties to be included in this volume of the reporter's record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this reporter's record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

I further certify that the total cost of the preparation of this reporter's record is $_____ and was paid/will be paid by _____.

WITNESS MY OFFICIAL HAND on this, the _____ day of _____, 2015.

_____/s/_____
TAMI L. WOLFF
Texas CSR 5833
Expiration: 12/31/15
Kendall County Courthouse
201 E. San Antonio, Suite 212
Boerne, Texas  78006
(830) 331-8286